1  LIONEL SAWYER & COLLINS
   Samuel S. Lionel (SBN 1766)
2  Paul R. Hejmanowski (SBN 94)
   Charles H. McCrea, Jr. (SBN 104)
3  1700 Bank of America Plaza
   300 South Fourth Street
4  Las Vegas, Nevada 89101
   Telephone:   (702) 383-8888
5  Facsimile:    (702) 383-8845

6  PAUL HASTINGS LLP
   William F. Sullivan*
7  Thomas A. Zaccaro*
   Howard M. Privette*
8  Thomas P. O'Brien*
   John S. Durrant*
9  515 South Flower Street, 25th Floor
   Los Angeles, CA 90071
10 Telephone:   (213)683-6000
   Facsimile:    (213)683- 0705

11

12 Attorneys for Defendants and Counterclaimants
   ARUZE USA, INC. and UNIVERSAL
13 ENTERTAINMENT CORPORATION
   *pro hac vice application forthcoming

14

15          **UNITED STATES DISTRICT COURT**

16              **DISTRICT OF NEVADA**

17

| | |
|---|---|
| 18  WYNN RESORTS, LIMITED, a Nevada Corporation, | CASE NO: 2:12-cv-00400-LRH-PAL |
| 19 | |
| 20                    Plaintiff, | **COUNTERCLAIM AND ANSWER** |
|      vs. | **OF ARUZE USA, INC. AND** |
| 21 | **UNIVERSAL ENTERTAINMENT** |
|      KAZUO OKADA, an individual, ARUZE | **CORPORATION** |
| 22  USA, INC., a Nevada corporation, | |
|      UNIVERSAL ENTERTAINMENT | **JURY DEMAND** |
| 23  CORPORATION, a Japanese corporation, | |
| 24                    Defendants. | |
| 25  ARUZE USA, INC., a Nevada corporation, | |
| 26  UNIVERSAL ENTERTAINMENT CORPORATION, a Japanese corporation | |
| 27                    Counterclaimants, | |
| 28  vs. | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WYNN RESORTS, LIMITED, a Nevada
Corporation, STEPHEN A. WYNN, an
individual, KIMMARIE SINATRA, an
individual, LINDA CHEN, an individual,
RAY R. IRANI, an individual, RUSSELL
GOLDSMITH, an individual, ROBERT J.
MILLER, an individual, JOHN A. MORAN,
an individual, MARC D. SCHORR, an
individual, ALVIN V. SHOEMAKER, an
individual, D. BOONE WAYSON, an
individual, ELAINE P. WYNN, an individual,
ALLAN ZEMAN, an individual,

                    Counterdefendants.

1

**TABLE OF CONTENTS**

2

Page

3      COUNTERCLAIM ............................................................................ 1

4      JURISDICTION AND VENUE.......................................................... 1

5      NATURE OF THE ACTION.............................................................. 2

6      PARTIES ........................................................................................... 4

       GENERAL ALLEGATIONS ............................................................. 7

7      I.     MR. OKADA AND STEVE WYNN LAUNCH WYNN RESORTS................... 7

8             A.    Turned Out By Mirage Resorts, Steve Wynn Turns to Kazuo Okada
9                   to Finance the New Wynn Project ................................................ 7

10            B.    The Stockholders Agreement................................................ 8

11            C.    Wynn Resorts' Original Articles of Incorporation ................... 10

              D.    The Contribution Agreement ................................................ 10
12
              E.    After Securing Aruze USA's Contribution, Steve Wynn Unilaterally
13                  Amends the Articles of Incorporation.......................................... 11

14            F.    Wynn Resorts Goes Public........................................................ 13

15            G.    The Close and Trusting Relationship of Steve Wynn and Mr. Okada ...... 13

16     II.    UNIVERSAL DISCLOSES AND ULTIMATELY PURSUES FOREIGN
              DEVELOPMENT PROJECTS .................................................................. 14

17            A.    In 2007, Universal Fully Discloses to Wynn Resorts Its Interest In
18                  Pursuing a Casino Project in the Philippines ............................. 14

19            B.    With the Blessing of Wynn Resorts, Universal Commits Significant
                    Funds and Energy to the Philippine Project................................. 16
20
              C.    Steve Wynn and Elaine Wynn Divorce ...................................... 17
21
              D.    Steve Wynn and Kazuo Okada Visit the Philippines in 2010, as
22                  Wynn Resorts Considers Involvement with the Philippine Project........... 18

23            E.    Over Kazuo Okada's Objection, Wynn Resorts Makes an
                    Unprecedented $135 Million Donation For Wynn Macau ........................ 20
24
              F.    Steve Wynn and Kim Sinatra Fraudulently Promise Mr. Okada
25                  Financing for the Philippine Project .......................................... 22

26            G.    The Chair of Universal's and Aruze Gaming America's Compliance
                    Committee Resigns ................................................................. 25

27

28

**TABLE OF CONTENTS**
(continued)

Page

III.  STEVE WYNN DIRECTS WYNN RESORTS TO CONDUCT A
PRETEXTUAL INVESTIGATION FOR THE PURPOSE OF
REDEEMING ARUZE USA'S SHARES ............................................................ 26

A.   Wynn Resorts Seeks Kazuo Okada's Resignation and Threatens
Redemption in an Attempt to Secure a Personal Benefit for Steve
Wynn ................................................................................................................ 26

B.   Steve Wynn and Kim Sinatra Try to Intimidate and Threaten Mr.
Okada, While Hiding Supposed Evidence of Wrongdoing ...................... 27

C.   A Letter From Steve Wynn's Outside Lawyer Confirms that, While
Wynn Resorts Had Already Determined the Outcome, a Pretextual
"Investigation" is Only Just Starting .......................................................... 29

D.   Wynn Resorts Refuses to Allow Mr. Okada and Aruze USA to
Review Any Supposed "Evidence" ............................................................... 30

E.   The Board Summarily Removes Mr. Okada As Vice-Chairman ............. 30

F.   Kazuo Okada Seeks More Information Regarding Wynn Macau ............ 31

G.   Aruze USA Nominates Directors; But Steve Wynn Refuses to
Endorse Them Despite His Obligation to Do So ....................................... 31

H.   The Freeh Investigation Proceeds Without Seeking Any Input From
Kazuo Okada ................................................................................................... 32

I.   Freeh Sporkin Refuses to Provide Meaningful Information Regarding
the Investigation to Kazuo Okada ............................................................... 33

J.   Kazuo Okada Voluntarily Sits For A Full-Day Interview With Freeh
Sporkin ............................................................................................................. 34

K.   Wynn Resorts Allows No Opportunity for A Reasonable Response ........ 34

L.   Steve Wynn Hurriedly Schedules Board of Directors Meeting ................. 37

M.   Steve Wynn Tries to Use the Threat of Redemption to Buy Aruze
USA's Stock at a Substantial Discount ....................................................... 38

IV.   WYNN RESORTS' UNFOUNDED AND UNPRECEDENTED
REDEMPTION OF MORE THAN $2.7 BILLION OF ARUZE USA'S
SHARES ............................................................................................................... 38

A.   The Board Hurriedly Meets and Rushes to Redeem Aruze USA's
Stock ................................................................................................................. 38

B.   Aruze USA Disputes That Redemption Has Occurred ............................. 40

C.   The Board Redeems on False Premises ...................................................... 41

-ii-

# TABLE OF CONTENTS
## (continued)

Page

D. Even if Aruze USA Was Subject to the Redemption Provision (Which it is Not), the Unilateral Blanket 30% Discount that Wynn Resorts Applied to the Stock is Erroneous ................................. 42

E. The Timing of the Redemption Suggests Wynn Resorts Traded on Inside Information ........................................................... 43

CLAIMS FOR RELIEF ................................................................................ 45

COUNT I ................................................................................................... 45

Declaratory Relief (By Aruze USA and Universal Against Wynn Resorts and the Wynn Directors) .................................................... 45

COUNT II .................................................................................................. 47

Permanent Prohibitory Injunction (By Aruze USA Against Wynn Resorts and the Wynn Directors) .................................................... 47

COUNT III ................................................................................................ 49

Permanent Mandatory Injunction (By Aruze USA Against Wynn Resorts and the Wynn Directors) .................................................... 49

COUNT IV ................................................................................................ 50

Breach of Contract in Connection with Wynn Resorts' Involuntary Redemption (By Aruze USA Against Wynn Resorts) ........................... 50

COUNT V .................................................................................................. 51

Breach of Articles of Incorporation/Breach of Contract in Connection with Wynn Resorts' Discounting Method of Involuntary Redemption (By Aruze USA Against Wynn Resorts) ................................................. 51

COUNT VI ................................................................................................ 52

Breach of Fiduciary Duty (By Aruze USA Against the Wynn Directors) .......... 52

COUNT VII ............................................................................................... 55

Imposition of a Constructive Trust and Unjust Enrichment (By Aruze USA Against Wynn Resorts) .................................................... 55

COUNT VIII .............................................................................................. 56

Conversion (By Aruze USA Against Wynn Resorts) ......................................... 56

COUNT IX ................................................................................................ 57

Violations Of Nevada's Racketeer Influenced And Corrupt Organizations Act (RICO) (N.R.S. § 207.350, Et. Seq.) (By Aruze USA Against Steve Wynn And Kim Sinatra) ........................................................... 57

1

**TABLE OF CONTENTS**
(continued)

2

Page

3    COUNT X ........................................................................................... 61

4        Fraud/Fraudulent Misrepresentation in Connection with Financing for Aruze
         USA (By Aruze USA Against Wynn Resorts, Steve Wynn, and Kim
5        Sinatra) ......................................................................................... 61

6    COUNT XI ........................................................................................ 63

7        Negligent Misrepresentation in Connection with Financing for Aruze USA
         (By Aruze USA Against Wynn Resorts, Steve Wynn, and Kim Sinatra) ........... 63
8
     COUNT XII ....................................................................................... 65
9
         Civil Conspiracy in Connection with Financing for Aruze USA (By Aruze
10       USA Against Steve Wynn and Kim Sinatra) ....................................... 65

11   COUNT XIII ..................................................................................... 67

12       Fraud/Fraud in the Inducement of the Contribution Agreement (By Aruze
         USA Against Wynn Resorts and Steve Wynn) .................................... 67

13   COUNT XIV ..................................................................................... 70

14       Negligent Misrepresentation in Connection with the Contribution
         Agreement (By Aruze USA Against Wynn Resorts and Steve Wynn) ............... 70
15
     COUNT XV ...................................................................................... 72
16
         Breach of Contract in Connection with the Stockholders Agreement (By
17       Aruze USA Against Steve Wynn) ..................................................... 72

18   COUNT XVI ..................................................................................... 73

19       Breach of Covenant of Good Faith and Fair Dealing in Stockholders
         Agreement (By Aruze USA Against Steve Wynn) ................................. 73
20
     COUNT XVII .................................................................................... 75
21
         Claim for Violations of Section 10(b) of the Securities Exchange Act of
22       1934 and SEC Rule 10b-5(a) Promulgated Thereunder (By Aruze USA
         Against Wynn Resorts and Steve Wynn) ........................................... 75
23
     COUNT XVIII ................................................................................... 79
24
         Claim for Violations of Section 10(b) of the Securities Exchange Act of
25       1934 and SEC Rule 10b-5(c) Promulgated Thereunder (By Aruze USA
         Against Wynn Resorts and Steve Wynn) ........................................... 79
26
     COUNT XIX ...................................................................................... 83

27

28

1
2

**TABLE OF CONTENTS**
**(continued)**

                                                                                    Page

3
4

Claim for Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5(b) Promulgated Thereunder (By Aruze USA Against Wynn Resorts and Steve Wynn)................................................ 83

5

COUNT XX .................................................................................................... 87

6
7

Claim for Violations of Section 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder (By Aruze USA Against Steve Wynn) ........................................................................................ 87

8

PRAYER FOR RELIEF.................................................................................... 88

9
10

ANSWER OF DEFENDANTS ARUZE USA, INC. AND UNIVERSAL ENTERTAINMENT CORPORATION TO THE COMPLAINT ...................... 89

11

ANSWER TO PRAYER FOR RELIEF ........................................................... 99

AFFIRMATIVE DEFENSES ......................................................................... 100

12

FIRST AFFIRMATIVE DEFENSE (No Injury) .................................... 100

13

SECOND AFFIRMATIVE DEFENSE (Failure to State a Claim) ................... 100

14

THIRD AFFIRMATIVE DEFENSE (No Breach) ............................................ 100

15

FOURTH AFFIRMATIVE DEFENSE (Standing) ........................................... 100

16

FIFTH AFFIRMATIVE DEFENSE (Statute of Limitations) ........................... 101

17

SIXTH AFFIRMATIVE DEFENSE (Contributory Negligence)....................... 101

18

SEVENTH AFFIRMATIVE DEFENSE (Comparative Negligence) ................ 101

EIGHTH AFFIRMATIVE DEFENSE (Superseding Cause) ............................ 101

19

NINTH AFFIRMATIVE DEFENSE (Good Faith) ........................................... 102

20

TENTH AFFIRMATIVE DEFENSE (Speculative Damages)........................... 102

21

ELEVENTH AFFIRMATIVE DEFENSE (No Causation)................................ 102

22

TWELFTH AFFIRMATIVE DEFENSE (Failure to Mitigate)......................... 102

23

THIRTEENTH AFFIRMATIVE DEFENSE (Breach of Fiduciary Duty by Wynn Resorts' Board) ................................................................ 102

24

FOURTEENTH AFFIRMATIVE DEFENSE (Improper Taking) ..................... 103

25

FIFTEENTH AFFIRMATIVE DEFENSE (Violation of Nevada and U.S. Law) ............................................................................................... 103

26

SIXTEENTH AFFIRMATIVE DEFENSE (Lack of Subject Matter Jurisdiction)................................................................................... 103

27
28

1

## TABLE OF CONTENTS
### (continued)

2

Page

3    SEVENTEENTH AFFIRMATIVE DEFENSE (Fraudulent Inducement)......... 103

4    EIGHTEENTH AFFIRMATIVE DEFENSE (Limitation on Liability)............. 104

5    NINETEENTH AFFIRMATIVE DEFENSE (Insufficient Pleadings) .............. 104

6    TWENTIETH AFFIRMATIVE DEFENSE (Assumption of Risk) ................... 104

7    TWENTY-FIRST AFFIRMATIVE DEFENSE (License)................................. 104

     TWENTY-SECOND AFFIRMATIVE DEFENSE (Unclean Hands)................ 104

8    TWENTY-THIRD AFFIRMATIVE DEFENSE (Estoppel) .............................. 105

9    TWENTY-FOURTH AFFIRMATIVE DEFENSE (Laches) ............................ 105

10   TWENTY-FIFTH AFFIRMATIVE DEFENSE (Waiver) ................................ 105

11   TWENTY-SIXTH AFFIRMATIVE DEFENSE (Acquiescence) ..................... 105

12   TWENTY-SEVENTH AFFIRMATIVE DEFENSE (Ratification) ................... 105

13   TWENTY-EIGHTH AFFIRMATIVE DEFENSE (Res Judicata) ..................... 105

14   TWENTY-NINTH AFFIRMATIVE DEFENSE (Unconscionability) .............. 106

     THIRTIETH AFFIRMATIVE DEFENSE (Contrary to Public Policy)............ 106

15   THIRTY-FIRST AFFIRMATIVE DEFENSE (Illegal Penalty) ........................ 106

16   THIRTY-SECOND AFFIRMATIVE DEFENSE (Unlawful Forfeiture) .......... 106

17   THIRTY-THIRD AFFIRMATIVE DEFENSE (Reserve All Rights)................. 106

18   JURY DEMAND ........................................................................................ 107

19

20

21

22

23

24

25

26

27

28

1
2

# COUNTERCLAIM

## JURISDICTION AND VENUE

3       1.      This Court has jurisdiction over this Counterclaim pursuant to Section 27 of

4   the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa; 28 U.S.C. §

5   1331; and 28 U.S.C. § 1367.

6       2.      The claims asserted herein arise under Section 10(b) of the Exchange Act,

7   15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240 10b-5, the

8   Nevada Racketeer Influenced and Corrupt Organizations Act ("RICO"), N.R.S. § 207.400

9   *et seq.*, and Nevada statutory and common law.  Additionally, the claims asserted herein

10  raise substantial federal questions under the Foreign Corrupt Practices Act of 1977

11  ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.*

12      3.      Venue is proper in this District pursuant to:  (i) 15 U.S.C. § 78aa, because

13  this is the District in which acts constituting the violation occurred and in which

14  Defendants transact business; and (ii) 28 U.S.C. § 1391(b)(2), because this is a District in

15  which a substantial part of the events or omissions giving rise to the claim occurred, or a

16  substantial part of the property that is the subject of the action is situated.

17
18
19
20
21
22
23
24
25
26
27
28

-1-

COUNTERCLAIM AND ANSWER

**NATURE OF THE ACTION**

4.     Plaintiff and Counterdefendant Wynn Resorts, Limited ("Wynn Resorts" or the "Company") initiated this litigation on the same night it claims to have forcibly purchased (*i.e.*, "redeemed") the nearly 20% of its own common stock held by Counterclaimant Aruze USA, Inc. ("Aruze USA"). Wynn Resorts understood that, as soon as it became known that it was doing this, Aruze USA would sue Wynn Resorts and the Wynn Directors.[1] Wynn Resorts had undertaken the redemption in the dead of night through a rushed and secretive process.

5.     Among other things, Wynn Resorts purported to redeem the shares at a flat 30% discount to the most recent market price. Aruze USA's interests, valued by the market at more than $2.7 billion, would be forcibly purchased in exchange for a promissory note to pay approximately $1.9 billion in a single "balloon payment" 10 years from now. So Wynn Resorts raced to court, electronically filing a complaint at 2:14 a.m. on a Sunday morning – even before giving notice to Aruze USA of the purported redemption. Wynn Resorts apparently thought that its position as the named "plaintiff" would help obfuscate the issues and distract the court from the claims of wrongdoing sure to be filed against it by Aruze USA and Counterclaimant Universal Entertainment Corporation ("Universal" and collectively with Aruze USA, "Counterclaimants"). Wynn Resorts' cynical tactics are unavailing. Based on the facts and the law, it is clear that it is Counterclaimants who have been grievously damaged in this case, and any suggestion to the contrary is entirely without credibility.

6.     This Counterclaim arises because this purported redemption would: (a) violate the express terms of agreements between Wynn Resorts and Aruze USA; (b) allow Mr. Wynn and others to profit unjustly from their illegal acts and a process that

---

[1] The Wynn Resorts' Board of Directors (the "Board"), other than Kazuo Okada ("Kazuo Okada" and "Mr. Okada"), are Stephen A. Wynn ("Mr. Wynn" or "Steve Wynn"), Linda Chen, Russell Goldsmith, Ray R. Irani, Robert J. Miller, John A. Moran, Marc D. Schorr, Alvin V. Shoemaker, Boone Wayson, Elaine P. Wynn, and Allan Zeman.

1  was corrupt and unfair; and (c) subject Aruze USA to an unconscionably punitive remedy

2  based on an unproven pretext.

3       7.     To be clear at the outset, Aruze USA disputes that any redemption has

4  occurred.  Among other things, even if the redemption provision in the Company's

5  Second Amended Articles of Incorporation were legally enforceable (which it is not), the

6  Board's vote of redemption is void *ab initio*, because Wynn Resorts is barred by contract

7  from redeeming Aruze USA's securities.  According to Wynn Resorts, the stock held by

8  Aruze USA is subject to transfer restrictions in a stockholders agreement (the

9  "Stockholders Agreement").  The transfer restrictions in the Stockholders Agreement (to

10  which Wynn Resorts agreed to be bound), if valid, preclude any redemption of Aruze

11  USA's stock.  In addition, Aruze USA's stock was never subject to the redemption

12  provision in the Company's Articles of Incorporation, because Aruze USA agreed to

13  purchase Wynn Resorts stock *before* the redemption provision became effective.  As a

14  threshold matter, then, the applicable contracts relied upon by Wynn Resorts to justify its

15  conduct actually bar Wynn Resorts' purported redemption of Aruze USA's stock.

16       8.     Even if the Articles of Incorporation allowed the redemption of

17  Aruze USA's interests in Wynn Resorts (which they do not), there was no legitimate

18  factual or legal basis to invoke the redemption provision in this case.  Wynn Resorts

19  undertook a secret investigation, hiding the subjects of the investigation from Aruze USA

20  by erroneously invoking attorney-client privilege and confidentiality, even after Wynn

21  Resorts had leaked a "report" of the investigation to the *Wall Street Journal*.  Wynn

22  Resorts refused Aruze USA any reasonable opportunity to respond prior to redeeming

23  Aruze USA's interests, despite prior written promises to do so.  If Wynn Resorts had

24  provided the opportunity, it would be clear why redemption is unwarranted.

25       9.     The Wynn Directors breached their fiduciary duties to Wynn Resorts and to

26  Aruze USA in not undertaking a thorough, independent, and objective examination of the

27  law, facts, and evidence before purporting to usurp the role of the gaming authorities in

28  finding Aruze USA "unsuitable."  Similarly, they breached their duties by then voting for

-3-

COUNTERCLAIM AND ANSWER

1    a wholly unnecessary and improper "redemption" on unconscionable terms.  As a result,

2    the Wynn Directors cannot rely on the "business judgment rule," as they did not act in a

3    fully informed, good faith, and independent manner, and their actions are both contrary to

4    the law and not objectively reasonable.

5         10.    Apart from the lack of any legal basis for Wynn Resorts' actions,

6    Aruze USA sues because Wynn Resorts, for all its accomplishments, is not a corporation

7    in any ordinary sense.  Rather, Wynn Resorts' flamboyant Chairman, Mr. Wynn, has run

8    Wynn Resorts as a personal fiefdom, packing the Board with friends who do his personal

9    bidding, and paying key executives exorbitant amounts for their unwavering fealty.

10        11.    In the course of trying to illegally force out Aruze USA as Wynn Resorts'

11   largest stockholder, Mr. Wynn and Wynn Resorts' General Counsel Kimmarie Sinatra

12   ("Kim Sinatra" or "Ms. Sinatra") committed a series of predicate acts of racketeering,

13   which include fraud, acquiring property under false pretenses, acquiring signatures under

14   false pretenses, and other similar wrongful activities.  Mr. Wynn and Ms. Sinatra executed

15   on a scheme and pattern of racketeering activity, the aim of which was to defraud, defame,

16   and steal from Aruze USA and its President, Mr. Okada, by taking Aruze USA's interest

17   in Wynn Resorts, for the purpose of illegally placing and maintaining the control of Wynn

18   Resorts in a single man – Mr. Wynn.  The wrongful acts complained of here cannot be

19   countenanced, and the purported taking of Aruze USA's property cannot stand

20                                    **PARTIES**

21        12.    Counterclaimant Aruze USA is a company organized and existing under the

22   laws of the State of Nevada and is a wholly-owned subsidiary of Universal.  Aruze USA

23   has its principal place of business in Las Vegas, Nevada.  Aruze USA has been found

24   suitable by the Nevada Gaming Commission as a stockholder of Wynn Resorts.  Aruze

25   USA owns 24,549,222 shares or 19.66% of the total outstanding stock of Wynn Resorts,

26   making it the largest single owner of Wynn Resorts stock.

27        13.    Counterclaimant Universal (f/k/a Aruze Corp.) is a corporation organized

28   and existing under the laws of Japan.  Universal manufactures and sells pachislot and

-4-

COUNTERCLAIM AND ANSWER

1   pachinko machines.  Universal is registered with the Nevada Gaming Commission, and

2   was deemed suitable by the Nevada Gaming Commission as a 100% shareholder of Aruze

3   USA.  Mr. Okada is the Chairman of the Board of Universal.

4         14.     Counterdefendant Wynn Resorts, Limited is a corporation organized and

5   existing under the laws of the State of Nevada with its principal place of business in Las

6   Vegas, Nevada.  Wynn Resorts' stock is publicly traded on NASDAQ under the ticker

7   symbol "WYNN."

8         15.     Counterdefendant Stephen A. Wynn is the Chairman of the Board and Chief

9   Executive Officer of Wynn Resorts and is a resident of Nevada.  Mr. Wynn owns

10   10,026,708 shares[2] of the common stock of Wynn Resorts.

11         16.     Counterdefendant Kimmarie Sinatra is the General Counsel, Secretary, and a

12   Senior Vice President of Wynn Resorts and, on information and belief, is a resident of

13   Nevada.  Ms. Sinatra owns 40,887 shares of the common stock of Wynn Resorts.

14         17.     Counterdefendant Elaine P. Wynn is a director of Wynn Resorts and, on

15   information and belief, is a resident of Nevada.  Elaine Wynn is Mr. Wynn's ex-spouse.

16   Elaine Wynn owns 9,742,150 shares of the common stock of Wynn Resorts.

17         18.     Counterdefendant Linda Chen is a director of Wynn Resorts and, on

18   information and belief, is a resident of Macau.  Ms. Chen owns 265,000 shares of the

19   common stock of Wynn Resorts.

20         19.     Counterdefendant Ray R. Irani is a director of Wynn Resorts and, on

21   information and belief, is a resident of California.  Mr. Irani owns 18,000 shares of the

22   common stock of Wynn Resorts.

23         20.     Counterdefendant Russell Goldsmith is a director of Wynn Resorts and, on

24   information and belief, is a resident of California.  Mr. Goldsmith owns 40,000 shares of

25   the common stock of Wynn Resorts.

26

27   [2] All references to the number of shares owned by Counterdefendants are as of March 1, 2012, as disclosed in Wynn Resorts' Schedule 14A Proxy Statement, filed with the SEC on March 7,

28   2012.

1    21.    Counterdefendant Robert J. Miller is a director of Wynn Resorts and, on

2    information and belief, is a resident of Nevada.  Mr.  Miller owns 20,500 shares of the

3    common stock of Wynn Resorts.

4    22.    Counterdefendant John A. Moran is a director of Wynn Resorts and, on

5    information and belief, is a resident of Florida.  Mr. Moran owns 190,500 shares of the

6    common stock of Wynn Resorts.

7    23.    Counterdefendant Marc D. Schorr is a director and Chief Operating Officer

8    of Wynn Resorts and, on information and belief, is a resident of Nevada.  Mr. Schorr owns

9    250,000 shares of the common stock of Wynn Resorts.

10    24.    Counterdefendant Alvin V. Shoemaker is a director of Wynn Resorts and,

11    on information and belief, is a resident of New Jersey.  Mr.  Shoemaker owns 40,500

12    shares of the common stock of Wynn Resorts.

13    25.    Counterdefendant D. Boone Wayson is a director of Wynn Resorts and, on

14    information and belief, is a resident of Maryland.  Mr. Wayson owns 90,500 shares of the

15    common stock of Wynn Resorts.

16    26.    Counterdefendant Allan Zeman is a director of Wynn Resorts and, on

17    information and belief, is a resident of Macau.  Mr. Zeman owns 30,500 shares of the

18    common stock of Wynn Resorts.

19

20

21

22

23

24

25

26

27

28

COUNTERCLAIM AND ANSWER

## GENERAL ALLEGATIONS

**I.    MR. OKADA AND STEVE WYNN LAUNCH WYNN RESORTS**

    **A.    Turned Out By Mirage Resorts, Steve Wynn Turns to Kazuo Okada to Finance the New Wynn Project**

    27.    Mr. Wynn has a long history of involvement in Las Vegas as a casino operator.  As Las Vegas changed, Mr. Wynn sought to present himself as a representative of the new "corporate" Las Vegas.  Mr. Wynn developed Mirage Resorts, Inc., a casino conglomerate that owned and operated the Mirage, Treasure Island, and Bellagio.  On May 31, 2000, MGM Grand Inc. completed a merger with Mirage Resorts, Inc.  In June 2000, after a bruising boardroom battle, which centered on allegations that Mr. Wynn misappropriated company funds, MGM Grand, Inc. ousted Mr. Wynn as Chief Executive Officer of Mirage Resorts.

    28.    Humiliated by his public ouster, Mr. Wynn was anxious to re-enter the casino business and rebuild his reputation and standing in Las Vegas.  He purchased the old Desert Inn casino and had plans to build a new casino on the site – it was to be a monument to himself, called "Wynn."  But Mr. Wynn lacked the capital to fund the development of the casino, so he undertook an extensive search for investors.  Having recently been forced out of Mirage Resorts, Inc., however, he was shunned by other sources of capital; Mr. Wynn eventually called on Mr. Okada, who became the means for Mr. Wynn to get back on his feet.

    29.    Mr. Okada was and is a highly successful Japanese entrepreneur and himself a pioneer in the gaming industry.  After leaving high school, Mr. Okada attended an electronics trade school.  In 1969, Mr. Okada founded Universal Lease Co. Ltd., which is now Universal.  Mr. Okada became a leader in the businesses of pachinko.  In addition, Mr. Okada founded a company that created one of the first video poker machines.  In fact, Mr. Wynn originally met Mr. Okada when one of Mr. Okada's affiliated companies, Aruze Gaming America, was selling electronic gaming machines in Nevada.

-7-

30.     Beginning in November 2000, Mr. Wynn used a Nevada limited liability company called Valvino Lamore, LLC ("Valvino") as the holding entity for his new Desert Inn casino project.  After in-person discussions between Mr. Wynn and Mr. Okada, Aruze USA made a contribution of $260 million in cash to Valvino in exchange for 50% of the membership interests in Valvino effective November 30, 2000.  This contribution was the seed capital that allowed for the development of what is now Wynn Resorts. Valvino is referred to by Wynn Resorts as Wynn Resorts' "predecessor."

31.     In April 2002, Aruze USA made two additional contributions totaling $120 million to Valvino.  Mr. Wynn told Mr. Okada that $30 million was related to Macau, but Mr. Wynn did not explain to Mr. Okada how Mr. Wynn actually spent the money. Serious questions now exist about how Mr. Wynn used the money and whether Mr. Wynn used the funds for his personal benefit and/or for other inappropriate purposes.  There are also serious questions about the use of the other $90 million Aruze USA contributed.

**B.      The Stockholders Agreement**

32.     In 2002, all three owners of LLC interests in Valvino – Mr. Wynn, Aruze USA, and Baron Asset Fund[3] – understood that the Wynn organization was planning to go public as Wynn Resorts.  This required a series of legal steps by which the owners' interests in Valvino were converted into shares of a newly formed corporation, "Wynn Resorts, Limited," that could then sell additional shares to the public.

33.     On April 11, 2002, prior to the filing of the Articles of Incorporation for Wynn Resorts, the three owners of LLC interests in Valvino – Mr. Wynn, Aruze USA, and Baron Asset Fund – entered into the Stockholders Agreement, which imposed certain restrictions on the sale of the stock they were to receive in "NewCo," the entity that would become Wynn Resorts.  As described in Wynn Resorts' prospectus, dated October 29, 2002, "the stockholders agreement establishes various rights among Mr. Wynn, Aruze

---

[3] Baron Asset Fund is a Massachusetts business trust comprised of a series of funds.  It became a member of Valvino pursuant to the First Amendment to Amended and Restated Operating Agreement of Valvino Lamore, LLC, dated April 16, 2001.

-8-

1    USA and Baron Asset Fund with respect to the ownership and management of Wynn

2    Resorts."

3        34.    Notably, the parties to the Stockholders Agreement stated that the terms of

4    that agreement were a condition of transferring their LLC interests in Valvino to Wynn

5    Resorts.  Specifically, the Stockholders Agreement stated "as a condition to their

6    willingness to form [Wynn Resorts], either through the contribution of their interests in

7    the LLC or through a different technique, the Stockholders are willing to agree to the

8    matters set forth" in the Stockholders Agreement.

9        35.    Wynn Resorts publicly acknowledged the impact of the Stockholders

10   Agreement on the Company and the shareholders, disclosing in Wynn Resorts' Form S-

11   1/A filed with the SEC on October 7, 2002 that the Stockholders Agreement established

12   "restrictions on the transfer of the shares of Wynn Resorts' common stock owned by the

13   parties to the stockholders agreement."  In this way, Wynn Resorts – and all other

14   stockholders – were aware that there were limitations written in the Stockholders

15   Agreement on the transferability of the Wynn Resorts stock held by Aruze USA.

16       36.    The Stockholders Agreement contained certain transfer restrictions on

17   shares held by Aruze USA.  The agreement defined a "[t]ransfer" as "any . . . disposition,

18   either voluntary or *involuntary*" (emphasis added).  The agreement provided that such

19   securities may only be transferred to Mr. Okada, an immediate family member of Mr.

20   Okada, a family trust, or a company related to Aruze USA.  No other transfers were

21   allowed.  For example, there is no provision that would allow Wynn Resorts to buy or

22   take, or redeem the securities.  To the contrary, the Stockholders Agreement expressly

23   made **any** transfer of shares – including any involuntary transfers – in violation of the

24   Agreement "null and void *ab initio*."  As explained in further detail below, because Wynn

25   Resorts expressly adopted this transfer restriction at the time of the contribution of Aruze

26   USA's LLC interests in Valvino, and Wynn Resorts asserts that these transfer restrictions

27   are legally valid, Wynn Resorts had no legal right or ability to redeem Aruze USA's

28   interests in Wynn Resorts.

COUNTERCLAIM AND ANSWER

37.     Apart from removing Aruze USA from the purview of later-adopted redemption provisions in Wynn Resorts' Articles of Incorporation, the Stockholders Agreement also contained provisions that allowed Mr. Wynn to nominate a bare majority of directors, and Aruze USA to nominate all remaining directors. Although Aruze USA repeatedly tried over the years to nominate directors, Mr. Wynn refused to allow this to happen, instead nominating all of the directors himself to ensure and perpetuate his complete control of the Board.

38.     Finally, the Stockholders Agreement gave Mr. Wynn the power of attorney to sign all documentation necessary to transfer Aruze USA's LLC interests in Valvino to Wynn Resorts in exchange for Wynn Resorts stock, and thereby created a fiduciary duty as between Mr. Wynn and Aruze USA.

39.     On November 8, 2006, Mr. Wynn caused Aruze USA to enter into an Amendment to the Stockholders Agreement which purports to contain a mutual restriction on the sale of stock without the other party's written consent. All other relevant terms of the Stockholders Agreement remained unchanged.

**C.      Wynn Resorts' Original Articles of Incorporation**

40.     On June 3, 2002, Mr. Wynn, on behalf of Wynn Resorts, caused the filing of the Company's initial Articles of Incorporation. Those Articles of Incorporation did not include any provision establishing Wynn Resorts' purported right to redeem shares held by "Unsuitable Person[s]."

**D.      The Contribution Agreement**

41.     Before Wynn Resorts could go public, the LLC interests in Valvino held by Mr. Wynn, Aruze USA, and Baron Asset Fund had to be transferred to the new Wynn Resorts entity. This was no small matter. By this point, Aruze USA had contributed some $380 million in exchange for its LLC interests in Valvino.

42.     On June 11, 2002, Wynn Resorts, Mr. Wynn, Aruze USA, Baron Asset Fund, and the Kenneth R. Wynn Family Trust entered into the Contribution Agreement (the "Contribution Agreement"), by which they agreed to contribute all of the Valvino

-10-

1    membership interests to Wynn Resorts in exchange for the capital stock of Wynn Resorts.

2    The Wynn Resorts stock acquired by Aruze USA was subject to the provisions of the

3    Stockholders Agreement.

4         43.    The Contribution Agreement made clear that Wynn Resorts could not later

5    enlarge its rights *vis-à-vis* the stock held by Aruze USA.  An integration clause stated:

6              *This Agreement, the Stockholders Agreement, and the*
7              *Operating Agreement contain the entire understanding of the*
              *parties* with respect to the subject matter hereof or thereof.
              *There are no restrictions, agreements, promises,*
8              *representations, warranties, covenants, or undertakings with*
              *respect to the subject matter hereof other than those expressly*
9              *set forth or referred to herein or therein.*  This Agreement, *the*
              *Stockholders Agreement,* and the Operating Agreement
10             supersede all prior agreements and understandings between
              the parties with respect to their subject matter.
11

12   (emphasis added) (The Contribution Agreement defined the "Stockholders Agreement" as

13   the agreement dated April 11, 2002, and "as it may be amended and/or restated from time

14   to time.").  Accordingly, any attempt by Wynn Resorts to claim that it could unilaterally

15   impose a redemption provision on Aruze USA is contradicted by the express language of

16   Wynn Resorts' agreements with Aruze USA.

17   **E.    After Securing Aruze USA's Contribution, Steve Wynn Unilaterally**
         **Amends the Articles of Incorporation**
18

19        44.    After entering into the Contribution Agreement, but before transferring the

20   LLC interests in Valvino, Mr. Wynn secretly and unilaterally changed Wynn Resorts'

21   Articles of Incorporation to include a provision that purportedly allows Wynn Resorts to

22   "redeem" stock held by stockholders under certain circumstances.  At this time, Mr. Wynn

23   was the sole stockholder and director of Wynn Resorts.

24        45.    Under the Stockholders Agreement, Mr. Wynn had power of attorney to

25   transfer the LLC interests in Valvino to Wynn Resorts.  Although the Contribution

26   Agreement obligated Mr. Wynn to "as soon as practicable . . . deliver or cause to be

27   delivered to Holders certificates representing the Common Stock[,]" Mr. Wynn

28   deliberately delayed the contribution of the LLC interests in Valvino interests to Wynn

-11-

1    Resorts. Among other things, this delay meant that, although he had already received

2    Aruze USA's commitment via the Contribution Agreement and the Stockholders

3    Agreement, Mr. Wynn would continue to maintain unilateral control over Wynn Resorts

4    for the period of the delay. This enabled Mr. Wynn to improperly change the Company's

5    Articles of Incorporation in an attempt to achieve Mr. Wynn's own long-term interests at

6    Aruze USA's expense. This deliberate delay, and the intervening acts taken by Mr. Wynn

7    before he fulfilled the terms of the Contribution Agreement, breached Mr. Wynn's

8    fiduciary duties to Aruze USA.

9         46.    On September 16, 2002, Mr. Wynn secretly and unilaterally amended Wynn

10   Resorts' Articles of Incorporation. Although this change would purport to fundamentally

11   alter the securities received by Aruze USA, Mr. Wynn made the change unilaterally,

12   without providing notice and affording Aruze USA the opportunity to vote on the changes,

13   as required in order to make the provision enforceable. The language Mr. Wynn

14   unilaterally added to the Articles of Incorporation provided, in pertinent part:

15            The Securities Owned or Controlled by an Unsuitable Person
              or an Affiliate of an Unsuitable Person shall be subject to
16            redemption by the Corporation, out of funds legally available
              therefor, by action of the board of directors, to the extent
17            required by the Gaming Authority making the determination
              of unsuitability or to the extent deemed necessary or advisable
18            by the board of directors. . . .

19        47.    If Mr. Wynn had done what he was bound to do pursuant to the trust and

20   duties placed in him under the Stockholders Agreement and Contribution Agreement, and

21   transferred the LLC interests in Valvino to Wynn Resorts *before* adding the redemption

22   provision, Aruze USA would have had the right under Nevada law to vote on the changes

23   to Wynn Resorts' Articles of Incorporation. On information and belief, Mr. Wynn's

24   actions were a deliberate effort to induce Aruze USA to agree to transfer the LLC interests

25   in Valvino, and then change the nature of the Wynn Resorts stock that Aruze USA would

26   receive in exchange for those interests. Aruze USA relied on the absence of a redemption

27   provision in making its sizable contribution of interests to Wynn Resorts. Although the

28   first acts perpetrated in furtherance of this fraud occurred in 2002, damages only accrued

-12-

1   recently, when Wynn Resorts purported to use the redemption provision to redeem Aruze

2   USA's shares in 2012 for a fraction of their true value.

3       **F.     Wynn Resorts Goes Public**

4       48.     On September 28, 2002, Mr. Wynn eventually contributed the LLC interests

5   in Valvino to Wynn Resorts.  Thereafter, on October 21, 2002, Mr. Okada became a

6   member of Wynn Resorts' Board.

7       49.     On October 25, 2002, Wynn Resorts conducted an initial public offering

8   ("IPO") on NASDAQ at $13 per share.  At this time, Mr. Okada and Mr. Wynn each

9   owned about 30% of the outstanding stock.  Shortly thereafter, Mr. Okada became Vice

10  Chairman of Wynn Resorts' Board.

11      50.     On April 28, 2005, Wynn Las Vegas opened.  It was an instant success.  On

12  September 8, 2006, Wynn Resorts opened in Macau.  "Encore" hotels followed in both

13  locations.  Again, each property has been very successful.  None of this success would

14  have been possible without the capital funding, support, and expertise of Aruze USA and

15  Mr. Okada.

16      51.     As one form of recognition for Aruze USA's contributions, Wynn Resorts

17  included a high-end Japanese restaurant at both the Las Vegas and Macau resorts.  These

18  restaurants have been named "Okada."

19      **G.     The Close and Trusting Relationship of Steve Wynn and Mr. Okada**

20      52.     Although they have very different backgrounds and educational experiences,

21  both Mr. Wynn and Mr. Okada are of similar ages, interests, and ambitions.  Beyond their

22  business dealings, Mr. Wynn gave every indication that he considered Mr. Okada to be a

23  close personal friend, and repeatedly called him his "partner."

24      53.     For example, at hearings before the Nevada State Gaming Control Board

25  and Nevada Gaming Commission, on June 4 and 17, 2004, respectively Mr. Wynn

26  affirmed that "Mr. Okada was not only suitable" to receive a gaming license "but he was

27  desirable."  Repeatedly referring to Mr. Okada as his "partner," Mr. Wynn said Mr. Okada

28  was "dedicated to the pursuit of excellence."

54.     In this sworn testimony, Mr. Wynn also affirmed Mr. Okada's generosity and unwavering trust in Mr. Wynn.  Mr. Wynn said "I have never dreamed that there would be a man as supportive, as long-term thinking, as selfless in his investment as Mr. Okada."  Mr. Wynn recalled a conversation with Mr. Okada on a plane from Macau to Tokyo:  Mr. Okada "told me the most important thing, Steve . . . is the right thing.  Take the high road.  Do the right thing.  Don't worry about me.  I'll support any decision you may make."

55.     And, indeed, Mr. Okada trusted Mr. Wynn.  Mr. Wynn knew this, and callously and illegally set out to exploit this trust for his advantage.

## II.     UNIVERSAL DISCLOSES AND ULTIMATELY PURSUES FOREIGN DEVELOPMENT PROJECTS

### A.     In 2007, Universal Fully Discloses to Wynn Resorts Its Interest In Pursuing a Casino Project in the Philippines

56.     Universal and Mr. Okada first began exploring the possibility of acquiring and developing land in the Philippines in 2007, with one possible option for development being a casino and hotel resort.  Although the initial discussions were preliminary, Mr. Okada brought the opportunity immediately to Mr. Wynn, hoping that Wynn Resorts might be interested in undertaking the project.  Mr. Wynn told Mr. Okada that Wynn Resorts was not interested at that time in pursuing a project in the Philippines.  However, Mr. Wynn voiced no concerns at all with Universal's pursuit of the project.  Mr. Okada thereafter kept Mr. Wynn fully informed of the project's progress.

57.     On December 20, 2007, Universal publicly announced a planned casino project in the Asian market.

58.     On April 25, 2008, Universal announced its planned casino project in the Philippines.

59.     From that point on, Wynn Resorts and Universal had an agreement.  Universal could pursue a project in the Philippines, but at least for the time being, it would not formally be a Wynn Resorts project.  On a May 1, 2008 conference call with stock

COUNTERCLAIM AND ANSWER

1  analysts, Mr. Wynn affirmed that Wynn Resorts' Board and management team had

2  longstanding knowledge of and fully supported Universal's project in the Philippines:

3  
> Well, first of all, I love Kazuo Okada as much as any man that
> I've ever met in my life. He's my partner and my friend. And
> there is hardly anything that I won't do for him. Now, we are
> not at the present time an investor, nor do we contemplate, an
> investment in the Philippines. *This is something that Kazuo
> Okada and his company, [Universal], has done on its own
> initiative. He consults me and has discussed it with me
> extensively and I've given him my own personal thoughts on
> the subject and advice. And, to the extent that he comes to me
> for any more advice or input, all of us here at the Company
> will be glad to give him our opinions.* But that's short of
> saying this is a Wynn Resorts project. It is a [Universal]
> project.

10  (emphasis added).

11      60.    Importantly, Mr. Wynn voiced no concerns about the potential of the

12  Philippine project competing with Wynn Macau, Ltd. ("Wynn Macau"). As reflected in

13  his public statement to Wynn Resorts' shareholders and analysts, Mr. Wynn's attitude

14  reflected Wynn Resorts' official position on the Philippine project until at least late 2011

15  or early 2012 when Mr. Wynn decided to use it as a pretext to deprive Aruze USA of its

16  Wynn Resorts stock.

17      61.    As a further example of Wynn Resorts' knowledge and approval of

18  Universal and Aruze USA's activities in the Philippines, on April 4, 2008, Kevin Tourek,

19  a member of Wynn Resorts' Compliance Committee, emailed Frank Schreck, the then-

20  head of Universal's Compliance Committee. The email was regarding Universal's

21  investment in the Philippines. Mr. Tourek confirmed that – so long as Universal was in

22  compliance with the laws of the Philippines – the investment would not be something that

23  would concern Nevada regulators or Wynn Resorts.

24      62.    Once again, on September 24, 2009, Wynn Resorts acknowledged

25  Universal's project in the Philippines. Wynn Macau's IPO prospectus explicitly

26  acknowledged Universal's plans to develop a casino in the Philippines:

27  
> In addition to its investment in Wynn Resorts, Limited,
> [Universal]. has invested in the construction of a hotel casino
> resort in the Philippines, which is anticipated to open to the

-15-

COUNTERCLAIM AND ANSWER

public in 2010.  Mr. Okada confirms that, as at the Latest
Practicable Date, except for his indirect shareholding interests
in Wynn Resorts, Limited through Aruze USA, Inc., neither he
nor his associates holds, owns or controls more than 5%
voting interests in an entity which, directly or indirectly,
carries on, engages, invests, participates or otherwise is
interested in any company, business or operation that
competes, or is reasonably expected to compete, with the
business carried on by us in Macau.

63.     In this way, Wynn Macau's prospectus acknowledged and ratified

Universal's plans to open a casino in the Philippines and – by adopting Universal's

statement – affirmed that a casino in the Philippines will not materially compete with

Wynn Macau.

**B.      With the Blessing of Wynn Resorts, Universal Commits Significant
         Funds and Energy to the Philippine Project**

64.     As was disclosed fully to Wynn Resorts and the Nevada Gaming

Commission, Universal went about the difficult process of acquiring land and approvals to

build a casino in the Philippines.

65.     In 2008, after negotiations with private landowners that spanned several

months, Universal purchased contiguous land in and about a special economic zone in

Manila Bay that was specifically zoned for casinos.  It made this purchase with a

Philippine-based partner; and at all times (contrary to statements in the Complaint and by

Mr. Freeh) has complied with the laws of the Philippines requiring the citizenship for

landholding.

66.     The Philippine government approached Universal as early as 2005 and

courted Universal for years.  The Philippine government ultimately secured an agreement

that Universal would employ significant numbers of local people to work in the casinos,

and press reports indicate Universal's project could create as many as 15,000 jobs for

Filipinos, and generate billions of dollars in tax revenues for the Philippine government.

When Universal delayed the project in the wake of the 2008 financial crisis, the Philippine

government again stepped up its efforts to encourage Universal to advance the

-16-

1   development of its project.  While Universal certainly expects the Manila Bay Project to

2   be a "win-win" for the Philippines and Universal, the idea that Universal needed to curry

3   special favor with Philippine government officials is profoundly mistaken.

4       **C.**    **Steve Wynn and Elaine Wynn Divorce**

5       67.    In March 2009, Mr. Wynn divorced Elaine Wynn.  The divorce proved to be

6   damaging to Mr. Wynn's financial position and standing within Wynn Resorts.  By early

7   2010, Mr. Wynn had reached an agreement to split his ownership of Wynn Resorts stock

8   with Elaine Wynn.  As a result of the divorce settlement, Aruze USA was now by far

9   Wynn Resorts' largest stockholder, owning some 24,549,222 shares of Wynn Resorts, or

10  19.66% of the outstanding stock.  Mr. Wynn would now own less than half what Aruze

11  USA owned of Wynn Resorts stock.  While neither Aruze USA nor Mr. Okada ever made

12  any threats against Mr. Wynn, the possibility loomed that Mr. Wynn could be losing

13  control of Wynn Resorts, as had happened ten years earlier, Mr. Wynn lost control of

14  Mirage Resorts, Inc.

15      68.    On January 6, 2010, Mr. Wynn obtained an Amended and Restated

16  Stockholders Agreement.  The amended agreement altered the Stockholders Agreement

17  language regarding Aruze USA's right to nominate directors.  Aruze USA could endorse

18  nominees so long as the majority of nominees were endorsed by Mr. Wynn.  Although the

19  agreement required Mr. Wynn to support a minority slate of directors proposed by Aruze

20  USA, he never did so.  On information and belief, Mr. Wynn obtained the Amended and

21  Restated Stockholders Agreement, with the intention of never supporting any director

22  proposed by Aruze USA.  In fact, Mr. Wynn consistently refused efforts to consider Aruze

23  USA directors for the Board, in an effort to continue to monopolize control over Wynn

24  Resorts.

25      69.    In addition, the Amended and Restated Stockholders Agreement continued

26  to contain a non-compete clause that prohibited Mr. Okada, Aruze USA, and Universal

27  only from operating casinos in Clark County, Nevada and in Macau, and certain Internet

28  gaming ventures.  Neither this version of the Stockholders Agreement, nor any prior or

-17-

1  subsequent agreements, contained any prohibition or concerns regarding the Philippines or

2  Korea.

3      70.    In January 2010, Mr. Okada indicated that he was willing to move ahead

4  with the amendments provided that Mr. Wynn reciprocated by allowing Aruze USA to sell

5  publicly the same number of shares as Mr. Wynn and Elaine Wynn.  In this way, Mr.

6  Okada expected to receive liquidity for Aruze USA whenever Mr. Wynn and Elaine Wynn

7  asked permission to sell or transfer their stock.

8      **D.    Steve Wynn and Kazuo Okada Visit the Philippines in 2010, as Wynn
           Resorts Considers Involvement with the Philippine Project**
9

10     71.    Though Mr. Wynn had consistently declined to involve Wynn Resorts

11  formally in the Philippine project, he began to reconsider the opportunity in 2010.  On

12  June 14, 2010, Mr. Wynn and Mr. Okada jointly visited Manila to conduct due diligence

13  on behalf of Wynn Resorts and Universal.  On information and belief, Mr. Wynn was

14  considering pursuing the project in his individual capacity as well as on behalf of Wynn

15  Resorts.

16     72.    As illustrated in the photographs, this pre-arranged trip involved meetings

17  with dignitaries and officials and informational presentations on the project.

18

19

20

21

22

23

24

25

26

27

28

COUNTERCLAIM AND ANSWER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



COUNTERCLAIM AND ANSWER



73.     Mr. Wynn never formally committed Wynn Resorts to the Manila Bay project, but was clearly interested in pursuing the opportunity.  The idea – promulgated by Mr. Wynn in recent press conferences – that Mr. Okada and Universal were off "doing their own thing" unbeknownst to anyone at Wynn Resorts, is not true.

**E.     Over Kazuo Okada's Objection, Wynn Resorts Makes an Unprecedented $135 Million Donation For Wynn Macau**

74.     In May 2011, Wynn Macau pledged to donate HK$1 billion (about $135 million) to the University of Macau Development Foundation.  This contribution consisted of a $25 million contribution made in May 2011, and a commitment for additional donations of $10 million each year for the calendar years 2012 through 2022 inclusive.  Suspiciously, Wynn Macau's current gaming concession covers essentially the same 10-year period expiring in June 2022.  Wynn Macau and Wynn Resorts have also disclosed that Wynn Macau is in the process of seeking to obtain land in Macau and the rights to develop a third casino in the area.

75.     At a Board meeting in April, 2011, Mr. Okada objected to and voted against this donation, which appears to be unprecedented in the annals of the University of Macau, and in the history of Wynn Resorts.  Mr. Okada objected to the unprecedented size

-20-

1    and duration of the commitment.  It was unclear how the University of Macau would use

2    the funds.  Mr. Okada wondered why a wealthy university that sits on government land

3    and largely caters to non-Macau residents might need or want such a large donation.  Mr.

4    Okada, who is himself a significant philanthropist, wondered whether such a donation

5    actually benefits the people who live in Macau.  He was concerned about the lack of

6    deliberation of the boards of Wynn Resorts and Wynn Macau (the donation was approved

7    at a joint meeting in Macau of the two boards), and that pending approvals in Macau

8    related to a new development in Cotai, and the coincidence of the date of the donation and

9    the term of Wynn Macau's gaming license in Macau, might make it appear that Wynn

10   Macau and Wynn Resorts were paying for benefits.

11        76.    Notably, for example, the Chancellor of University of Macau is also the

12   head of Macao's government, with ultimate oversight of gaming matters.

13        77.    While Wynn Resorts claims to have received a legal opinion sanctioning the

14   unprecedented donation, Wynn Resorts did not provide that legal opinion to Mr. Okada or,

15   on information and belief, to any other members of the board of either Wynn Macau or

16   Wynn Resorts.  On information and belief, Mr. Wynn – and potentially others – misled the

17   Wynn Resorts' Board by securing its consent to the donation, without disclosing his

18   personal knowledge of the close connection between University of Macau and officials

19   responsible for regulatory decisions related to Wynn Macau's gaming operations.

20        78.    Mr. Okada's opposition to this donation caught the attention of the U.S.

21   Securities and Exchange Commission ("SEC").  According to Wynn Resorts 2011 Form

22   10-K, Wynn Resorts received a letter from the Division of Enforcement of the SEC

23   indicating the SEC has commenced an "informal inquiry" regarding matters in Macau.

24   Mr. Wynn, Ms. Sinatra (Wynn Resorts' General Counsel), and Mr. Miller (head of Wynn

25   Resorts' Compliance Committee) did not take kindly to Mr. Okada's scrutiny of the

26   donation.  On information and belief, Mr. Wynn, Ms. Sinatra, and Mr. Miller set out to

27   discredit Mr. Okada, in an effort to distract attention from the problematic Macau

28   donation.

COUNTERCLAIM AND ANSWER

F.    **Steve Wynn and Kim Sinatra Fraudulently Promise Mr. Okada**
      **Financing for the Philippine Project**

79.    On or about April 29, 2011, Mr. Wynn married his current wife Andrea Hissom.  Shortly thereafter, on May 16, 2011, Mr. Wynn and Mr. Okada met in Macau. Ms. Sinatra was present at the meeting, as was Matt Maddox ("Mr. Maddox"), the Chief Financial Officer of Wynn Resorts, and Michiaki Tanaka ("Mr. Tanaka") of Aruze USA, who prepared a transcript of the meeting.

80.    According to the transcript of the meeting, Mr. Wynn told Mr. Okada that Elaine Wynn was very angry at Mr. Wynn for remarrying.  Knowing she was going through a difficult time, Mr. Okada expressed sympathy for Elaine Wynn.  Mr. Wynn said that Elaine Wynn had a desire to transfer her shares to a new owner, and that there was an urgent need for Mr. Okada to immediately consent on Aruze USA's behalf to the transfer of the securities under the Stockholders Agreement.

81.    Mr. Okada was amenable to allowing Elaine Wynn to transfer her stock because of this exigency but, in return, Mr. Okada wanted to sell or pledge some of Aruze USA's Wynn Resorts stock in order to obtain a measure of liquidity from the stock.

82.    Mr. Wynn suggested that instead of having Aruze USA sell or pledge its shares, he had "good answers to solve [Mr. Okada's] . . . requests."  Mr. Wynn suggested that Wynn Resorts would make a loan to Aruze USA.  Mr. Wynn told Mr. Okada that this was better than Aruze USA liquidating its stock (which could have hurt Wynn Resorts' stock value), and much better than a bank loan because a bank:  (1) would set a credit line of only 50% of the market value of Aruze USA's stock; (2) would require additional guarantees if the market value of Aruze USA's stock decreases; and (3) could require forfeiture of Aruze USA's stock if there was any delay in payment.

83.    Mr. Wynn gave Mr. Okada an explicit personal assurance that financing would occur.  Mr. Wynn stated that this proposal would be good for Mr. Okada and good for Wynn Resorts, because it will contribute to the stability of Wynn Resorts.  And, based

-22-

COUNTERCLAIM AND ANSWER

1    on such assurances, Mr. Okada agreed to financing from Wynn Resorts, rather than selling

2    or otherwise pledging Aruze USA's stock.

3        84.    Ms. Sinatra was present at the meeting.  On information and belief, Ms.

4    Sinatra is a highly sophisticated and knowledgeable attorney, and is one of the highest

5    paid general counsels in the United States.  Toward the end of the meeting, Ms. Sinatra

6    stated that draft loan agreements would be provided to Aruze USA within 10 days to

7    support the agreement reached between Mr. Okada and Mr. Wynn.  Neither Mr. Wynn nor

8    Ms. Sinatra said anything about internal or external limitations on loans to directors and

9    officers.  For example, neither of them made any mention of Section 402 of the Sarbanes-

10   Oxley Act ("SOX") which, contrary to Japanese law that has no such prohibition, would

11   appear to bar any loan to Aruze USA by Wynn Resorts.  On information and belief, at the

12   time of this meeting, Ms. Sinatra was intimately familiar with SOX and Section 402 of the

13   Act, having overseen the implementation of SOX compliance policies at Wynn Resorts

14   that specifically addressed prohibitions on loans to officers and directors.

15       85.    At the conclusion of the meeting, and in reliance on the assurances by Mr.

16   Wynn and Ms. Sinatra that Wynn Resorts would make a loan to provide liquidity for

17   Aruze USA and that loan documents would be forthcoming, Mr. Okada signed a waiver

18   and consent granting Elaine Wynn the option to transfer her stock.  Simultaneously, Mr.

19   Tanaka of Aruze USA made a handwritten note to memorialize the agreement that Wynn

20   Resorts would provide financing to Aruze USA.

21       86.    Later that day, in response to Mr. Tanaka's note and after Mr. Okada had

22   signed the waiver and consent about Elaine Wynn's stock, Ms. Sinatra prepared a draft

23   "Side Letter" to replace the one prepared by Mr. Tanaka.  The "Side Letter" prepared by

24   Ms. Sinatra stated that Wynn Resorts would negotiate a loan from Wynn Resorts to Aruze

25   USA secured by Aruze USA's stock "*to the extent compliant with all state and federal*

26   *laws*" (emphasis added).  On information and belief, Ms. Sinatra inserted this language

27   because she knew Section 402 of SOX prohibited the loan proposed by Mr. Wynn and

28   agreed to by both Mr. Wynn and Mr. Okada.

-23-

87.     At the time, Wynn Resorts had extensive SOX compliance policies.  Yet, Ms. Sinatra said nothing to Mr. Okada or Aruze USA concerning the loan prohibitions under SOX, leading Mr. Okada and Aruze USA to believe that financing through Wynn Resorts was not only possible, but would be forthcoming in the near future.  Ms. Sinatra's role in this transaction makes clear that she was not working on Wynn Resorts' behalf. Rather, in breach of her duty to Wynn Resorts, she intentionally sought to deceive Mr. Okada for the personal benefit of Mr. Wynn, who would benefit personally from stringing along Aruze USA.

88.     On June 9, 2011, Ms. Sinatra emailed Aruze USA's attorneys regarding the "Side Letter," expressing "concern."  For the first time, Ms. Sinatra specifically referred to Section 402 of SOX.  She provided no further explanation (although this confirmed that she understood the issue).  Ms. Sinatra urged Aruze USA to "obtain sophisticated US securities lawyers to assist."  Ms. Sinatra also disputed that Mr. Wynn had committed to provide financing at the meeting, a statement that she knew to be false.

89.     On June 20, 2011, Ms. Sinatra asked Aruze USA's counsel if Mr. Okada's consent to Elaine Wynn's transfer of shares was conditioned on Aruze USA receiving the loan.  On July 13, 2011, Aruze USA's lawyer emailed Ms. Sinatra stating that Aruze USA, through Mr. Okada, would allow the immediate transfer of Elaine Wynn's shares because he understood that approval was needed urgently, but stated that the consent was "based upon the mutual understanding between Mr. Okada and Mr. Wynn that Mr. Wynn would pursue avenues for Mr. Okada to obtain financing."  Ms. Sinatra immediately sent an email back:  "Thank you very much for this."

90.     In the same email, Ms. Sinatra then explained that Wynn Resorts was negotiating with Deutsche Bank on a margin loan transaction, with Wynn Resorts acting as a "backstop."  She did not dispute that Mr. Okada's consent to the amendment in the Stockholders Agreement was based on Wynn Resorts agreement to continue to pursue financing for a loan to Aruze USA (using Aruze USA's Wynn Resorts shares as collateral).  At no point in time did Ms. Sinatra call into question the Philippine project.

-24-

COUNTERCLAIM AND ANSWER

91.     On or about September 23, 2011, Ms. Sinatra called Aruze USA. Ms. Sinatra informed Aruze USA that Wynn Resorts' Compliance Committee would be meeting the following week regarding the Philippines, which could impact whether Wynn Resorts would allow the loan.

92.     Wynn Resorts' Compliance Committee is not an independent committee of the Board. Rather, it is made up of one Wynn Resorts director, former Nevada Governor Bob Miller, and two Wynn Resorts insiders. On information and belief, each member of Wynn Resorts' Compliance Committee depends on Mr. Wynn for his livelihood and each is beholden to Mr. Wynn. On information and belief, Mr. Wynn has plenary control over the Compliance Committee. On September 30, 2011, the Compliance Committee refused to permit the loan to Aruze USA.

### G.     The Chair of Universal's and Aruze Gaming America's Compliance Committee Resigns

93.     Also, on or about September 27, 2011, Frank A. Schreck, who had been the Chairman of the Universal Compliance Committee for years, abruptly resigned his position. In addition to being the Chair of the Universal Compliance Committee, he was (and, on information and belief, still is) a long-time lawyer for Mr. Wynn.

94.     Richard Morgan, the new Chairman of the Universal Compliance Committee, spoke with Mr. Schreck regarding his reasons for resignation. Mr. Schreck told Mr. Morgan that he did not resign from the Committees because of any suitability concerns about Mr. Okada. Mr. Morgan asked Mr. Schreck if he knew of any facts that gave Mr. Schreck concerns about Mr. Okada's suitability; Mr. Schreck told Mr. Morgan that he knew of no such facts.

95.     Notably, Mr. Schreck's law firm thereafter appeared as litigation counsel for Wynn Resorts on January 27, 2012, representing Wynn Resorts in the Nevada state court in seeking to deny Mr. Okada his right as a director of Wynn Resorts to review Wynn Resorts' records regarding the enormous donation it made to the University of Macau.

III.   **STEVE WYNN DIRECTS WYNN RESORTS TO CONDUCT A PRETEXTUAL INVESTIGATION FOR THE PURPOSE OF REDEEMING ARUZE USA'S SHARES**

A.     **Wynn Resorts Seeks Kazuo Okada's Resignation and Threatens Redemption in an Attempt to Secure a Personal Benefit for Steve Wynn**

96.    On September 30, 2011, Aruze USA's lawyers, Robert Faiss and Mark Clayton of Lionel Sawyer & Collins law firm, met with Ms. Sinatra and Kevin Tourek of Wynn Resorts.  The conversation took a very unexpected turn.

97.    First, Ms. Sinatra and Mr. Tourek said that Wynn Resorts' Compliance Committee had commissioned two "investigations" and that the Compliance Committee had produced an investigative "report."  Ms. Sinatra and Mr. Tourek were concerned that Universal had purchased land from a person in the Philippines who was now under indictment for tax evasion.  Neither Ms. Sinatra nor Mr. Tourek explained how Universal or Mr. Okada could bear any responsibility for another man's alleged failure to pay his taxes.

98.    Second, Ms. Sinatra and Mr. Tourek said that Wynn Resorts has a "policy" that officers and directors cannot pledge their Company stock.  This was the first mention of such a policy, despite extensive discussions of a loan secured by Aruze USA's stock.

99.    Third, Ms. Sinatra and Mr. Tourek stated that, if there was a loan, Mr. Okada would have to step down from the Board and then would have the right to pledge or sell Aruze USA's shares subject to the voting agreement.  Again, this was the first mention of such a requirement.

100.   Fourth, Ms. Sinatra and Mr. Tourek proposed to change the Stockholders Agreement to allow Aruze USA to sell or pledge shares, but subject to a voting trust, which would allow Mr. Wynn to vote the shares, and a right of first refusal for Mr. Wynn to purchase the shares.  This proposal was improper.  Ms. Sinatra and Mr. Tourek were again advocating for Mr. Wynn, not for Wynn Resorts.  This was another breach of duty by Ms. Sinatra to Wynn Resorts and to its largest shareholder, Aruze USA.

-26-

101.   Fifth, Ms. Sinatra and Mr. Tourek stated that Mr. Okada has a fiduciary duty to present to Wynn Resorts any proposed competitive opportunities.  Further, they stated that if Mr. Okada has a competing casino business, he should consider stepping down from the Board.  This was the first mention of any "competitive" concerns.  Mr. Wynn and Wynn Resorts (and, indeed, Ms. Sinatra and Mr. Tourek) had known about Universal's Philippine project for years.  Universal had committed hundreds of millions of dollars to pursuing the project.  Wynn Resorts and Mr. Wynn had never objected to the Philippine project.

102.   Sixth, toward the end of the meeting, Ms. Sinatra gave Mr. Okada's counsel a copy of the Articles of Incorporation of Wynn Resorts, with certain provisions highlighted in yellow.  The highlighted portions included the redemption provision.  That was the first time that redemption was ever obliquely mentioned to Mr. Okada or his counsel.

103.   Ms. Sinatra then brought her threat into stark reality.  She stated that the Compliance Committee would meet on October 31, 2011 (in advance of a November 1 Board meeting).  She told Mr. Okada that she hoped a "resolution" would be reached before those meetings regarding Mr. Okada's directorship and the voting rights of Aruze USA's stock, so as to avoid presenting this matter to the Compliance Committee and the Board.  Ms. Sinatra's intent was clear – Wynn Resorts' compliance procedures were being used to extract a personal benefit for Mr. Wynn.

**B.     Steve Wynn and Kim Sinatra Try to Intimidate and Threaten Mr. Okada, While Hiding Supposed Evidence of Wrongdoing**

104.   On an October 3, 2011 telephone call, Aruze USA's counsel asked Ms. Sinatra to provide Aruze USA with a copy of the Compliance Committee's investigative report regarding Mr. Okada.  Ms. Sinatra replied that she would have to check to see if a copy could be provided; in fact, she did not and has never provided a copy of the investigative report to Aruze USA, Mr. Okada, or their counsel.

105.   On October 4, 2011, Mr. Wynn and Ms. Sinatra met with Mr. Okada and his

-27-

COUNTERCLAIM AND ANSWER

counsel.  At the meeting, Mr. Wynn stated that of Wynn Resorts' other directors had already decided that Mr. Okada must be removed as Vice Chairman of the Company's Board and as a director of both the Wynn Macau and Wynn Resorts Boards.  It apparently did not matter to Mr. Wynn and Ms. Sinatra that in Nevada *only stockholders can remove directors*.  Based on a false threat, Mr. Wynn demanded Mr. Okada's resignation as a director.

106.   Mr. Okada's counsel told Mr. Wynn that, in all his years, he had never before experienced a situation where the subject of an investigative report had never been formally questioned or even permitted to respond to the accusations being levied against him.  Mr. Okada's counsel once again requested a copy of the investigative report so that he and Mr. Okada's other attorneys could ensure they were advising Mr. Okada properly and that the Wynn Directors could make a decision based on accurate information.  Over the course of the remainder of the October 4 meeting, counsel for Mr. Okada asked at least two additional times for a copy of the investigative report.  Ms. Sinatra finally replied that Mr. Okada and his counsel could not see a copy of the investigative report because it was "privileged."  On information and belief, Ms. Sinatra once again intentionally misrepresented the law (Mr. Okada, as a director of the Company, has a right to see the Company's books and records, including its communications with counsel), in breach of her duties to Wynn Resorts.

107.   During the October 4, 2011 meeting, Mr. Wynn stated that the purported "grounds" upon which the other directors based their decision to move against Mr. Okada were as follows:

- That the Philippines were so corrupt that no one could possibly do business in that country without violating the FCPA;

- That "research" showed Mr. Okada owned land without a Philippines partner, and that this violated Philippines law;

- That the other directors were "convinced" that Mr. Okada's use of his Wynn Resorts business card in other countries had caused a belief that Wynn

-28-

1    Resorts was involved in the Philippine project and that the Company would

2    not be in this position had he instead used his Universal business card;

3    • That Mr. Okada had used the Wynn Resorts' building design and other trade

4    secrets without permission; and

5    • That Mr. Okada had associated with persons who had later been indicted in

6    the Philippines on charges unrelated to the Philippine project.

7    108.   Mr. Wynn's characterizations of the allegations are telling for several

8    reasons.  First, many of these claims were not ultimately used as a basis to redeem

9    Aruze USA's stock.  Rather, Wynn Resorts had an ever-changing list of supposed

10   transgressions it claimed against Mr. Okada, strongly suggesting that Mr. Wynn and

11   Wynn Resorts were seeking to find something – anything – to justify a predetermined

12   outcome.  Second, many of these claims are demonstrably false – as one example, the

13   acquisition of the land in the Philippines was entirely compliant with Philippine law.

14   109.   Mr. Wynn closed the meeting by telling Mr. Okada that if he had any

15   respect for Mr. Wynn and the other members of the Board, he would voluntarily step

16   down from his role as a director and Vice Chairman of Wynn Resorts.  At this time, Mr.

17   Okada's counsel explained to Mr. Wynn that Mr. Okada should not be required to respond

18   to his demand for resignation until he had time to further consider it.  Mr. Wynn agreed

19   and the meeting was adjourned.

20   110.   Around this same time, the Chairman of Universal's Compliance Committee

21   also requested a copy of the investigative report through the Chairman of Wynn Resorts'

22   Compliance Committee.  This request has been ignored.

23   **C.    A Letter From Steve Wynn's Outside Lawyer Confirms that, While**

24   **Wynn Resorts Had Already Determined the Outcome, a Pretextual**
     **"Investigation" is Only Just Starting**

25   111.   On October 13, 2011, Robert L. Shapiro, Esq., an attorney retained by Wynn

26   Resorts, sent a letter to Aruze USA.  Without any elaboration, the letter reiterated the

27   same mistaken – and soon to be abandoned – conclusions that Mr. Wynn outlined in the

28   October 4 meeting.  Mr. Shapiro also explicitly stated that Universal's Manila Bay project

-29-

"raises questions" regarding "possible violations of the Foreign Corrupt Practices Act." The letter again demanded Mr. Okada's resignation.

112.   Curiously, Mr. Shapiro's letter admitted that the Compliance Committee was only then beginning the very investigation that Mr. Wynn and Ms. Sinatra claimed to have already been concluded.  They also claimed to have already generated a report.  Yet Mr. Shapiro wrote that "The Compliance Committee of Wynn Resorts must fully investigate the foregoing acts and have retained Louis J. Freeh . . . to conduct an independent investigation."  On information and belief, as of the date of Mr. Shapiro's letter, Mr. Freeh had not started his investigation.

**D.     Wynn Resorts Refuses to Allow Mr. Okada and Aruze USA to Review Any Supposed "Evidence"**

113.   On October 24, 2011, Mr. Okada through his counsel made an initial demand for documents regarding the Philippine investigation.  Although he was plainly entitled to such documents as a director under Nevada law, Wynn Resorts refused this and numerous subsequent demands for documents.  Wynn Resorts aimed to conduct a secret investigation and never allow Mr. Okada or his counsel to scrutinize or respond to the supposed "evidence" against him.

**E.     The Board Summarily Removes Mr. Okada As Vice-Chairman**

114.   At the Board's November 1, 2011 meeting, Mr. Miller presented a report of an alleged investigation by the Compliance Committee into Mr. Okada's and Universal's activities in the Philippines.  The report disclosed that the Compliance Committee had allegedly conducted one internal and two "independent" investigations into allegations of suitability, conflicts of interest, and possible breaches of fiduciary duties related to acquisition of land for the Philippine project and charitable contributions made by Universal.  To date, the contents of these purported investigations have not been presented to Mr. Okada.

115.   Mr. Miller reported that the Compliance Committee (and not a committee consisting of the independent directors) had retained Freeh Sporkin & Sullivan LLP

-30-

COUNTERCLAIM AND ANSWER

1  ("Freeh Sporkin") as a special investigator to conduct an investigation into the allegations

2  against Mr. Okada.  The Board – without debate, deliberation, or allowing Mr. Okada a

3  chance to respond – summarily eliminated Mr. Okada's position as Vice-Chairman of

4  Board and ratified the decision to hire Freeh Sporkin.

5  **F.    Kazuo Okada Seeks More Information Regarding Wynn Macau**

6          116.    The vehemence of the actions by Mr. Wynn, Ms. Sinatra, Mr. Miller, and

7  the Board against Mr. Okada is highly suspicious.  After all, Mr. Okada had raised

8  concerns about the donation to the University of Macau before Wynn Resorts had raised

9  any type of unsuitability allegations against Mr. Okada and before anyone associated with

10  Wynn Resorts even mentioned the word "redemption" to him.  Mr. Okada made several

11  requests for access to Wynn Resorts' books and records for information relating to the

12  donation made by Wynn Resorts to the University of Macau, all of which were denied

13  without a valid basis.  In the state court of Nevada, Mr. Okada even filed a petition for a

14  writ of mandamus on January 11, 2012 to compel Wynn Resorts to grant him access to

15  Wynn Resorts' books and records.  *Okada v. Wynn Resorts, Ltd.*, case number A-12-

16  65422-B, Department XI (the "Inspection Action").  At a hearing on February 9, 2012, the

17  Court ordered Wynn Resorts to comply with Mr. Okada's reasonable requests.

18  **G.    Aruze USA Nominates Directors; But Steve Wynn Refuses to Endorse**
        **Them Despite His Obligation to Do So**

19

20          117.    To further address the concerns about Wynn Resorts management, on

21  January 18, 2012, pursuant to Section 2(a) of the Stockholders Agreement, Aruze USA

22  submitted a letter to the Nominating and Corporate Governance Committee of the

23  Company designating three individuals as candidates to be considered for nomination as

24  directors of the Company and included in the Company's proxy statement relating to the

25  Company's 2012 annual meeting of the stockholders or any stockholder meeting held for

26  the purpose of electing Class I directors.  Despite numerous written requests to Mr. Wynn

27  to endorse the slate of directors nominated by Aruze USA, as required by the Stockholders

28  Agreement, Mr. Wynn refused to do so.

**H.     The Freeh Investigation Proceeds Without Seeking Any Input From Kazuo Okada**

118.    In early November 2011, counsel for Mr. Okada contacted Freeh Sporkin requesting further information regarding how its investigation would proceed and to request copies of documents, evidence, or reports related to the allegations against Mr. Okada. Mr. Okada requested the documents so that he could address the allegations made against him. Freeh Sporkin declined to provide any materials and instead directed counsel for Mr. Okada to make such requests of Mr. Shapiro. When such requests were made of Mr. Shapiro, they were rejected.

119.    While Plaintiffs allege in their Complaint that Mr. Okada "long evaded" his interview (Complaint at 2), the record conclusively contradicts this contention. Freeh Sporkin did not contact Mr. Okada or his counsel about an interview until January 9, 2012, at which time it demanded (not requested) an interview of Mr. Okada during the week of January 30 (*i.e.*, January 30-February 5). On January 15, 2012, four days after Mr. Okada filed his Inspection Action, Freeh Sporkin informed Mr. Okada's counsel that the "schedule has changed" and pressured Mr. Okada to agree to an interview *before* the week of January 30.

120.    On January 19, 2012, Mr. Miller, Chair of Wynn Resorts' Compliance Committee, wrote directly to Mr. Okada, threatening that if Mr. Okada failed to make himself available for interviews with Freeh Sporkin on January 30 or 31, the Compliance Committee "can only conclude that you have refused participation." The letter stated that the Compliance Committee originally had a goal of receiving a report by the end of 2011, which was extended to January 15, 2012. In addition to this being the first time anyone shared the Compliance Committee's purported deadlines with Mr. Okada, these dates are inconsistent with Freeh Sporkin making its initial request to conduct an interview of Mr. Okada that would take place in the first week of February. It proved not to be the first time Mr. Miller was "confused" about the "investigation" that was supposedly operating under his direction.

-32-

121.   Mr. Okada had only recently hired new counsel to assist with the response to the Freeh Sporkin investigation.  In order to prepare for the interview, the new counsel requested that the parties seek a mutually convenient date for an interview by February 15, 2012.  Freeh Sporkin then agreed to schedule the interview on February 15.  This undeniable record demolishes any claim that Mr. Okada avoided an interview with Freeh Sporkin, let alone that he "long evaded" an interview.

I.     **Freeh Sporkin Refuses to Provide Meaningful Information Regarding the Investigation to Kazuo Okada**

122.   While attempting to set a date to schedule the Freeh Sporkin interview, Mr. Okada's counsel requested that Freeh Sporkin identify the specific matters under review so that Mr. Okada could prepare appropriately for his interview.  After all, Mr. Okada is the Chairman of a publicly traded corporation – and cannot be expected to know every operational detail in his organizations.  In addition, translations between Japanese and English are notoriously difficult because of subtleties in language. Mr. Okada's counsel repeatedly requested documents that Freeh Sporkin might use in the interview and topics so Mr. Okada could prepare for the interview and be ready to provide information and documents that could help Freeh Sporkin (and the Board) understand the facts concerning whatever topics and issues it wanted to discuss with Mr. Okada.

123.   Freeh Sporkin refused to provide anything more than a statement that it was investigating "all matters related to Mr. Okada's, Universal's, and Aruze's activities in the Philippines and Korea."  This was the first time that Korea was even mentioned as the subject of any investigation by the Company.  Again – the basis of Aruze USA's supposed "unsuitability" kept changing.

124.   Instead of sharing the topics of the interview with Mr. Okada, Mr. Freeh chose to conduct the interview as an ambush, not unlike the hostile interrogation of a suspected criminal, rather than a respectful and cooperative interview seeking information from a director of Wynn Resorts.  If he was afforded the opportunity to do so, Mr. Okada could have helped Mr. Freeh and Freeh Sporkin avoid the public embarrassment of a

COUNTERCLAIM AND ANSWER

1 report that is riddled with factual and legal errors.

2 **J.     Kazuo Okada Voluntarily Sits For A Full-Day Interview With Freeh Sporkin**

3

4 125.    On February 15, 2012, Mr. Okada sat for a full-day interview with

5 Mr. Freeh and other lawyers for Freeh Sporkin.

6 126.    The questions focused mainly on expenses that Mr. Freeh claimed had been

7 paid by Universal for lodging and meals at Wynn Resorts properties on behalf of persons

8 Mr. Freeh identified as foreign officials.  This was a subject that had never been

9 mentioned in the months before when Ms. Sinatra asserted that an investigation had

10 already been conducted by the Company, or when Mr. Wynn or Mr. Shapiro, in a

11 subsequent letter, listed the supposed bases for the directors taking action to eliminate Mr.

12 Okada's position as Vice Chairman.  Other than allegations regarding such purported

13 expenses, Mr. Freeh also asked questions about Universal's compliance with Philippine

14 landownership requirements, which had been handled for Universal by one of the

15 Philippines' leading law firms.

16 127.    The interview went well into the evening, hours past the time originally

17 estimated by Mr. Freeh.  At the end of the interview, Mr. Okada stated that he would look

18 into the matters raised during the interview, and that he would be willing to report back

19 with detailed information once it could be assembled.

20 **K.     Wynn Resorts Allows No Opportunity for A Reasonable Response**

21 128.    At a press conference following the redemption of Aruze USA's stock,

22 Mr. Miller made a number of statements that will prove to be false.  One stood out in

23 particular.  Mr. Miller said:

24 > Following the interview, [Mr. Freeh] informed Mr. Okada that
> he would be finalizing the report on Friday, February 17, and
25 > offered [Mr. Okada] an opportunity to present any exculpatory
> evidence prior to that time frame. [Mr. Freeh] determined that
26 > no additional exculpatory evidence was presented, and thus a
> final report was presented.
27

28 129.    Similarly, the Wynn Resorts Complaint states that "Freeh announced that he

-34-

COUNTERCLAIM AND ANSWER

1   would report his findings to the Board of Directors on February 18, 2012." (Compl. at ¶
2   43.)

3        130.   Neither statement is true.  Mr. Freeh said nothing regarding the date of the
4   completion of his report at the interview, and, in fact, said at the February 15, 2012
5   interview of Mr. Okada that his investigation was not complete and that his report was not
6   complete.

7        131.   On February 16, 2012, Mr. Okada's counsel emailed Mr. Freeh stating:

8        Louis:

9        I hope you had a good trip back to the US.  Following your
     interview of Mr. Okada, we understand that you will be
10        drafting a report for submission to the Wynn Resorts
     Compliance Committee.  I am writing to request an
11        opportunity for Mr. Okada and Universal Entertainment to
     submit additional material for your consideration, prior to the
12        submission of your report. Please let me know as soon as you
     are able if you will allow us to do.

13        132.   In response, on February 17, 2012, Mr. Freeh offered two options to Mr.
14   Okada's counsel:

15        Joel Friedman called you about 900a today (PT) and left a
     message for you to call a well as an email.
16

17        I can suggest two possibilities in response to your letter:

18        First, that you provide me as soon as possible, and no later
     than 600p PacT today, with a proffer of what Mr Okada and
19        Universal wish to submit for additional consideration. Your
     very able firm has represented Mr. Okada now for several
20        weeks and you know the principal areas of our investigation
     based on Wednesday's interview. So I would expect you can
21        make such a proffer.

22        *Secondly, Mr Okada will have the opportunity to respond to
     my report after he receives a copy, along with the other Wynn
23        Resorts' directors. I will certainly consider and evaluate
     whatever information may be provided.*

24        . . .

25        I also note that Mr. Okada's litigation against Wynn Resorts
     has now predicated an SEC inquiry and no doubt drawn the
26        proper attention of other regulatory agencies. Consequently,
     the Compliance Committee has given me instructions to
27        conclude my report with all deliberate speed.

28        . . .

COUNTERCLAIM AND ANSWER

> Anyway, I have a great deal of respect for you and believe the above alternatives allow for a fair resolution at this stage.
>
> Best regards,
>
> Louie

(emphasis added.)

133.    Given the timing, Mr. Okada elected to respond to the Freeh Sporkin report once he was able to see it, responding through his counsel:

> Louis:
>
> Thanks for your response. I am still traveling in Asia, and did not have a chance to review Joel's message or contact him. I appreciate your willingness to review any supplemental information that we provide and to consider it in your findings. *Under the circumstances, and in particular the tight time framework, I think it makes the most sense for Mr. Okada, UE, Aruze USA, and our Firm to review your report and to use it to focus our efforts in providing you additional information.* So, we accept the second of the two proposals in your letter, and would expect that the opportunity to respond will include an opportunity for our law firm to work with Mr. Okada, UE, and Aruze USA in order to be able to respond in a complete and helpful fashion. Thanks very much.

(emphasis added.)

134.    Mr. Freeh responded "Thanks Tom and safe travels."

135.    Curiously, about an hour and half later (now late in the day on Friday, February 17), Mr. Freeh sent a second response, stating:

> Just to confirm, I will now deliver my report to the Compliance Committee having completed my investigation regarding the matters under inquiry. It is my understanding that the Compliance Committee will thereafter provide all of the Directors, including Mr. Okada, with a copy of the report. As we both stated, Mr. Okada can then submit any responses to the report which will be considered and evaluated. However, the report I am submitting is not a 'draft' subject to being finalized after Mr. Okada provides any response. Rather this is akin to a final brief being submitted with the opportunity for a response to be made.

-36-

COUNTERCLAIM AND ANSWER

1          Please let me know if you have any questions.

2          Best regards

3          Louie

4          136.    Perhaps unbeknownst to Mr. Freeh, this statement would prove to be

5   misleading.  As it turned out, Wynn Resorts would refuse to give Mr. Okada a copy of the

6   Freeh Sporkin report and then purported to redeem Aruze USA's stock (at a nearly $1

7   billion discount) *on the day the other Wynn Directors received the report*, without giving

8   Mr. Okada any reasonable opportunity to respond.

9          137.    In addition, Mr. Freeh's statement that he was preparing a "final brief" is

10  very telling about how Mr. Freeh viewed his role in the process.  Mr. Freeh was not

11  preparing an objective report of the facts by an "independent" investigator – he was

12  providing the Board with an argumentative document as an *advocate* against Mr. Okada.

13  But even so, Mr. Freeh clearly contemplated that Mr. Okada would and should have the

14  opportunity for a response.  Nevertheless, spurred on by Mr. Wynn, the Board ignored Mr.

15  Freeh's promise of an opportunity to respond to the report (and the express statements in

16  Mr. Freeh's report that further investigation would be needed on certain topics), and

17  instead acted rashly to redeem Aruze USA's stock on an incomplete factual record and a

18  faulty understanding of governing legal principles (including, for example, the application

19  of the FCPA to the facts, as well as Wynn Resorts' (lack of) contractual rights to attempt

20  to redeem Aruze USA's stock).

21         **L.     Steve Wynn Hurriedly Schedules Board of Directors Meeting**

22         138.    On February 15, 2012, scant hours after the completion of Mr. Freeh's

23  interview of Mr. Okada, Wynn Resorts noticed a special meeting of its Board.  The

24  meeting was set for Saturday, February 18, 2012, at 9:00 a.m. in Las Vegas – which is

25  2:00 a.m. Sunday morning in Japan.  Although the notice for the Board meeting went out

26  immediately following the conclusion of the interview of Mr. Okada, and was scheduled

27  to occur a mere three days after the interview, Mr. Wynn and Ms. Sinatra included on the

28  agenda a review of the Freeh Sporkin report.

1

**M.     Steve Wynn Tries to Use the Threat of Redemption to Buy Aruze USA's Stock at a Substantial Discount**

2

3       139.    Following the interview, Mr. Wynn communicated to Aruze USA through

4   intermediaries that, instead of having the Board consider the Freeh Sporkin report, Mr.

5   Wynn would be willing to buy Aruze USA's stock for his benefit at a significant discount.

6   A sale to Mr. Wynn was presented as an alternative to the embarrassment and regulatory

7   issues attendant to possible disclosure of the Freeh Sporkin report.

8   **IV.   WYNN RESORTS' UNFOUNDED AND UNPRECEDENTED REDEMPTION OF MORE THAN $2.7 BILLION OF ARUZE USA'S**

9   **SHARES**

10      **A.     The Board Hurriedly Meets and Rushes to Redeem Aruze USA's Stock**

11      140.    On February 17, 2012, Mr. Okada's counsel contacted Wynn Resorts'

12   representatives to express Mr. Okada's concerns with the substantive and procedural

13   process for the Company's investigation, and stated that any discussion of unsuitability or

14   redemption, including any discussion involving the Freeh Sporkin report at the

15   February 18 Board meeting, would be premature.

16      141.    Rather than addressing the substantive and procedural issues raised by

17   Mr. Okada and his counsel, Wynn Resorts responded briefly, informing Mr. Okada's

18   counsel that additional accommodations would not be made to facilitate translation to

19   enable Mr. Okada's participation by teleconference.  The Company also informed Mr.

20   Okada's counsel that, despite the seriousness of the accusations against him, Mr. Okada

21   was not permitted to have counsel present for the Board call.

22      142.    When it came time for the meeting, at 2:00 a.m. on Sunday morning, Mr.

23   Okada sat ready to participate by telephone.  Mr. Wynn yelled at Mr. Okada's counsel

24   when he introduced himself.  Mr. Wynn also said that Mr. Okada's counsel could not be

25   present to advise Mr. Okada even though counsel made clear that he would not address the

26   meeting.  (At the threat of having Mr. Okada's telephone connection to the meeting

27   severed, Mr. Okada's counsel had to sit outside the room while the meeting went on,

28

1   despite Wynn Resorts having a battery of lawyers from multiple law firms present on its

2   end of the line.) Mr. Wynn and a company lawyer informed Mr. Okada that – despite

3   prior assurances that Mr. Okada would receive a copy of the Freeh Sporkin report along

4   with the other directors – he would not receive a copy of the report unless both he and his

5   legal counsel signed a nondisclosure agreement.  The nondisclosure agreement would

6   have arguably precluded Mr. Okada from using the report in legal proceedings.  Mr.

7   Okada did not sign the nondisclosure agreement.

8       143.   As alleged in detail below, a few hours after demanding that Mr. Okada sign

9   the nondisclosure agreement claiming confidentiality, Wynn Resorts would leak a copy of

10  the Freeh Sporkin report to the *Wall Street Journal* and would itself attach a copy to its

11  Complaint in this action.

12      144.   There were numerous translation problems during the Board meeting.  Mr.

13  Wynn provided a translator who was woefully unable to perform an accurate simultaneous

14  translation.  Mr. Okada requested that the translation be provided sequentially (with each

15  speaker and the translator speaking in turn) rather than simultaneously (with the translator

16  speaking at the same time as the speaker at the meeting), but this request was denied.  As a

17  result, Mr. Okada could not follow or participate in the proceedings.

18      145.   In this way, Mr. Okada sat and listened while Mr. Freeh made a presentation

19  in English that Mr. Okada could not understand.  After Mr. Freeh completed his

20  presentation, the Board asked if Mr. Okada had any questions.  Mr. Okada stated that he

21  could not understand the presentation, and that he would be able to address the claims of

22  the report only after receiving a copy and discussing with counsel.  Mr. Okada also asked

23  the Board to delay making any resolutions until he could respond to the Freeh Sporkin

24  report.

25      146.   At some point, someone at Wynn Resorts hung up the telephone, cutting Mr.

26  Okada off from the meeting.  Mr. Okada waited to be reconnected, staying up until the sun

27  rose in Asia, all the while not knowing whether the Board had resolved anything following

28  the presentation by Mr. Freeh.  Ms. Sinatra later claimed that cutting off the telephone

-39-

COUNTERCLAIM AND ANSWER

1     connection to Mr. Okada was a "misunderstanding."  No other contact was made with Mr.

2     Okada.

3           147.   At 4:45 am ET on February 19, 2012, Aruze USA's counsel received

4     correspondence, containing a notice of determination of unsuitability and a purported

5     redemption notice.  In the redemption notice, the Company stated that it would redeem

6     Aruze USA's stock for a note of approximately $1.936 billion, a discount of exactly 30%

7     off the value measured by the stock market's valuation of the stock based on the prior

8     day's closing price.

9           148.   Although Wynn Resorts had claimed the Freeh Sporkin report was

10    confidential and tried to extract a signature from both Mr. Okada and his legal counsel in

11    order to see the report prior to redemption, a copy of the report was leaked to the *Wall*

12    *Street Journal* in the early morning Eastern Time of February 19, 2012.  Almost

13    immediately, reports appeared on the *Wall Street Journal* website regarding the contents

14    of the report.

15          149.   In addition, at 2:14 a.m. PT on February 19, 2012, Wynn Resorts

16    electronically filed a complaint attaching the supposedly confidential Freeh Sporkin report

17    (without exhibits).

18          150.   Despite repeated requests to Ms. Sinatra and Mr. Shapiro, Mr. Okada's

19    counsel only obtained a copy of the "confidential" report when it sent a messenger to court

20    on February 21, 2012, the first court day following the weekend Board meeting.  Wynn

21    Resorts continues to refuse to provide the Freeh Sporkin report's exhibits to Mr. Okada or

22    Aruze USA.

23    **B.**    **Aruze USA Disputes That Redemption Has Occurred**

24          151.   In public statements, representatives of Wynn Resorts have claimed

25    redemption is complete and that the securities formerly held by Aruze USA have been

26    cancelled.  Aruze USA disputes that this has happened.  Among other reasons, as

27    explained elsewhere in this Counterclaim, the purported redemption is void *ab initio*.

28

COUNTERCLAIM AND ANSWER

C.    **The Board Redeems on False Premises**

152.   Even if Aruze USA were bound by the Redemption Provision (which Aruze USA disputes), the Articles of Incorporation only purport to allow redemption in three situations.

153.   First, according to the Articles of Incorporation, Wynn can redeem when it "is determined by a Gaming Authority to be unsuitable to Own or Control any Securities or unsuitable to be connected or affiliated with a Person engaged in Gaming Activities in a Gaming Jurisdiction." This has not occurred. In fact, Aruze USA has been found to be "suitable" by the Nevada gaming authorities.

154.   Second, according to the Articles of Incorporation, Wynn can redeem when a person "causes the Corporation or any Affiliated Company to lose or to be threatened with the loss of any Gaming License." This has not occurred.

155.   Third, Wynn Resorts' Articles of Incorporation profess that the Company can redeem where a person "in the sole discretion of the board of directors of the Corporation, is deemed likely to jeopardize the Corporation's or any Affiliated Company's [a] application for, [b] receipt of approval for, [c] right to the use of, or [d] entitlement to, any Gaming License." Subsections [a] and [b] do not apply because, on information and belief, Wynn Resorts has no present plan to apply for a license and is not awaiting approval of any pending application. So, even under the standards of the Articles of Incorporation, Wynn Resorts could only seek redemption upon a showing that Aruze USA's stock ownership is "likely to jeopardize" Wynn Resorts' "right to the use of, or entitlement to" its existing gaming licenses.

156.   No such showing was made in the rushed Freeh Sporkin report. In fact, in the gaming industry, any impact on the right to use or entitlement to a gaming license requires action by the cognizant gaming authority. No gaming authority has found Aruze USA, Universal, or Mr. Okada to be "unsuitable." Furthermore, association with an "unsuitable" person would only conceivably create a problem for a gaming license *after* that person has been found to by a gaming authority to be unsuitable. Even then, such

-41-

1 │ concerns can be addressed via a voting trust or orderly sale of shares. If Wynn Resorts'

2 │ true aim was to disassociate itself from Aruze USA in order to protect its interests, it failed

3 │ miserably. Even if the redemption were effective, Aruze USA would now be Wynn

4 │ Resorts' largest holder of debt – a circumstance which would be impermissible under

5 │ Nevada law if Aruze USA were truly "unsuitable." Under the circumstances, it is obvious

6 │ that the supposed redemption of Aruze USA's shares was simply a pretext to seek to quiet

7 │ a potential dissident shareholder and director, increase the relative ownership interests of

8 │ the Board members by virtue of their shareholdings in Wynn Resorts, and to enhance and

9 │ maintain Mr. Wynn's personal control over Wynn Resorts.

**D.** **Even if Aruze USA Was Subject to the Redemption Provision (Which it is Not), the Unilateral Blanket 30% Discount that Wynn Resorts Applied to the Stock is Erroneous**

12 │ 157. According to a press release dated February 19, 2012, Wynn Resorts issued

13 │ a note in the amount of $1.936 billion to Aruze USA. This amount is exactly 30% less

14 │ than the market value of Aruze USA's stock as measured by the closing price of Wynn

15 │ Resorts' stock on the Friday prior to the Saturday Board meeting. According to its press

16 │ release, Wynn Resorts arrived at this value because "it engaged an independent financial

17 │ advisor to assist in the fair value calculation and concluded that a discount to the current

18 │ trading price was appropriate because of restrictions on most of the shares which are

19 │ subject to the terms of an existing stockholder agreement." The irony here is rich, because

20 │ the Stockholders Agreement, by its terms, either precludes the redemption of Aruze

21 │ USA's stock altogether or, alternately, the transfer restrictions are not binding on Aruze

22 │ USA to the extent that they constitute an illegal restraint on alienability, and thus could

23 │ not legitimately impact the value of Aruze USA's shares so as to support a discount

24 │ against the market price.

25 │ 158. Nevertheless, hoping to unilaterally decide on a "clearance" price for

26 │ Aruze USA's almost 20% shareholder interest in the Company, Wynn Resorts relied

27 │ solely on one opinion from Moelis & Company ("Moelis"), *which has done business with*

28 │ *Wynn Resorts in the past.*

-42-

COUNTERCLAIM AND ANSWER

159.   Mr. Wynn and Kenneth Moelis ("Mr. Moelis") – the founder of Moelis – go way back.  Mr. Moelis first worked with Mr. Wynn when Mr. Moelis worked at the investment banking firm of Drexel Burnham Lambert ("Drexel").  At Drexel, Mr. Moelis was the banker who helped Mr. Wynn finance his Golden Nugget Casino in Atlantic City and Mirage Casino in Las Vegas.  On information and belief, Mr. Wynn has a close personal and professional relationship with Mr. Moelis.  According to press reports, Mr. Moelis has stated that he would take the first flight out of LAX to rush to the assistance of Mr. Wynn.  Mr. Wynn reciprocates Mr. Moelis' loyalty and support.  Mr. Wynn engaged Mr. Moelis to serve as the lead underwriter of Wynn Resorts' $210 million common stock offering in March 2009.

160.   Mr. Wynn called on Mr. Moelis' loyalty in this case.  Despite the fact that at least some of the stock was exempted from the Stockholders Agreement, Moelis discounted Aruze USA's more than $2.7 billion shares of Wynn Resorts stock by a round 30%.

### E.      The Timing of the Redemption Suggests Wynn Resorts Traded on Inside Information

161.   On March 2, 2012, Wynn Resorts released two Form 8-Ks.

162.   The first Form 8-K purported to disclose positive news regarding Wynn Resorts' efforts in Macau to receive certain land concessions related to Cotai:

> As previously disclosed . . . Wynn Macau, Limited ("WML"), an indirect subsidiary of the Registrant with ordinary shares of its common stock listed on The Stock Exchange of Hong Kong Limited, announced that Palo Real Estate Company Limited ("Palo") and Wynn Resorts (Macau) S.A. ("Wynn Macau"), each an indirect subsidiary of the Registrant, formally accepted the terms and conditions of a land concession contract (the "Land Concession Contract") from the government (the "Macau Government") of the Macau Special Administrative Region of the People's Republic of China ("Macau") in respect of approximately 51 acres of land in the Cotai area of Macau (the "Cotai Land").  The Land Concession Contract permits Palo and Wynn Macau to develop a resort containing a five-star hotel, gaming areas, retail, entertainment, food and beverage, spa and convention offerings on the Cotai Land.

-43-

COUNTERCLAIM AND ANSWER

The Land Concession Contract was published in the official gazette of Macau (the "Gazette") on January [•] 2012. Effective from such publication date, Palo will lease the Cotai Land from the Macau Government for an initial term of 25 years with the right to renew the Land Concession Contract for additional successive periods, subject to applicable legislation.  The Land Concession Contract also requires that Wynn Macau, as a gaming concessionaire, operate and manage gaming operations on the Cotai Land.  In addition, as previously disclosed in the Registrant's filings with the Commission, on August 1, 2008, Palo and certain affiliates of the Registrant entered into an agreement (the "Agreement") with an unrelated third party to make a one-time payment in the amount of US $50 million in consideration of the latter's relinquishment of certain rights in and to any future development on the Cotai Land.  The Agreement provides that such payment be made within 15 days after the publication of the Land Concession Contract in the Gazette.

The foregoing description of the Land Concession Contract is qualified in its entirety by reference to the full English translation of the Land Concession Contract (originally published in the Gazette in traditional Chinese and Portuguese), which is filed as Exhibit 10.1 hereto and incorporated herein by reference.  Dollar amounts in the Land Concession Contract refer to Macau Patacas.

163.   If true, such a land concession would be a significant positive development for Wynn Resorts.  In fact, Wynn Resorts' stock immediately spiked 6% on this news. Shortly, thereafter, Wynn Resorts issued a corrective Form 8-K:

On March 2, 2012, a Current Report regarding the gazetting of the Cotai Land Concession Contract on Form 8-K (the "Land Concession 8-K") was filed by mistake by the Company's agent.  The filing was not authorized by the Company.  The Cotai Land Concession Contract has not been gazetted.  The purpose of this filing is to retract the Land Concession 8-K in its entirety.

164.   Wynn Resorts blamed a clerical error at its outside law firm for the accidental filing of the detailed Form 8-K.  To the extent any positive developments in Macau (or elsewhere in Wynn Resorts operational sphere) was imminent and known, and to the extent redemption happened, Wynn Resorts and its directors traded on inside information when it allegedly purchased Aruze USA's stock.

-44-

COUNTERCLAIM AND ANSWER

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CLAIMS FOR RELIEF

## COUNT I

### Declaratory Relief

### (By Aruze USA and Universal Against Wynn Resorts and the Wynn Directors)

165.    Aruze USA and Universal reassert and reallege Paragraphs 4 through 164 above as if set forth in full below.

166.    Aruze USA and Universal seek a judicial declaration that the purported redemption of Aruze USA's shares is void *ab initio*, and that Aruze USA is the owner of 24,549,222 shares or 19.66% of the total outstanding common stock of Wynn Resorts, with all rights and privileges appurtenant thereto (including, but not limited to, payment of dividends and voting rights). This declaration is appropriate because, as alleged above: (1) the redemption provision in the Articles of Incorporation is inapplicable to the Wynn Resorts stock owned by Aruze USA because Aruze USA entered into the Contribution Agreement, which prevented any further restrictions without agreement of the parties, before the enactment of the redemption provision, and Wynn Directors' acts were *ultra vires*; (2) the redemption provision in the Articles of Incorporation is inconsistent with Nevada law and public policy, and thus void; (3) the Stockholders Agreement bars redemption of the Wynn Resorts stock owned by Aruze USA; (4) the Board lacked a sufficient basis for a finding of "unsuitability" or for redemption; and/or, (5) the redemption provision as written and as applied is unconscionable.

167.    In addition or alternatively, Aruze USA and Universal seek a judicial declaration that the redemption provision in Wynn Resorts' Articles of Incorporation is invalid as a matter of law because it is impermissibly vague, contrary to law and public policy, and/or unconscionable. This declaration is appropriate because, among other things, Nevada gaming regulators are given the authority under the laws of Nevada to make determinations regarding "suitability." The redemption provision in Wynn Resorts' Articles of Incorporation purportedly relied on here by the Wynn Directors improperly

-45-

1   and illegally usurps that authority.  Furthermore, if and when Nevada gaming regulators

2   were to make such a determination, redemption that simply replaces equity with debt is

3   ineffective to effect a disassociation; it, therefore, would not comply with Nevada law.

4        168.   In addition or alternatively, Aruze USA and Universal seek a judicial

5   declaration that the Board resolution finding Aruze USA, Universal, and Mr. Okada

6   "unsuitable" was procedurally and/or substantively defective and contrary to the Articles

7   of Incorporation and/or Nevada law.  As alleged in detail above, this declaration is

8   appropriate because the Wynn Directors' finding that there was a likely jeopardy to Wynn

9   Resorts' gaming licenses lacked a sound foundation and was made without a thorough and

10  complete review of relevant law, facts, and evidence.

11       169.   In addition or alternatively, Aruze USA and Universal seek a judicial

12  declaration that the Board resolution to redeem Aruze USA's shares was procedurally

13  and/or substantively defective, and contrary to law and public policy.  As alleged in detail

14  above, this declaration is appropriate because (1) the Stockholders Agreement bars

15  redemption of the Wynn Resorts stock owned by Aruze USA; (2) the redemption

16  provision in the Articles of Incorporation is inapplicable to the Wynn Resorts stock owned

17  by Aruze USA because Aruze USA entered into the Contribution Agreement, which

18  prevented any further restrictions without agreement of the parties, before the enactment

19  of the redemption provision, and Wynn Directors' acts were *ultra vires*; (3) the Board

20  lacked a sufficient basis for a finding of "unsuitability" or redemption and made its

21  findings without a thorough and complete review of relevant law, facts, and evidence; (4)

22  the redemption provision in the Articles of Incorporation is inconsistent with Nevada law

23  and public policy, and thus void; and, (5) the redemption provision, as written and as

24  applied, is unconscionable.

25       170.   Alternatively, to the extent that redemption is not otherwise barred, Aruze

26  USA and Universal seek a judicial declaration that the form and amount of compensation

27  paid for Aruze USA's shares was improper and/or inadequate and that Aruze USA is

28  entitled to cash in an amount equivalent to at least the closing price of the stock on

-46-

COUNTERCLAIM AND ANSWER

February 17, 2012.  As alleged in detail above, this declaration is appropriate because simply converting Wynn Resorts' largest shareholder to Wynn Resorts' largest creditor serves no valid legal purpose.  Furthermore, the valuation by Moelis was not objective, independent, or the product of sound financial analysis, and, among other things, did not consider material non-public information available to Wynn Resorts that would militate in favor of a higher valuation, did not account for the premium that would be applied to such a large block of shares, and did not consider the extent to which transfer restrictions were not valid as to Aruze USA.

171.    Aruze USA and Universal bring this claim within the relevant statute of limitations under Nevada law, having discovered facts giving rise to this claim, including injury arising from the purported redemption of Aruze USA's shares of Wynn Resorts' stock, on or about February 18, 2012.  Despite having exercised reasonable diligence, Aruze USA and Universal did not and could not reasonably have discovered earlier the facts giving rise to this claim.

172.    An actual justifiable controversy has now arisen between the parties whose interests are adverse, and the dispute is ripe for adjudication.  Wynn Resorts acted unlawfully when it purported to "redeem" Aruze USA's equity interest in Wynn Resorts.

173.    It has been necessary for Aruze USA and Universal to retain the services of attorneys to prosecute this action, and Aruze USA and Universal are entitled to an award of the reasonable value of said services performed and to be performed in a sum to be determined.

## COUNT II

### Permanent Prohibitory Injunction

### (By Aruze USA Against Wynn Resorts and the Wynn Directors)

174.    Aruze USA reasserts and realleges Paragraphs 4 through 164 above as if set forth in full below.

175.    Aruze USA seeks a permanent injunction enjoining and restraining Wynn

-47-

1  Resorts and the Wynn Directors, their agents, servants, employees, attorneys, and all those

2  acting in concert or in active participation with Wynn Resorts, from enforcing a

3  redemption notice upon Aruze USA, and from engaging in any efforts to redeem Aruze

4  USA's equity holdings in Wynn Resorts, including but not limited to making any demands

5  that Aruze USA surrender its Wynn Resorts stock, instructing any transfer agent for Wynn

6  Resorts stock to effect any transfer or cancellation of Aruze USA's Wynn Resorts stock,

7  and/or making any other changes to Wynn Resorts' stock ledger regarding Aruze USA's

8  stock.

9       176.   For the reasons alleged above, the purported redemption is invalid as a

10  matter of law and violated applicable contracts, and/or depends on provisions of contracts

11  that are unenforceable as a matter of law.  Even if there were a potentially valid legal

12  mechanism to redeem Aruze USA's stock, which there is not, redemption would be

13  inappropriate in this case because the Board lacked sufficient basis to find Aruze USA or

14  any of its affiliates or employees "unsuitable."

15      177.   Harm will result if relief is not granted because Aruze USA's interest in

16  Wynn Resorts is not fungible and Aruze USA's status as the largest shareholder in Wynn

17  Resorts cannot be fully remedied through damages.

18      178.   Injunctive relief poses no appreciable risk of undue prejudice to Wynn

19  Resorts and the Wynn Directors.

20      179.   Aruze USA brings this claim within the relevant statute of limitations under

21  Nevada law, having discovered facts giving rise to this claim, including injury arising

22  from the purported redemption of Aruze USA's shares of Wynn Resorts' stock, on or

23  about February 18, 2012.  Despite having exercised reasonable diligence, Aruze USA did

24  not and could not reasonably have discovered earlier the facts giving rise to this claim.

25      180.   It has been necessary for Aruze USA to retain the services of attorneys to

26  prosecute this action, and Aruze USA is entitled to an award of the reasonable value of

27  said services performed and to be performed in a sum to be determined.

28

-48-

COUNTERCLAIM AND ANSWER