LIONEL SAWYER & COLLINS
Samuel S. Lionel (SBN #1766)
Paul R. Hejmanowski (SBN #94)
Charles H. McCrea, Jr. (SBN #104)
1700 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101
Telephone:    (702) 383-8888
Facsimile:    (702) 383-8845

PAUL HASTINGS LLP
William F. Sullivan*
Thomas A. Zaccaro*
Howard M. Privette*
Thomas P. O'Brien*
John S. Durrant*
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Telephone:    (213) 683-6000
Facsimile:    (213) 683-0705

DAVIS POLK & WARDWELL LLP
Linda Chatman Thomsen**
Paul Spagnoletti**
Greg D. Andres**
450 Lexington Avenue
New York, NY 10017
Telephone:    (212) 450-4000
Facsimile:    (212) 701-5800

Attorneys for Defendants and Counterclaimants
ARUZE USA, INC. and UNIVERSAL
ENTERTAINMENT CORPORATION
* admitted pro hac vice
** will comply with Local Rule 10-2 governing pro hac
vice petitions within the require timeframe

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| WYNN RESORTS, LIMITED, a Nevada Corporation, | CASE NO: |
| Plaintiff, | |
| vs. | **FIRST AMENDED COUNTERCLAIM OF ARUZE USA, INC. AND UNIVERSAL ENTERTAINMENT CORP.** |
| KAZUO OKADA, an individual, ARUZE USA, INC., a Nevada corporation, UNIVERSAL ENTERTAINMENT CORP., a Japanese corporation, | |
| Defendants. | **JURY DEMAND** |

1

2   ARUZE USA, INC., a Nevada corporation
    and UNIVERSAL ENTERTAINMENT
3   CORP., a Japanese corporation

4                           Counterclaimants,
    vs.
5
    WYNN RESORTS, LIMITED, a Nevada
6   corporation, STEPHEN A. WYNN, an
    individual, KIMMARIE SINATRA, an
7   individual, LINDA CHEN, an individual,
    RAY R. IRANI, an individual, RUSSELL
8   GOLDSMITH, an individual,  ROBERT J.
    MILLER, an individual, JOHN A.
9   MORAN, an individual, MARC D.
    SCHORR, an individual, ALVIN V.
10  SHOEMAKER, an individual, D. BOONE
    WAYSON, an individual, ELAINE P.
11  WYNN, an individual, ALLAN ZEMAN,
    an individual,
12
                            Counterdefendants.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

COUNTERCLAIM ...........................................................................................1

JURISDICTION AND VENUE...................................................................... 1

NATURE OF THE ACTION .......................................................................... 2

PARTIES ........................................................................................................4

GENERAL ALLEGATIONS........................................................................... 6

I.     KAZUO OKADA AND STEVE WYNN LAUNCH WYNN RESORTS ............. 6

       A.     Turned Out By Mirage Resorts, Steve Wynn Turns to Kazuo Okada
              to Finance the New Wynn Project.................................................. 6

       B.     The Stockholders Agreement ....................................................... 8

       C.     Wynn Resorts' Original Articles of Incorporation................................ 10

       D.     The Contribution Agreement ...................................................... 10

       E.     After Securing Aruze USA's Contribution, Steve Wynn Unilaterally
              Amends the Articles of Incorporation........................................... 11

       F.     Wynn Resorts Goes Public.......................................................... 13

       G.     The Close and Trusting Relationship of Steve Wynn and Kazuo
              Okada............................................................................... 14

II.    UNIVERSAL DISCLOSES AND ULTIMATELY PURSUES FOREIGN
       DEVELOPMENT PROJECTS ..................................................................... 15

       A.     In 2007, Universal Fully Discloses to Wynn Resorts Its Interest In
              Pursuing a Casino Project in the Philippines ................................. 15

       B.     With the Blessing of Wynn Resorts, Universal Commits Significant
              Funds and Energy to the Philippine Project.................................. 17

       C.     Steve Wynn and Elaine Wynn Divorce.......................................... 17

       D.     Steve Wynn and Kazuo Okada Visit the Philippines in 2010, as
              Wynn Resorts Considers Involvement with the Philippine Project............ 19

       E.     Over Kazuo Okada's Objection, Wynn Resorts Makes an
              Unprecedented $135 Million Donation For Wynn Macau ..................... 21

       F.     Steve Wynn and Kim Sinatra Fraudulently Promise Kazuo Okada
              Financing for the Philippine Project............................................. 22

       G.     The Chair of Universal's and Aruze Gaming America's Compliance
              Committee Resigns................................................................. 26

-i-

# TABLE OF CONTENTS
## (continued)

Page

III.   STEVE WYNN DIRECTS WYNN RESORTS TO CONDUCT A
PRETEXTUAL INVESTIGATION FOR THE PURPOSE OF
REDEEMING ARUZE USA'S SHARES ............................................................ 27

    A.   Wynn Resorts Seeks Kazuo Okada's Resignation and Threatens
Redemption in an Attempt to Secure a Personal Benefit for Steve
Wynn ............................................................................................................ 27

    B.   Steve Wynn and Kim Sinatra Try to Intimidate and Threaten
Kazuo Okada, While Hiding Supposed Evidence of Wrongdoing ........... 29

    C.   A Letter From Steve Wynn's Outside Lawyer Confirms that, While
Wynn Resorts Had Already Determined the Outcome, a Pretextual
"Investigation" was Only Just Starting ...................................................... 31

    D.   Wynn Resorts Refuses to Allow Kazuo Okada and Aruze USA to
Review Any Supposed "Evidence" ............................................................. 31

    E.   The Board Summarily Removes Kazuo Okada As Vice-Chairman .......... 32

    F.   Kazuo Okada Seeks More Information Regarding Wynn Macau ............. 32

    G.   Aruze USA Nominates Directors, But Steve Wynn Refuses to
Endorse Them Despite His Obligation to Do So ....................................... 33

    H.   The Freeh Investigation Proceeds Without Seeking Any Input From
Kazuo Okada .............................................................................................. 33

    I.   Freeh Sporkin Refuses to Provide Meaningful Information Regarding
the Investigation to Kazuo Okada ............................................................. 34

    J.   Kazuo Okada Voluntarily Sits For A Full-Day Interview With Freeh
Sporkin ....................................................................................................... 35

    K.   Wynn Resorts Allows No Opportunity for A Reasonable Response ........ 36

    L.   Steve Wynn Hurriedly Schedules Board of Directors Meeting ................ 39

    M.   Steve Wynn Tries to Use the Threat of Redemption to Buy Aruze
USA's Stock at a Substantial Discount ...................................................... 39

IV.   WYNN RESORTS' UNFOUNDED AND UNPRECEDENTED
REDEMPTION OF MORE THAN $2.7 BILLION OF ARUZE USA'S
SHARES .............................................................................................................. 40

    A.   Wynn Resorts Publicly Asserts That the Value of Aruze USA's Stock
Is $2.9 Billion ............................................................................................ 40

    B.   The Board Hurriedly Meets and Rushes to Redeem Aruze USA's
Stock ........................................................................................................... 40

1
2

# TABLE OF CONTENTS
## (continued)

Page

3   C.   Aruze USA Disputes That Redemption Has Occurred .............................. 43

4   D.   The Board Redeems on False Premises ...................................... 43

5
6
7
    E.   Even if Aruze USA Was Subject to the Redemption Provision (Which it is Not), the Unilateral Blanket 30% Discount that Wynn Resorts Applied to the Stock is Erroneous and the Promissory Note is Unconscionably Vague, Ambiguous, and Oppressive .............................. 44

8
9
    F.   The Timing of the Redemption Demonstrates that Wynn Resorts Redeemed Aruze USA's Shares Based on Material, Non-Public Information that Was Not Incorporated Into the Redemption Price .......... 46

10  CLAIMS FOR RELIEF ...................................................... 49

    COUNT I ............................................................... 49
11
12
    Declaratory Relief  (By Aruze USA and Universal Against Wynn Resorts and the Wynn Directors) ...................................... 49

13  COUNT II .............................................................. 51
14
    Permanent Prohibitory Injunction  (By Aruze USA Against Wynn Resorts and the Wynn Directors) ...................................... 51
15
16  COUNT III ............................................................. 53

    Permanent Mandatory Injunction (By Aruze USA Against Wynn Resorts and the Wynn Directors) ...................................... 53
17
18  COUNT IV .............................................................. 54
19
    Breach of Contract in Connection with Wynn Resorts' Involuntary Redemption (By Aruze USA Against Wynn Resorts) ........................... 54

20  COUNT V ............................................................... 55

21
22
    Breach of Articles of Incorporation/Breach of Contract in Connection with Wynn Resorts' Discounting Method of Involuntary Redemption (By Aruze USA Against Wynn Resorts) ...................................... 55

23  COUNT VI .............................................................. 57
24
    Breach of Fiduciary Duty (By Aruze USA Against the Wynn Directors)............ 57
25  COUNT VII ............................................................. 59
26
    Imposition of a Constructive Trust and Unjust Enrichment (By Aruze USA Against Wynn Resorts)...................................... 59
27  COUNT VIII............................................................. 60
28
    Conversion  (By Aruze USA Against Wynn Resorts) ......................... 60

-iii-

**TABLE OF CONTENTS**
**(continued)**

                                                                              Page

COUNT IX ...................................................................................................... 61

    Violations Of Nevada's Racketeer Influenced And Corrupt Organizations
    Act (RICO) (N.R.S. § 207.350, *Et. Seq.*) (By Aruze USA Against Steve
    Wynn And Kim Sinatra) ......................................................................... 61

COUNT X ........................................................................................................ 65

    Fraud/Fraudulent Misrepresentation in Connection with Financing for Aruze
    USA (By Aruze USA Against Wynn Resorts, Steve Wynn, and Kim
    Sinatra) ................................................................................................... 65

COUNT XI ...................................................................................................... 67

    Negligent Misrepresentation in Connection with Financing for Aruze USA
    (By Aruze USA Against Wynn Resorts, Steve Wynn, and Kim Sinatra)............ 67

COUNT XII ..................................................................................................... 69

    Civil Conspiracy in Connection with Financing for Aruze USA (By Aruze
    USA Against Steve Wynn and Kim Sinatra) ......................................... 69

COUNT XIII .................................................................................................... 72

    Promissory Estoppel in Connection with Financing for Aruze USA (By
    Aruze USA Against Wynn Resorts, Steve Wynn, and Kim Sinatra).................... 72

COUNT XIV ................................................................................................... 74

    Fraud/Fraud in the Inducement of the Contribution Agreement (By Aruze
    USA Against Wynn Resorts and Steve Wynn) ..................................... 74

COUNT XV...................................................................................................... 77

    Negligent Misrepresentation in Connection with the Contribution
    Agreement (By Aruze USA Against Wynn Resorts and Steve Wynn) ............... 77

COUNT XVI ................................................................................................... 79

    Breach of Contract in Connection with the Stockholders Agreement (By
    Aruze USA Against Steve Wynn) .......................................................... 79

COUNT XVII .................................................................................................. 81

    Breach of Covenant of Good Faith and Fair Dealing in Stockholders
    Agreement (By Aruze USA Against Steve Wynn) ............................... 81

COUNT XVIII................................................................................................. 82

    Claim for Violations of Section 10(b) of the Securities Exchange Act of
    1934 and SEC Rule 10b-5(a) Promulgated Thereunder (By Aruze USA
    Against Wynn Resorts and Steve Wynn) ............................................... 82

**TABLE OF CONTENTS**
**(continued)**

Page

COUNT XIX ....................................................................................................... 87

    Claim for Violations of Section 10(b) of the Securities Exchange Act of
    1934 and SEC Rule 10b-5(c) Promulgated Thereunder (By Aruze USA
    Against Wynn Resorts and Steve Wynn) ................................................. 87

COUNT XX ......................................................................................................... 91

    Claim for Violations of Section 10(b) of the Securities Exchange Act of
    1934 and SEC Rule 10b-5(b) Promulgated Thereunder (By Aruze USA
    Against Wynn Resorts and Steve Wynn) ................................................. 91

COUNT XXI ........................................................................................................ 95

    Claim for Violations of Section 20(a) of the Securities Exchange Act of
    1934 and SEC Rule 10b-5 Promulgated Thereunder (By Aruze USA
    Against Steve Wynn) ............................................................................... 95

COUNT XXII ....................................................................................................... 95

    Unconscionability/Reformation of Promissory Note (By Aruze USA
    Against Wynn Resorts) ............................................................................ 95

PRAYER FOR RELIEF ....................................................................................... 97

JURY DEMAND .................................................................................................. 97

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNTERCLAIM**

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over this Counterclaim pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa; 28 U.S.C. § 1331; and 28 U.S.C. § 1367.

2.      The claims asserted herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240 10b-5, the Nevada Racketeer Influenced and Corrupt Organizations Act ("RICO"), N.R.S. § 207.400 *et seq.*, and Nevada statutory and common law.  Additionally, the claims asserted in this action raise substantial federal questions under the Foreign Corrupt Practices Act of 1977 ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.*

3.      Venue is proper in this District pursuant to:  (i) 15 U.S.C. § 78aa, because this is the District in which acts constituting the violation occurred and in which Defendants transact business; and (ii) 28 U.S.C. § 1391(b)(2), because this is a District in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated.

FIRST AMENDED COUNTERCLAIM

**NATURE OF THE ACTION**

4.      Plaintiff and Counterdefendant Wynn Resorts, Limited ("Wynn Resorts" or the "Company") initiated this litigation on the same night it claims to have forcibly purchased (*i.e.*, "redeemed") nearly 20% of its own common stock held by its largest shareholder, Counterclaimant Aruze USA, Inc. ("Aruze USA").  Wynn Resorts understood that, as soon as it became known that it was doing this, Aruze USA would sue Wynn Resorts and the Wynn Directors.[1]  Wynn Resorts had undertaken the redemption in the dead of night through a rushed and secretive process.

5.      Among other things, Wynn Resorts purported to redeem the shares at a flat 30% discount to the most recent market price.  Aruze USA's interests, valued by the market at more than $2.7 billion and by Wynn Resorts at $2.9 billion three weeks prior to the redemption, would be forcibly purchased in exchange for a non-transferable promissory note to pay approximately $1.9 billion in a single "balloon payment" 10 years from now.  So Wynn Resorts raced to court, electronically filing a complaint at 2:14 a.m. on a Sunday morning – even before giving notice to Aruze USA of the purported redemption.  Wynn Resorts apparently thought that its position as the named "plaintiff" would help obfuscate the issues and distract the court from the claims of wrongdoing sure to be filed against it by Aruze USA and Counterclaimant Universal Entertainment Corporation ("Universal" and collectively with Aruze USA, "Counterclaimants").  Wynn Resorts' cynical tactics are unavailing.  Based on the facts and the law, it is clear that it is Counterclaimants who have been grievously damaged in this case, and any suggestion to the contrary is entirely without credibility.

6.      This Counterclaim arises because this purported redemption would:

(a) violate the express terms of agreements between Wynn Resorts and Aruze USA;

---

[1] The Wynn Resorts' Board of Directors (the "Board"), other than Kazuo Okada ("Kazuo Okada" and "Mr. Okada"), are Stephen A. Wynn ("Mr. Wynn" or "Steve Wynn"), Linda Chen, Russell Goldsmith, Ray R. Irani, Robert J. Miller, John A. Moran, Marc D. Schorr, Alvin V. Shoemaker, Boone Wayson, Elaine P. Wynn, and Allan Zeman (the "Wynn Directors").

1  (b) allow Mr. Wynn and others to profit unjustly from their illegal acts and a process that

2  was corrupt and unfair; and (c) subject Aruze USA to an unconscionably punitive remedy

3  based on an unproven pretext.

4        7.     To be clear at the outset, Aruze USA disputes that any redemption has

5  occurred.  Among other things, even if the redemption provision in the Company's

6  Second Amended Articles of Incorporation ("Articles of Incorporation") was legally

7  enforceable (which it is not), the Board's vote of redemption is void *ab initio*, because

8  Wynn Resorts is barred by contract from redeeming Aruze USA's securities.

9  Aruze USA's stock has never been subject to the redemption provision in the Company's

10  Articles of Incorporation, because Aruze USA agreed to purchase Wynn Resorts' stock

11  **before** the redemption provision became effective.  As a threshold matter, then, the

12  applicable contracts relied upon by Wynn Resorts to justify its conduct actually bar Wynn

13  Resorts' purported redemption of Aruze USA's stock.  In addition, according to Wynn

14  Resorts, the stock held by Aruze USA is subject to transfer restrictions in a stockholders

15  agreement (the "Stockholders Agreement").  The transfer restrictions in the Stockholders

16  Agreement (to which Wynn Resorts agreed to be bound), if valid, preclude any

17  redemption of Aruze USA's stock.

18        8.     Even if the Articles of Incorporation allowed the redemption of

19  Aruze USA's interests in Wynn Resorts (which they do not), there was no legitimate

20  factual or legal basis to invoke the redemption provision in this case.  Wynn Resorts

21  undertook a secret investigation, hiding the subjects of the investigation from Aruze USA

22  by erroneously invoking attorney-client privilege and confidentiality, even after Wynn

23  Resorts had leaked a "report" of the investigation to the *Wall Street Journal*.  Wynn

24  Resorts refused Aruze USA any reasonable opportunity to respond prior to redeeming

25  Aruze USA's interests, despite prior written promises to do so.  If Wynn Resorts had

26  provided the opportunity, it would be clear why redemption is unwarranted.

27        9.     The Wynn Directors breached their fiduciary duties to Wynn Resorts and to

28  Aruze USA in not undertaking a thorough, independent, and objective examination of the

-3-

FIRST AMENDED COUNTERCLAIM

law, facts, and evidence before purporting to usurp the role of the gaming authorities in finding Aruze USA "unsuitable."  Similarly, they breached their duties by then voting for a wholly unnecessary and improper "redemption" on unconscionable terms.  As a result, the Wynn Directors cannot rely on the "business judgment rule," as they did not act in a fully informed, good faith, and independent manner, and their actions are both contrary to the law and not objectively reasonable.

10.     Apart from the lack of any legal basis for Wynn Resorts' actions, Aruze USA sues because Wynn Resorts, for all its accomplishments, is not a corporation in any ordinary sense.  Rather, Wynn Resorts' flamboyant Chairman, Mr. Wynn, has run Wynn Resorts as a personal fiefdom, packing the Board with friends who do his personal bidding, and paying key executives exorbitant amounts for their unwavering fealty.

11.     In the course of trying to illegally force out Aruze USA as Wynn Resorts' largest stockholder, Mr. Wynn and Wynn Resorts' General Counsel Kimmarie Sinatra ("Kim Sinatra" or "Ms. Sinatra") committed a series of predicate acts of racketeering, which include fraud, acquiring property under false pretenses, acquiring signatures under false pretenses, and other similar wrongful activities.  Mr. Wynn and Ms. Sinatra executed on a scheme and pattern of racketeering activity, the aim of which was to defraud, defame, and steal from Aruze USA and its President, Mr. Okada, by taking Aruze USA's interest in Wynn Resorts for the purpose of illegally placing and maintaining the control of Wynn Resorts in a single man – Mr. Wynn.  The wrongful acts complained of here cannot be countenanced, and the purported taking of Aruze USA's property cannot stand.

## PARTIES

12.     Counterclaimant Aruze USA is a company organized and existing under the laws of the State of Nevada and is a wholly-owned subsidiary of Universal.  Aruze USA has its principal place of business in Las Vegas, Nevada.  Aruze USA has been found suitable by the Nevada Gaming Commission as a stockholder of Wynn Resorts.  Aruze USA owns 24,549,222 shares or 19.66% of the total outstanding stock of Wynn Resorts, making it the largest single owner of Wynn Resorts' stock.

-4-

13.     Counterclaimant Universal (f/k/a Aruze Corp.) is a corporation organized and existing under the laws of Japan.  Universal manufactures and sells pachislot and pachinko machines.  Universal is registered with the Nevada Gaming Commission, and has been deemed suitable by the Nevada Gaming Commission as a 100% shareholder of Aruze USA.  Mr. Okada is the Chairman of the Board of Universal.

14.     Counterdefendant Wynn Resorts is a corporation organized and existing under the laws of the State of Nevada with its principal place of business in Las Vegas, Nevada.  Wynn Resorts' stock is publicly traded on NASDAQ under the ticker symbol "WYNN."

15.     Counterdefendant Stephen A. Wynn is the Chairman of the Board and Chief Executive Officer of Wynn Resorts and is a resident of Nevada.  Mr. Wynn owns 10,026,708 shares of the common stock of Wynn Resorts.[2]

16.     Counterdefendant Kimmarie Sinatra is the General Counsel, Secretary, and a Senior Vice President of Wynn Resorts and, on information and belief, is a resident of Nevada.  Ms. Sinatra owns 40,887 shares of the common stock of Wynn Resorts.

17.     Counterdefendant Elaine P. Wynn is a director of Wynn Resorts and, on information and belief, is a resident of Nevada.  Elaine Wynn is Mr. Wynn's ex-spouse. Elaine Wynn owns 9,742,150 shares of the common stock of Wynn Resorts.

18.     Counterdefendant Linda Chen is a director of Wynn Resorts and, on information and belief, is a resident of Macau.  Ms. Chen owns 265,000 shares of the common stock of Wynn Resorts.

19.     Counterdefendant Ray R. Irani is a director of Wynn Resorts and, on information and belief, is a resident of California.  Mr. Irani owns 18,000 shares of the common stock of Wynn Resorts.

---

[2] All references to the number of shares owned by Counterdefendants are as of March 1, 2012, as disclosed in Wynn Resorts' Schedule 14A Proxy Statement, filed with the SEC on March 7, 2012.

FIRST AMENDED COUNTERCLAIM

20.     Counterdefendant Russell Goldsmith is a director of Wynn Resorts and, on information and belief, is a resident of California.  Mr. Goldsmith owns 40,000 shares of the common stock of Wynn Resorts.

21.     Counterdefendant Robert J. Miller is a director of Wynn Resorts and, on information and belief, is a resident of Nevada.  Mr. Miller owns 20,500 shares of the common stock of Wynn Resorts.

22.     Counterdefendant John A. Moran is a director of Wynn Resorts and, on information and belief, is a resident of Florida.  Mr. Moran owns 190,500 shares of the common stock of Wynn Resorts.

23.     Counterdefendant Marc D. Schorr is a director and Chief Operating Officer of Wynn Resorts and, on information and belief, is a resident of Nevada.  Mr. Schorr owns 250,000 shares of the common stock of Wynn Resorts.

24.     Counterdefendant Alvin V. Shoemaker is a director of Wynn Resorts and, on information and belief, is a resident of New Jersey.  Mr. Shoemaker owns 40,500 shares of the common stock of Wynn Resorts.

25.     Counterdefendant D. Boone Wayson is a director of Wynn Resorts and, on information and belief, is a resident of Maryland.  Mr. Wayson owns 90,500 shares of the common stock of Wynn Resorts.

26.     Counterdefendant Allan Zeman is a director of Wynn Resorts and, on information and belief, is a resident of Macau.  Mr. Zeman owns 30,500 shares of the common stock of Wynn Resorts.

## GENERAL ALLEGATIONS

### I.     KAZUO OKADA AND STEVE WYNN LAUNCH WYNN RESORTS

#### A.     Turned Out By Mirage Resorts, Steve Wynn Turns to Kazuo Okada to Finance the New Wynn Project

27.     Mr. Wynn has a long history of involvement in Las Vegas as a casino operator.  As Las Vegas changed, Mr. Wynn sought to present himself as a representative of the new "corporate" Las Vegas.  Mr. Wynn developed Mirage Resorts, Inc., a casino

FIRST AMENDED COUNTERCLAIM

conglomerate that owned and operated the Mirage, Treasure Island, and Bellagio.  On

May 31, 2000, MGM Grand Inc. completed a merger with Mirage Resorts, Inc.  In June

2000, after a bruising boardroom battle, which centered on allegations that Mr. Wynn

misappropriated company funds, MGM Grand, Inc. ousted Mr. Wynn as Chief Executive

Officer of Mirage Resorts, Inc.

28.  Humiliated by his public ouster, Mr. Wynn was anxious to re-enter the

casino business and rebuild his reputation and standing in Las Vegas.  He purchased the

old Desert Inn casino and had plans to build a new casino on the site – it was to be a

monument to himself, called "Wynn."  But Mr. Wynn lacked the capital to fund the

development of the casino, so he undertook an extensive search for investors.  Having

recently been forced out of Mirage Resorts, Inc., however, he was shunned by other

sources of capital; Mr. Wynn eventually called on Universal, Aruze USA, and Mr. Okada,

to become the means for Mr. Wynn to get back on his feet.

29.  Mr. Okada was and is a highly successful Japanese entrepreneur and himself

a pioneer in the gaming industry.  After leaving high school, Mr. Okada attended an

electronics trade school.  In 1969, Mr. Okada founded Universal Lease Co. Ltd., which is

now Universal.  Mr. Okada became a leader in the businesses of pachinko.  In addition,

Mr. Okada founded a company that created one of the first video poker machines.  In fact,

Mr. Wynn originally met Mr. Okada when one of Mr. Okada's affiliated companies,

Aruze Gaming America, was selling electronic gaming machines in Nevada.

30.  Beginning in October 2000, Mr. Wynn used a Nevada limited liability

company called Valvino Lamore, LLC ("Valvino") as the holding entity for his new

Desert Inn casino project.  After in-person discussions between Mr. Wynn and Mr. Okada,

Aruze USA made a contribution of $260 million in cash to Valvino in exchange for 50%

of the membership interests in Valvino effective October 3, 2000.  This contribution was

the seed capital that allowed for the development of what is now Wynn Resorts.  Valvino

is referred to by Wynn Resorts as Wynn Resorts' "predecessor."

FIRST AMENDED COUNTERCLAIM

31.     In April 2002, Aruze USA made two additional contributions totaling $120 million to Valvino.  Mr. Wynn told Mr. Okada that $30 million was related to Macau, but Mr. Wynn did not explain to Mr. Okada how Mr. Wynn actually spent the money. Serious questions now exist about how Mr. Wynn used the money and whether Mr. Wynn used the funds for his personal benefit and/or for other inappropriate purposes.  There are also serious questions about the use of the other $90 million Aruze USA contributed.

**B.     The Stockholders Agreement**

32.     In 2002, all three owners of LLC interests in Valvino – Mr. Wynn, Aruze USA, and Baron Asset Fund[3] – understood that the Wynn organization was planning to go public as Wynn Resorts.  This required a series of legal steps by which the owners' interests in Valvino were converted into shares of a newly formed corporation, "Wynn Resorts, Limited," that could then sell additional shares to the public.

33.     On April 11, 2002, prior to the filing of the Articles of Incorporation for Wynn Resorts, the three owners of LLC interests in Valvino – Mr. Wynn, Aruze USA, and Baron Asset Fund – entered into the Stockholders Agreement, which imposed certain restrictions on the sale of the stock they were to receive in "NewCo," the entity that would become Wynn Resorts.  As described in Wynn Resorts' prospectus, dated October 29, 2002, "the stockholders agreement establishes various rights among Mr. Wynn, Aruze USA and Baron Asset Fund with respect to the ownership and management of Wynn Resorts."

34.     Notably, the parties to the Stockholders Agreement stated that the terms of that agreement were a condition of transferring their LLC interests in Valvino to Wynn Resorts.  Specifically, the Stockholders Agreement stated "as a condition to their willingness to form [Wynn Resorts], either through the contribution of their interests in

---

[3] Baron Asset Fund is a Massachusetts business trust comprised of a series of funds.  It became a member of Valvino pursuant to the First Amendment to Amended and Restated Operating Agreement of Valvino Lamore, LLC, dated April 16, 2001.

FIRST AMENDED COUNTERCLAIM

1    the LLC or through a different technique, the Stockholders are willing to agree to the

2    matters set forth" in the Stockholders Agreement.

3         35.    Wynn Resorts publicly acknowledged the impact of the Stockholders

4    Agreement on the Company and the shareholders, disclosing in Wynn Resorts' Form S-

5    1/A filed with the SEC on October 7, 2002 that the Stockholders Agreement established

6    "restrictions on the transfer of the shares of Wynn Resorts' common stock owned by the

7    parties to the stockholders agreement."  In this way, Wynn Resorts – and all other

8    stockholders – were aware that there were limitations written in the Stockholders

9    Agreement on the transferability of the Wynn Resorts' stock held by Aruze USA.

10        36.    The Stockholders Agreement contained certain transfer restrictions on shares

11   held by Aruze USA.  The agreement defined a "[t]ransfer" as "any . . . disposition, either

12   voluntary or *involuntary*" (emphasis added).  The agreement provided that such securities

13   may only be transferred to Mr. Okada, an immediate family member of Mr. Okada, a

14   family trust, or a company related to Aruze USA.  No other transfers were allowed.  For

15   example, there is no provision that would allow Wynn Resorts to buy or take, or redeem

16   the securities.  To the contrary, the Stockholders Agreement expressly made **any** transfer

17   of shares – including any involuntary transfers – in violation of the Agreement "null and

18   void *ab initio*."  As explained in further detail below, because Wynn Resorts expressly

19   adopted this transfer restriction at the time of the contribution of Aruze USA's LLC

20   interests in Valvino, and Wynn Resorts asserts that these transfer restrictions are legally

21   valid, Wynn Resorts had no legal right or ability to redeem Aruze USA's interests in

22   Wynn Resorts.

23        37.    Apart from removing Aruze USA from the purview of later-adopted

24   redemption provisions in Wynn Resorts' Articles of Incorporation, the Stockholders

25   Agreement also contained provisions that allowed Mr. Wynn to nominate a bare majority

26   of directors, and Aruze USA to nominate all remaining directors.  Although Aruze USA

27   repeatedly tried over the years to nominate directors, Mr. Wynn refused to allow this to

28

-9-

FIRST AMENDED COUNTERCLAIM

1  happen, instead nominating all of the directors himself to ensure and perpetuate his
2  complete control of the Board.

3      38.    Finally, the Stockholders Agreement gave Mr. Wynn the power of attorney
4  to sign all documentation necessary to transfer Aruze USA's LLC interests in Valvino to
5  Wynn Resorts in exchange for Wynn Resorts' stock, and thereby created a fiduciary duty
6  as between Mr. Wynn and Aruze USA.

7      39.    On November 8, 2006, Mr. Wynn caused Aruze USA to enter into an
8  Amendment to the Stockholders Agreement which purports to contain a mutual restriction
9  on the sale of stock without the other party's written consent.  All other relevant terms of
10 the Stockholders Agreement remained unchanged.

11     **C.    Wynn Resorts' Original Articles of Incorporation**

12     40.    On June 3, 2002, Mr. Wynn, on behalf of Wynn Resorts, caused the filing of
13 the Company's initial Articles of Incorporation.  Those Articles of Incorporation did not
14 include any provision establishing Wynn Resorts' purported right to redeem shares held
15 by "Unsuitable Person[s]."

16     41.    Echoing a false statement made in a February 19, 2012 Wynn Resorts press
17 release, Matt Maddox, Wynn Resorts' Chief Financial Officer and Treasurer, erroneously
18 stated in a conference call with investors on February 21, 2012, that the redemption
19 provision in the Articles of Incorporation had "been there since the Company's
20 inception."

21     **D.    The Contribution Agreement**

22     42.    Before Wynn Resorts could go public, the LLC interests in Valvino held by
23 Mr. Wynn, Aruze USA, and Baron Asset Fund had to be transferred to the new Wynn
24 Resorts entity.  This was no small matter.  By this point, Aruze USA had contributed
25 some $380 million in exchange for its LLC interests in Valvino.

26     43.    On June 11, 2002, Wynn Resorts, Mr. Wynn, Aruze USA, Baron Asset
27 Fund, and the Kenneth R. Wynn Family Trust entered into the Contribution Agreement
28 (the "Contribution Agreement"), by which they agreed to contribute all of the Valvino

FIRST AMENDED COUNTERCLAIM

1  membership interests to Wynn Resorts in exchange for the capital stock of Wynn Resorts.

2  The Wynn Resorts' stock acquired by Aruze USA was subject to the provisions of the

3  Stockholders Agreement.

4      44.    The Contribution Agreement made clear that Wynn Resorts could not later

5  enlarge its rights *vis-à-vis* the stock held by Aruze USA.  An integration clause stated:

6  
7  
8  
9  
10  
11
> *This Agreement, the Stockholders Agreement, and the Operating Agreement contain the entire understanding of the parties* with respect to the subject matter hereof or thereof. *There are no restrictions, agreements, promises, representations, warranties, covenants, or undertakings with respect to the subject matter hereof other than those expressly set forth or referred to herein or therein.*  This Agreement, *the Stockholders Agreement*, and the Operating Agreement supersede all prior agreements and understandings between the parties with respect to their subject matter.

12  (emphasis added) (The Contribution Agreement defined the "Stockholders Agreement" as

13  the agreement dated April 11, 2002, and "as it may be amended and/or restated from time

14  to time.").

15      45.    Wynn Resorts further agreed that the existing restrictions could be altered

16  only with Aruze USA's express written consent.  The Contribution Agreement stated:

17  
18
> This Agreement may *not be modified or amended* except by an instrument in *writing* signed by the corporation and all of the Holders.

19  (emphasis added).  Accordingly, Wynn Resorts cannot unilaterally impose a redemption

20  restriction on Aruze USA because such a provision is expressly precluded by the terms of

21  Wynn Resorts' agreements with Aruze USA.

22  **E.**    **After Securing Aruze USA's Contribution, Steve Wynn Unilaterally**
23         **Amends the Articles of Incorporation**

24      46.    After entering into the Contribution Agreement, but before transferring the

25  LLC interests in Valvino, Mr. Wynn unilaterally changed Wynn Resorts' Articles of

26  Incorporation to include a restriction that purportedly allows Wynn Resorts to "redeem"

27  stock held by Wynn Resorts' stockholders.  At this time, Mr. Wynn was the sole

28  stockholder and director of Wynn Resorts.  It was not until 2012, however, that Mr. Wynn

1  and Wynn Resorts attempted to apply this redemption restriction to Aruze USA's shares,

2  even though the Contribution Agreement precluded Wynn Resorts from unilaterally

3  adding restrictions to the shares.

4          47.     Under the Stockholders Agreement, Mr. Wynn had power of attorney to

5  transfer the LLC interests in Valvino to Wynn Resorts.  Although the Contribution

6  Agreement obligated Mr. Wynn to "as soon as practicable . . . deliver or cause to be

7  delivered to Holders certificates representing the Common Stock[,]" Mr. Wynn delayed

8  the contribution of the LLC interests in Valvino to Wynn Resorts.  On information and

9  belief, the final closing condition under the Contribution Agreement was met by July 9,

10  2002.  Nevertheless, Mr. Wynn's delay meant that, although he had already received

11  Aruze USA's commitment via the Contribution Agreement and the Stockholders

12  Agreement, Mr. Wynn would continue to maintain unilateral control over Wynn Resorts

13  for the period of the delay.  This enabled Mr. Wynn to improperly change the Company's

14  Articles of Incorporation in an apparent attempt to achieve Mr. Wynn's own long-term

15  interests at Aruze USA's expense.  This deliberate delay, and the intervening acts taken by

16  Mr. Wynn before he fulfilled the terms of the Contribution Agreement, breached Mr.

17  Wynn's fiduciary duties to Aruze USA.

18          48.     On September 10, 2002, Mr. Wynn unilaterally amended Wynn Resorts'

19  Articles of Incorporation.  Although this change would purport to fundamentally alter the

20  securities received by Aruze USA, Mr. Wynn made the change unilaterally, without

21  affording Aruze USA the opportunity to vote on the changes, let alone expressly consent

22  in writing to the added restrictions as required in the Contribution Agreement, in order to

23  make the provision enforceable.  The language Mr. Wynn unilaterally added to the

24  Articles of Incorporation provided, in pertinent part:

25

26

27

28

-12-

1
2
3
4

> The Securities Owned or Controlled by an Unsuitable Person or an Affiliate of an Unsuitable Person shall be subject to redemption by the Corporation, out of funds legally available therefor, by action of the board of directors, to the extent required by the Gaming Authority making the determination of unsuitability or to the extent deemed necessary or advisable by the board of directors. . . .

5   49.    If Mr. Wynn had done what he was bound to do pursuant to the trust and

6   duties placed in him under the Stockholders Agreement and Contribution Agreement, and

7   transferred the LLC interests in Valvino to Wynn Resorts **before** adding the redemption

8   restriction, Aruze USA would have had the right under Nevada law to vote on the changes

9   to Wynn Resorts' Articles of Incorporation.  Aruze USA relied on the absence of a

10  redemption restriction in making its sizable contribution of interests to Wynn Resorts.

11  Years later, in February 2012, Mr. Wynn and Wynn Resorts nevertheless falsely asserted

12  that the redemption provision applied to Aruze USA's stock and acted to redeem Aruze

13  USA's shares.  Prior to Wynn Resorts' improper attempt to apply the redemption

14  restriction to Aruze USA's stock, Aruze USA was not and could not have been aware that

15  Wynn Resorts would ever attempt to apply the redemption provision against Aruze USA.

16  Thus, although the first acts perpetrated in furtherance of this fraud occurred in 2002, the

17  misconduct did not cause harm until recently, when Wynn Resorts purported to use the

18  redemption provision to redeem Aruze USA's shares in 2012 for a fraction of their true

19  value.

20  **F.    Wynn Resorts Goes Public**

21  50.    On September 28, 2002, Mr. Wynn eventually contributed the LLC interests

22  in Valvino to Wynn Resorts.  Thereafter, on October 21, 2002, Mr. Okada became a

23  member of Wynn Resorts' Board.

24  51.    On October 25, 2002, Wynn Resorts conducted an initial public offering

25  ("IPO") on NASDAQ at $13 per share.  At this time, Mr. Okada and Mr. Wynn each

26  owned about 30% of the outstanding stock.  Shortly thereafter, Mr. Okada became Vice

27  Chairman of Wynn Resorts' Board.

28

-13-

52.     On April 28, 2005, Wynn Las Vegas opened.  It was an instant success.  On September 10, 2006, Wynn Resorts opened in Macau.  "Encore" hotels followed in both locations.  Again, each property has been very successful.  None of this success would have been possible without the capital funding, support, and expertise of Aruze USA and Mr. Okada.

53.     As one form of recognition for Aruze USA's contributions, Wynn Resorts included a high-end Japanese restaurant at both the Las Vegas and Macau resorts.  These restaurants were named "Okada."

**G.     The Close and Trusting Relationship of Steve Wynn and Kazuo Okada**

54.     Although they have very different backgrounds and educational experiences, both Mr. Wynn and Mr. Okada are of similar ages, interests, and ambitions.  Beyond their business dealings, Mr. Wynn gave every indication that he considered Mr. Okada to be a close personal friend, and repeatedly called him his "partner."

55.     For example, at hearings before the Nevada State Gaming Control Board and Nevada Gaming Commission, on June 4 and 17, 2004, respectively, Mr. Wynn affirmed that "Mr. Okada was not only suitable" to receive a gaming license "but he was desirable."  Repeatedly referring to Mr. Okada as his "partner," Mr. Wynn said Mr. Okada was "dedicated to the pursuit of excellence."

56.     In this sworn testimony, Mr. Wynn also affirmed Mr. Okada's generosity and unwavering trust in Mr. Wynn.  Mr. Wynn said "I have never dreamed that there would be a man as supportive, as long-term thinking, as selfless in his investment as Mr. Okada."  Mr. Wynn recalled a conversation with Mr. Okada on a plane from Macau to Tokyo:  Mr. Okada "told me the most important thing, Steve . . .  is the right thing.  Take the high road.  Do the right thing.  Don't worry about me.  I'll support any decision you may make."

57.     And, indeed, Mr. Okada trusted Mr. Wynn.  Mr. Wynn knew this, and callously and illegally set out to exploit this trust for his advantage.

## II.   UNIVERSAL DISCLOSES AND ULTIMATELY PURSUES FOREIGN DEVELOPMENT PROJECTS

### A.   In 2007, Universal Fully Discloses to Wynn Resorts Its Interest In Pursuing a Casino Project in the Philippines

58.   Universal and Mr. Okada first began exploring the possibility of acquiring and developing land in the Philippines in 2007, with one possible option for development being a casino and hotel resort. Although the initial discussions were preliminary, Mr. Okada brought the opportunity immediately to Mr. Wynn, hoping that Wynn Resorts might be interested in undertaking the project. Mr. Wynn told Mr. Okada that Wynn Resorts was not interested at that time in pursuing a project in the Philippines. However, Mr. Wynn voiced no concerns at all with Universal's pursuit of the project. Mr. Okada thereafter kept Mr. Wynn fully informed of the project's progress.

59.   On December 20, 2007, Universal publicly announced a planned casino project in the Asian market.

60.   On April 25, 2008, Universal announced its planned casino project in the Philippines.

61.   From that point on, Wynn Resorts and Universal had an agreement. Universal could pursue a project in the Philippines, but at least for the time being, it would not formally be a Wynn Resorts project. On a May 1, 2008 conference call with stock analysts, Mr. Wynn affirmed that Wynn Resorts' Board and management team had longstanding knowledge of and fully supported Universal's project in the Philippines:

> Well, first of all, I love Kazuo Okada as much as any man that I've ever met in my life. He's my partner and my friend. And there is hardly anything that I won't do for him. Now, we are not at the present time an investor, nor do we contemplate, an investment in the Philippines. *This is something that Kazuo Okada and his company, [Universal], has done on its own initiative. He consults me and has discussed it with me extensively and I've given him my own personal thoughts on the subject and advice. And, to the extent that he comes to me for any more advice or input, all of us here at the Company will be glad to give him our opinions.* But that's short of saying this is a Wynn Resorts project. It is a [Universal] project.

-15-

FIRST AMENDED COUNTERCLAIM

1

(emphasis added).

2

     62.    Importantly, Mr. Wynn voiced no concerns about the potential of the

3

Philippine project competing with Wynn Macau, Ltd. ("Wynn Macau").  As reflected in

4

his public statement to Wynn Resorts' shareholders and analysts, Mr. Wynn's attitude

5

reflected Wynn Resorts' official position on the Philippine project until at least late 2011

6

or early 2012 when Mr. Wynn decided to use it as a pretext to deprive Aruze USA of its

7

Wynn Resorts' stock.

8

     63.    As a further example of Wynn Resorts' knowledge and approval of

9

Universal and Aruze USA's activities in the Philippines, on April 4, 2008, Kevin Tourek,

10

a member of Wynn Resorts' Compliance Committee, emailed Frank Schreck, the then-

11

head of Universal's Compliance Committee.  The email was regarding Universal's

12

investment in the Philippines.  Mr. Tourek confirmed that – so long as Universal was in

13

compliance with the laws of the Philippines – the investment would not be something that

14

would concern Nevada regulators or Wynn Resorts.

15

     64.    Once again, on September 24, 2009, Wynn Resorts acknowledged

16

Universal's project in the Philippines.  Wynn Macau's IPO prospectus explicitly

17

acknowledged Universal's plans to develop a casino in the Philippines:

18

19

20

21

22

23

24

> In addition to its investment in Wynn Resorts, Limited,
> [Universal] has invested in the construction of a hotel casino
> resort in the Philippines, which is anticipated to open to the
> public in 2010.  Mr. Okada confirms that, as at the Latest
> Practicable Date, except for his indirect shareholding interests
> in Wynn Resorts, Limited through Aruze USA, Inc., neither he
> nor his associates holds, owns or controls more than 5%
> voting interests in an entity which, directly or indirectly,
> carries on, engages, invests, participates or otherwise is
> interested in any company, business or operation that
> competes, or is reasonably expected to compete, with the
> business carried on by us in Macau.

25

     65.    In this way, Wynn Macau's prospectus acknowledged and ratified

26

Universal's plans to open a casino in the Philippines and – by adopting Universal's

27

statement – affirmed that a casino in the Philippines will not materially compete with

28

Wynn Macau.

-16-

**B.      With the Blessing of Wynn Resorts, Universal Commits Significant Funds and Energy to the Philippine Project**

66.      As was disclosed fully to Wynn Resorts and the Nevada Gaming Commission, Universal went about the difficult process of acquiring land and approvals to build a casino in the Philippines.

67.      In 2008, after negotiations with private landowners that spanned several months, Universal purchased contiguous land in and about a special economic zone in Manila Bay that was specifically zoned for casinos.  It made this purchase with a Philippine-based partner, and at all times (contrary to statements in the Complaint and by Mr. Freeh) has complied with the laws of the Philippines requiring the citizenship for landholding.

68.      The Philippine government approached Universal as early as 2005 and courted Universal for years.  The Philippine government ultimately secured an agreement that Universal would employ significant numbers of local people to work in the casinos. Press reports estimated that Universal's project could create as many as 15,000 jobs for Filipinos, and generate billions of dollars in tax revenues for the Philippine government. When Universal delayed the project in the wake of the 2008 financial crisis, the Philippine government again stepped up its efforts to encourage Universal to advance the development of its project.  While Universal certainly expects the Manila Bay Project to be a "win-win" for the Philippines and Universal, the idea that Universal needed to curry special favor with Philippine government officials is profoundly mistaken.

**C.      Steve Wynn and Elaine Wynn Divorce**

69.      In March 2009, Mr. Wynn divorced Elaine Wynn.  The divorce proved to be damaging to Mr. Wynn's financial position and standing within Wynn Resorts.  By early 2010, Mr. Wynn had reached an agreement to split his ownership of Wynn Resorts' stock with Elaine Wynn.  As a result of the divorce settlement, Aruze USA was now by far Wynn Resorts' largest stockholder, owning some 24,549,222 shares of Wynn Resorts, or 19.66% of the outstanding stock.  Mr. Wynn would now own less than half what Aruze

-17-

1    USA owned of Wynn Resorts' stock.  While neither Aruze USA nor Mr. Okada ever

2    made any threats against Mr. Wynn, the possibility loomed that Mr. Wynn could be losing

3    control of Wynn Resorts, as had happened ten years earlier, when Mr. Wynn lost control

4    of Mirage Resorts, Inc.

5        70.    On January 6, 2010, Mr. Wynn obtained an Amended and Restated

6    Stockholders Agreement.  The amended agreement altered the Stockholders Agreement

7    language regarding Aruze USA's right to nominate directors.  Aruze USA could endorse

8    nominees so long as the majority of nominees were endorsed by Mr. Wynn.  Although the

9    agreement required Mr. Wynn to support a minority slate of directors proposed by Aruze

10   USA, he never did so.  On information and belief, Mr. Wynn obtained the Amended and

11   Restated Stockholders Agreement, with the intention of never supporting any director

12   proposed by Aruze USA.  In fact, Mr. Wynn consistently refused efforts to consider

13   Aruze USA directors for the Board, in an effort to continue to monopolize control over

14   Wynn Resorts.

15       71.    In addition, the Amended and Restated Stockholders Agreement continued

16   to contain a non-compete clause that prohibited Mr. Okada, Aruze USA, and Universal

17   only from operating casinos in Clark County, Nevada and in Macau, and certain Internet

18   gaming ventures.  Neither this version of the Stockholders Agreement, nor any prior or

19   subsequent agreements, contained any prohibition or concerns regarding the Philippines

20   or Korea.

21       72.    In January 2010, Mr. Okada indicated that he was willing to move ahead

22   with the amendments provided that Mr. Wynn reciprocated by allowing Aruze USA to

23   sell publicly the same number of shares as Mr. Wynn and Elaine Wynn.  In this way,

24   Mr. Okada expected to receive liquidity for Aruze USA whenever Mr. Wynn and

25   Elaine Wynn asked permission to sell or transfer their stock.

26

27

28

1

2

**D.      Steve Wynn and Kazuo Okada Visit the Philippines in 2010, as Wynn Resorts Considers Involvement with the Philippine Project**

3

73.     Though Mr. Wynn had consistently declined to involve Wynn Resorts

4

formally in the Philippine project, he began to reconsider the opportunity in 2010.  On

5

June 14, 2010, Mr. Wynn and Mr. Okada jointly visited Manila to conduct due diligence

6

on behalf of Wynn Resorts and Universal.  On information and belief, Mr. Wynn was

7

considering pursuing the project in his individual capacity as well as on behalf of Wynn

8

Resorts.

9

74.     As illustrated in the photographs, this pre-arranged trip involved meetings

10

with dignitaries and officials and informational presentations on the project.

11

12

13

14

15



16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COUNTERCLAIM

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



FIRST AMENDED COUNTERCLAIM

75.     Mr. Wynn never formally committed Wynn Resorts to the Manila Bay project, but was clearly interested in pursuing the opportunity.  The idea – promulgated by Mr. Wynn in recent press conferences – that Mr. Okada and Universal were off "doing their own thing" unbeknownst to anyone at Wynn Resorts, is not true.

### E.     Over Kazuo Okada's Objection, Wynn Resorts Makes an Unprecedented $135 Million Donation For Wynn Macau

76.     In May 2011, Wynn Macau pledged to donate HK$1 billion (about $135 million) to the University of Macau Development Foundation.  This contribution consisted of a $25 million contribution made in May 2011, and a commitment for additional donations of $10 million each year for the calendar years 2012 through 2022 inclusive.  Suspiciously, Wynn Macau's current gaming concession covers essentially the same 10-year period expiring in June 2022.  Wynn Macau and Wynn Resorts also disclosed that Wynn Macau was in the process of seeking to obtain land in Macau and the rights to develop a third casino in the area.

77.     At a Board meeting in April, 2011, Mr. Okada objected to and voted against this donation, which appears to be unprecedented in the annals of the University of Macau, and in the history of Wynn Resorts.  Mr. Okada objected to the unprecedented size and duration of the commitment.  It was unclear how the University of Macau would use the funds.  Mr. Okada wondered why a wealthy university that sits on government land and largely caters to non-Macau residents might need or want such a large donation.  Mr. Okada, who is himself a significant philanthropist, wondered whether such a donation actually benefits the people who live in Macau.  He was concerned about the lack of deliberation of the boards of Wynn Resorts and Wynn Macau (the donation was approved at a joint meeting in Macau of the two boards), and that pending approvals in Macau related to a new development in Cotai, and the coincidence of the date of the donation and the term of Wynn Macau's gaming license in Macau, might make it appear that Wynn Macau and Wynn Resorts were paying for benefits.

-21-

78.     Notably, for example, the Chancellor of the University of Macau is also the head of Macao's government, with ultimate oversight of gaming matters.

79.     While Wynn Resorts claims to have received a legal opinion sanctioning the unprecedented donation, Wynn Resorts did not provide that legal opinion to Mr. Okada or, on information and belief, to any other members of the board of either Wynn Macau or Wynn Resorts.  On information and belief, Mr. Wynn – and potentially others – misled the Wynn Resorts' Board by securing its consent to the donation, without disclosing his personal knowledge of the close connection between the University of Macau and officials responsible for regulatory decisions related to Wynn Macau's gaming operations.

80.     Mr. Okada's opposition to this donation caught the attention of the U.S. Securities and Exchange Commission ("SEC").  According to Wynn Resorts 2011 Form 10-K, Wynn Resorts received a letter from the Division of Enforcement of the SEC indicating the SEC has commenced an "informal inquiry" regarding matters in Macau. Mr. Wynn, Ms. Sinatra (Wynn Resorts' General Counsel), and Mr. Miller (head of Wynn Resorts' Compliance Committee) did not take kindly to Mr. Okada's scrutiny of the donation.  On information and belief, Mr. Wynn, Ms. Sinatra, and Mr. Miller set out to discredit Mr. Okada, in an effort to distract attention from the problematic Macau donation.

**F.      Steve Wynn and Kim Sinatra Fraudulently Promise Kazuo Okada Financing for the Philippine Project**

81.     On or about April 29, 2011, Mr. Wynn married his current wife Andrea Hissom.  Shortly thereafter, on May 16, 2011, Mr. Wynn and Mr. Okada met in Macau. Ms. Sinatra was present at the meeting, as was Matt Maddox ("Mr. Maddox"), the Chief Financial Officer of Wynn Resorts, and Michiaki Tanaka ("Mr. Tanaka") of Aruze USA, who prepared a transcript of the meeting.

82.     According to the transcript of the meeting, Mr. Wynn told Mr. Okada that Elaine Wynn was very angry at Mr. Wynn for remarrying.  Knowing she was going through a difficult time, Mr. Okada expressed sympathy for Elaine Wynn.  Mr. Wynn said

-22-

1  that Elaine Wynn had a desire to transfer her shares to a new owner, and that there was an

2  urgent need for Mr. Okada to immediately consent on Aruze USA's behalf to the transfer

3  of the securities under the Stockholders Agreement.

4        83.   Mr. Okada was amenable to allowing Elaine Wynn to transfer her stock

5  because of this exigency but, in return, Mr. Okada wanted to pledge some of Aruze USA's

6  Wynn Resorts' stock in order to obtain a measure of liquidity from the stock.

7        84.   Mr. Wynn suggested that instead of having Aruze USA pledge its shares, he

8  had "good answers to solve [Mr. Okada's] . . . requests."  Mr. Wynn suggested that Wynn

9  Resorts would make a loan to Aruze USA.  Mr. Wynn told Mr. Okada that this was better

10  than Aruze USA liquidating its stock (which could have hurt Wynn Resorts' stock value),

11  and much better than a bank loan because a bank:  (1) would set a credit line of only 50%

12  of the market value of Aruze USA's stock; (2) would require additional guarantees if the

13  market value of Aruze USA's stock decreases; and (3) could require forfeiture of Aruze

14  USA's stock if there was any delay in payment.

15        85.   Mr. Wynn gave Mr. Okada an explicit personal assurance that financing

16  would occur.  Mr. Wynn stated that this proposal would be good for Mr. Okada and good

17  for Wynn Resorts, because it will contribute to the stability of Wynn Resorts.  And, based

18  on such assurances, Mr. Okada agreed to financing from Wynn Resorts, rather than

19  pledging Aruze USA's stock.

20        86.   Unbeknownst to Mr. Okada, Universal,or Aruze USA at the time, Mr. Wynn

21  was simultaneously orchestrating Wynn Resorts' "investigation" to have Mr. Okada,

22  Aruze USA, and Universal deemed unsuitable.  Indeed, Wynn Resorts has publicly

23  asserted that it began its "investigation" into the Philippines as early as February 2011,

24  well before Mr. Okada proposed to pledge Aruze USA's shares of Wynn Resorts' stock.

25  Through his assurances, however, Mr. Wynn took deliberate steps to keep Aruze USA,

26  Universal, and Mr. Okada associated with Wynn Resorts.  If Wynn Resorts and Mr. Wynn

27  were truly concerned with any risk that Aruze USA, Universal, and Mr. Okada supposedly

28  posed to their gaming licenses, they would have allowed Aruze USA to liquidate its

-23-

1    position.  Instead, to perpetrate the fraudulent scheme, and seek to forcibly redeem Aruze

2    USA's shares at a vast discount under extremely oppressive terms, Mr. Wynn instead

3    misled Aruze USA into not liquidating its shares.

4         87.    Ms. Sinatra was present at the meeting, and participated in this fraudulent

5    scheme.  On information and belief, Ms. Sinatra is a highly sophisticated and

6    knowledgeable attorney, and is one of the highest paid general counsels in the United

7    States.  Toward the end of the meeting, Ms. Sinatra stated that draft loan agreements

8    would be provided to Aruze USA within 10 days to support the agreement reached

9    between Mr. Okada and Mr. Wynn.  Neither Mr. Wynn nor Ms. Sinatra said anything

10   about internal or external limitations on loans to directors and officers.  For example,

11   neither of them made any mention of Section 402 of the Sarbanes-Oxley Act ("SOX").

12   Unlike Japanese law that has no such prohibition, on information and belief, Ms. Sinatra

13   believed Section 402 barred any loan to Aruze USA by Wynn Resorts.  On information

14   and belief, at the time of this meeting, Ms. Sinatra was intimately familiar with SOX and

15   Section 402, having overseen the implementation of SOX compliance policies at Wynn

16   Resorts that specifically addressed prohibitions on loans to officers and directors.

17        88.    At the conclusion of the meeting, and in reliance on the assurances by

18   Mr. Wynn and Ms. Sinatra that Wynn Resorts would make a loan to provide liquidity for

19   Aruze USA and that loan documents would be forthcoming, Mr. Okada signed a waiver

20   and consent granting Elaine Wynn the option to transfer her stock.  Simultaneously, Mr.

21   Tanaka of Aruze USA made a handwritten note to memorialize the agreement that Wynn

22   Resorts would provide financing to Aruze USA.

23        89.    Later that day, in response to Mr. Tanaka's note and after Mr. Okada had

24   signed the waiver and consent about Elaine Wynn's stock, Ms. Sinatra prepared a draft

25   "Side Letter" to replace the one prepared by Mr. Tanaka.  The "Side Letter" prepared by

26   Ms. Sinatra stated that Wynn Resorts would negotiate a loan from Wynn Resorts to Aruze

27   USA secured by Aruze USA's stock "*to the extent compliant with all state and federal*

28   *laws*" (emphasis added).  On information and belief, Ms. Sinatra inserted this language

1    because she believed Section 402 of SOX prohibited the loan proposed by Mr. Wynn and

2    agreed to by both Mr. Wynn and Mr. Okada.

3            90.     At the time, Wynn Resorts had extensive SOX compliance policies.  Yet,

4    Ms. Sinatra said nothing to Mr. Okada or Aruze USA concerning any purported loan

5    prohibitions under SOX, leading Mr. Okada and Aruze USA to believe that financing

6    through Wynn Resorts was not only possible, but would be forthcoming in the near future.

7    Ms. Sinatra's role in this transaction makes clear that she was not working on Wynn

8    Resorts' behalf.  Rather, in breach of her duty to Wynn Resorts, she intentionally sought

9    to deceive Mr. Okada for the personal benefit of Mr. Wynn, who would benefit from

10   stringing along Aruze USA.

11           91.     On June 9, 2011, Ms. Sinatra emailed Aruze USA's attorneys regarding the

12   "Side Letter," expressing "concern."  For the first time, Ms. Sinatra specifically referred

13   to Section 402 of SOX.  She provided no further explanation (although this confirmed that

14   she understood the issue).  Ms. Sinatra urged Aruze USA to "obtain sophisticated US

15   securities lawyers to assist."  Ms. Sinatra also disputed that Mr. Wynn had committed to

16   provide financing at the meeting, a statement that she knew to be false.

17           92.     On June 20, 2011, Ms. Sinatra asked Aruze USA's counsel if Mr. Okada's

18   consent to Elaine Wynn's transfer of shares was conditioned on Aruze USA receiving the

19   loan.  On July 13, 2011, Aruze USA's lawyer emailed Ms. Sinatra stating that

20   Aruze USA, through Mr. Okada, would allow the immediate transfer of Elaine Wynn's

21   shares because he understood that approval was needed urgently, but stated that the

22   consent was "based upon the mutual understanding between Mr. Okada and Mr. Wynn

23   that Mr. Wynn would pursue avenues for Mr. Okada to obtain financing."  Ms. Sinatra

24   immediately sent an email back:  "Thank you very much for this."

25           93.     In the same email, Ms. Sinatra then explained that Wynn Resorts was

26   negotiating with Deutsche Bank on a margin loan transaction, with Wynn Resorts acting

27   as a "backstop."  Ms. Sinatra suggested holding a telephone conference with Aruze USA's

28   counsel to discuss the proposed transaction further.  She did not dispute that Mr. Okada's

consent to the amendment in the Stockholders Agreement was based on Wynn Resorts' agreement to continue to pursue financing for a loan to Aruze USA (using Aruze USA's Wynn Resorts shares as collateral).  At no point in time did Ms. Sinatra call into question the Philippine project.

94.     On July 15, 2011, Ms. Sinatra and Aruze USA's counsel held a telephone conference to discuss the proposed financing from Deutsche Bank.  Ms. Sinatra provided background information on the state of the negotiations, and explained that Deutsche Bank was considering a margin loan of $800 million to Aruze USA.  She stated that Deutsche Bank expected that they would be able to provide draft documentation within two to three weeks, and that the loan would be proposed to the Wynn Resorts Compliance Committee thereafter.

95.     On or about September 23, 2011, Ms. Sinatra called Aruze USA.  Ms. Sinatra informed Aruze USA that Wynn Resorts' Compliance Committee would be meeting the following week regarding the Philippines, which could impact whether Wynn Resorts would allow the loan.

96.     Wynn Resorts' Compliance Committee is not an independent committee of the Board.  Rather, it is made up of one Wynn Resorts director, former Nevada Governor Bob Miller, and two Wynn Resorts insiders.  On information and belief, each member of Wynn Resorts' Compliance Committee depends on Mr. Wynn for his livelihood and each is beholden to Mr. Wynn.  On information and belief, Mr. Wynn has plenary control over the Compliance Committee.  On September 30, 2011, the Compliance Committee refused to permit the loan to Aruze USA.

**G.     The Chair of Universal's and Aruze Gaming America's Compliance Committee Resigns**

97.     Also, on or about September 27, 2011, Frank A. Schreck, who had been the Chairman of the Universal Compliance Committee for years, abruptly resigned his position.  In addition to being the Chair of the Universal Compliance Committee, he was (and, on information and belief, still is) a long-time lawyer for Mr. Wynn.

-26-

98.     Richard Morgan, the new Chairman of the Universal Compliance Committee, spoke with Mr. Schreck regarding his reasons for resignation.  Mr. Schreck told Mr. Morgan that he did not resign from the Committees because of any suitability concerns about Mr. Okada.  Mr. Morgan asked Mr. Schreck if he knew of any facts that gave Mr. Schreck concerns about Mr. Okada's suitability; Mr. Schreck told Mr. Morgan that he knew of no such facts.

99.     Notably, Mr. Schreck's law firm thereafter appeared as litigation counsel for Wynn Resorts on January 27, 2012, representing Wynn Resorts in the Nevada state court in seeking to deny Mr. Okada his right as a director of Wynn Resorts to review Wynn Resorts' records regarding the enormous donation it made to the University of Macau.

**III.    STEVE WYNN DIRECTS WYNN RESORTS TO CONDUCT A PRETEXTUAL INVESTIGATION FOR THE PURPOSE OF REDEEMING ARUZE USA'S SHARES**

**A.    Wynn Resorts Seeks Kazuo Okada's Resignation and Threatens Redemption in an Attempt to Secure a Personal Benefit for Steve Wynn**

100.    On September 30, 2011, Aruze USA's lawyers, Robert Faiss and Mark Clayton of the Lionel Sawyer & Collins law firm, met with Ms. Sinatra and Kevin Tourek of Wynn Resorts.  The conversation took a very unexpected turn.

101.    First, Ms. Sinatra and Mr. Tourek said that Wynn Resorts' Compliance Committee had commissioned two "investigations" and that the Compliance Committee had produced an investigative "report."  Ms. Sinatra and Mr. Tourek were concerned that Universal had purchased land from a person in the Philippines who was now under indictment for tax evasion.  Neither Ms. Sinatra nor Mr. Tourek explained how Universal or Mr. Okada could bear any responsibility for another man's alleged failure to pay his taxes.

102.    Second, Ms. Sinatra and Mr. Tourek said that Wynn Resorts has a "policy" that officers and directors cannot pledge their Company stock.  This was the first mention of such a policy, despite extensive discussions of a loan secured by Aruze USA's stock.

-27-

103.   Third, Ms. Sinatra and Mr. Tourek stated that, if there was a loan, Mr. Okada would have to step down from the Board and then would have the right to pledge or sell Aruze USA's shares subject to the voting agreement.  Again, this was the first mention of such a requirement.

104.   Fourth, Ms. Sinatra and Mr. Tourek proposed to change the Stockholders Agreement to allow Aruze USA to sell or pledge shares, but subject to a voting trust, which would allow Mr. Wynn to vote the shares, and a right of first refusal for Mr. Wynn to purchase the shares.  This proposal was improper.  Ms. Sinatra and Mr. Tourek were again advocating for Mr. Wynn, not for Wynn Resorts.  This was another breach of duty by Ms. Sinatra to Wynn Resorts and to its largest shareholder, Aruze USA.

105.   Fifth, Ms. Sinatra and Mr. Tourek stated that Mr. Okada has a fiduciary duty to present to Wynn Resorts any proposed competitive opportunities.  Further, they stated that if Mr. Okada has a competing casino business, he should consider stepping down from the Board.  This was the first mention of any "competitive" concerns.  Mr. Wynn and Wynn Resorts (and, indeed, Ms. Sinatra and Mr. Tourek) had known about Universal's Philippine project for years.  Universal had committed hundreds of millions of dollars to pursuing the project.  Wynn Resorts and Mr. Wynn had never objected to the Philippine project.

106.   Sixth, toward the end of the meeting, Ms. Sinatra gave Mr. Okada's counsel a copy of the Articles of Incorporation of Wynn Resorts, with certain provisions highlighted in yellow.  The highlighted portions included the redemption provision.  That was the first time that redemption was ever obliquely mentioned to Mr. Okada or his counsel.

107.   Ms. Sinatra then brought her threat into stark reality.  She stated that the Compliance Committee would meet on October 31, 2011 (in advance of a November 1 Board meeting).  She told Mr. Okada that she hoped a "resolution" would be reached before those meetings regarding Mr. Okada's directorship and the voting rights of Aruze USA's stock, so as to avoid presenting this matter to the Compliance Committee

-28-

1    and the Board.  Ms. Sinatra's intent was clear – Wynn Resorts' compliance procedures

2    were being used to extract a personal benefit for Mr. Wynn.

3        **B.     Steve Wynn and Kim Sinatra Try to Intimidate and Threaten**
         **Kazuo Okada, While Hiding Supposed Evidence of Wrongdoing**

4

5        108.   On an October 3, 2011 telephone call, Aruze USA's counsel asked

6    Ms. Sinatra to provide Aruze USA with a copy of the Compliance Committee's

7    investigative report regarding Mr. Okada.  Ms. Sinatra replied that she would have to

8    check to see if a copy could be provided; in fact, she did not and has never provided a

9    copy of the investigative report to Aruze USA, Mr. Okada, or their counsel.

10       109.   On October 4, 2011, Mr. Wynn and Ms. Sinatra met with Mr. Okada and his

11   counsel.  At the meeting, Mr. Wynn stated that Wynn Resorts' other directors had already

12   decided that Mr. Okada must be removed as Vice Chairman of the Company's Board and

13   as a director of both the Wynn Macau and Wynn Resorts Boards.  It apparently did not

14   matter to Mr. Wynn and Ms. Sinatra that in Nevada *only stockholders can remove*

15   *directors*.  Based on a false threat, Mr. Wynn demanded Mr. Okada's resignation as a

16   director.

17       110.   Mr. Okada's counsel told Mr. Wynn that, in all his years, he had never

18   before experienced a situation where the subject of an investigative report had never been

19   formally questioned or even permitted to respond to the accusations being levied against

20   him.  Mr. Okada's counsel once again requested a copy of the investigative report so that

21   he and Mr. Okada's other attorneys could ensure they were advising Mr. Okada properly

22   and that the Wynn Directors could make a decision based on accurate information.  Over

23   the course of the remainder of the October 4 meeting, counsel for Mr. Okada asked at

24   least two additional times for a copy of the investigative report.  Ms. Sinatra finally

25   replied that Mr. Okada and his counsel could not see a copy of the investigative report

26   because it was "privileged."  On information and belief, Ms. Sinatra once again

27   intentionally misrepresented the law (Mr. Okada, as a director of the Company, has a right

28

-29-

1    to see the Company's books and records, including its communications with counsel), in

2    breach of her duties to Wynn Resorts.

3         111.   During the October 4, 2011 meeting, Mr. Wynn stated that the purported

4    "grounds" upon which the other directors based their decision to move against Mr. Okada

5    were as follows:

6         •    That the Philippines were so corrupt that no one could possibly do business

7              in that country without violating the FCPA;

8         •    That "research" showed Mr. Okada owned land without a Philippines

9              partner, and that this violated Philippines law;

10        •    That the other directors were "convinced" that Mr. Okada's use of his Wynn

11             Resorts business card in other countries had caused a belief that Wynn

12             Resorts was involved in the Philippine project and that the Company would

13             not be in this position had he instead used his Universal business card;

14        •    That Mr. Okada had used the Wynn Resorts' building design and other trade

15             secrets without permission; and

16        •    That Mr. Okada had associated with persons who had later been indicted in

17             the Philippines on charges unrelated to the Philippine project.

18        112.   Mr. Wynn's characterizations of the allegations are telling for several

19   reasons.  First, many of these claims were not ultimately used as a basis to redeem

20   Aruze USA's stock.  Rather, Wynn Resorts had an ever-changing list of supposed

21   transgressions it claimed against Mr. Okada, strongly suggesting that Mr. Wynn and

22   Wynn Resorts were seeking to find something – anything – to justify a predetermined

23   outcome.  Second, many of these claims are demonstrably false – as one example, the

24   acquisition of the land in the Philippines was entirely compliant with Philippine law.

25        113.   Mr. Wynn closed the meeting by telling Mr. Okada that if he had any respect

26   for Mr. Wynn and the other members of the Board, he would voluntarily step down from

27   his role as a director and Vice Chairman of Wynn Resorts.  At this time, Mr. Okada's

28   counsel explained to Mr. Wynn that Mr. Okada should not be required to respond to his

1    demand for resignation until he had time to further consider it.  Mr. Wynn agreed and the

2    meeting was adjourned.

3            114.   Around this same time, the Chairman of Universal's Compliance Committee

4    also requested a copy of the investigative report through the Chairman of Wynn Resorts'

5    Compliance Committee.  This request has been ignored.

6        **C.     A Letter From Steve Wynn's Outside Lawyer Confirms that, While
               Wynn Resorts Had Already Determined the Outcome, a Pretextual
7              "Investigation" was Only Just Starting**

8            115.   On October 13, 2011, Robert L. Shapiro, Esq., an attorney retained by Wynn

9    Resorts, sent a letter to Aruze USA.  Without any elaboration, the letter reiterated the

10   same mistaken – and soon to be abandoned – conclusions that Mr. Wynn outlined in the

11   October 4 meeting.  Mr. Shapiro also explicitly stated that Universal's Manila Bay project

12   "raises questions" regarding "possible violations of the Foreign Corrupt Practices Act."

13   The letter again demanded Mr. Okada's resignation.

14           116.   Curiously, Mr. Shapiro's letter admitted that the Compliance Committee was

15   only then beginning the very investigation that Mr. Wynn and Ms. Sinatra claimed to have

16   already been concluded.  They also claimed to have already generated a report.  Yet

17   Mr. Shapiro wrote that "The Compliance Committee of Wynn Resorts must fully

18   investigate the foregoing acts and have retained Louis J. Freeh . . . to conduct an

19   independent investigation."  On information and belief, as of the date of Mr. Shapiro's

20   letter, Mr. Freeh had not started his investigation.

21       **D.     Wynn Resorts Refuses to Allow Kazuo Okada and Aruze USA to
22             Review Any Supposed "Evidence"**

23           117.   On October 24, 2011, Mr. Okada through his counsel made an initial

24   demand for documents regarding the Philippine investigation.  Although he was plainly

25   entitled to such documents as a director under Nevada law, Wynn Resorts refused this and

26   numerous subsequent demands for documents.  Wynn Resorts aimed to conduct a secret

27   investigation and never allow Mr. Okada or his counsel to scrutinize or respond to the

28   supposed "evidence" against him.

FIRST AMENDED COUNTERCLAIM

**E.    The Board Summarily Removes Kazuo Okada As Vice-Chairman**

118.   At the Board's November 1, 2011 meeting, Mr. Miller presented an oral report of an alleged investigation by the Compliance Committee into Mr. Okada's and Universal's activities in the Philippines.  The report disclosed that the Compliance Committee had allegedly conducted one internal and two "independent" investigations into allegations of suitability, conflicts of interest, and possible breaches of fiduciary duties related to acquisition of land for the Philippine project and charitable contributions made by Universal.  To date, the contents of these purported investigations have not been presented to Mr. Okada.

119.   Mr. Miller reported that the Compliance Committee (and not a committee consisting of the independent directors) had retained Freeh Sporkin & Sullivan LLP ("Freeh Sporkin") as a special investigator to conduct an investigation into the allegations against Mr. Okada.  The Board – without debate, deliberation, or allowing Mr. Okada a chance to respond – summarily eliminated Mr. Okada's position as Vice-Chairman of the Board and ratified the decision to hire Freeh Sporkin.

**F.    Kazuo Okada Seeks More Information Regarding Wynn Macau**

120.   The vehemence of the actions by Mr. Wynn, Ms. Sinatra, Mr. Miller, and the Board against Mr. Okada is highly suspicious.  After all, Mr. Okada had raised concerns about the donation to the University of Macau before Wynn Resorts had raised any type of unsuitability allegations against Mr. Okada and before anyone associated with Wynn Resorts even mentioned the word "redemption" to him.  Mr. Okada made several requests for access to Wynn Resorts' books and records for information relating to the donation made by Wynn Resorts to the University of Macau, all of which were denied without a valid basis.  In the state court of Nevada, Mr. Okada even filed a petition for a writ of mandamus on January 11, 2012 to compel Wynn Resorts to grant him access to Wynn Resorts' books and records.  *Okada v. Wynn Resorts, Ltd.*, case number A-12-65422-B, Department XI (the "Inspection Action").  At a hearing on February 9, 2012, the Court ordered Wynn Resorts to comply with Mr. Okada's reasonable requests.

### G.   Aruze USA Nominates Directors, But Steve Wynn Refuses to Endorse Them Despite His Obligation to Do So

121.   To further address the concerns about Wynn Resorts management, on January 18, 2012, pursuant to Section 2(a) of the Stockholders Agreement, Aruze USA submitted a letter to the Nominating and Corporate Governance Committee of the Company designating three individuals as candidates to be considered for nomination as directors of the Company and included in the Company's proxy statement relating to the Company's 2012 annual meeting of the stockholders or any stockholder meeting held for the purpose of electing Class I directors.  Despite numerous written requests to Mr. Wynn to endorse the slate of directors nominated by Aruze USA, as required by the Stockholders Agreement, Mr. Wynn refused to do so.

### H.   The Freeh Investigation Proceeds Without Seeking Any Input From Kazuo Okada

122.   In early November 2011, counsel for Mr. Okada contacted Freeh Sporkin requesting further information regarding how its investigation would proceed and to request copies of documents, evidence, or reports related to the allegations against Mr. Okada.  Mr. Okada requested the documents so that he could address the allegations made against him.  Freeh Sporkin declined to provide any materials and instead directed counsel for Mr. Okada to make such requests of Mr. Shapiro.  When such requests were made of Mr. Shapiro, they were rejected.

123.   While Wynn Resorts alleges in its Complaint that Mr. Okada "long evaded" his interview (Complaint at 2), the record conclusively contradicts this contention.  Freeh Sporkin did not contact Mr. Okada or his counsel about an interview until January 9, 2012, at which time it demanded (not requested) an interview of Mr. Okada during the week of January 30 (*i.e.*, January 30-February 5).  On January 15, 2012, four days after Mr. Okada filed his Inspection Action, Freeh Sporkin informed Mr. Okada's counsel that the "schedule has changed" and pressured Mr. Okada to agree to an interview *before* the week of January 30.

124.   On January 19, 2012, Mr. Miller, Chair of Wynn Resorts' Compliance Committee, wrote directly to Mr. Okada, threatening that if Mr. Okada failed to make himself available for interviews with Freeh Sporkin on January 30 or 31, the Compliance Committee "can only conclude that you have refused participation."  The letter stated that the Compliance Committee originally had a goal of receiving a report by the end of 2011, which was extended to January 15, 2012.  In addition to this being the first time anyone shared the Compliance Committee's purported deadlines with Mr. Okada, these dates are inconsistent with Freeh Sporkin making its initial request to conduct an interview of Mr. Okada that would take place in the first week of February.  It proved not to be the first time Mr. Miller was "confused" about the "investigation" that was supposedly operating under his direction.

125.   Mr. Okada had only recently hired new counsel to assist with the response to the Freeh Sporkin investigation.  In order to prepare for the interview, the new counsel requested that the parties seek a mutually convenient date for an interview by February 15, 2012.  Freeh Sporkin then agreed to schedule the interview on February 15.  This undeniable record demolishes any claim that Mr. Okada avoided an interview with Freeh Sporkin, let alone that he "long evaded" an interview.

**I.      Freeh Sporkin Refuses to Provide Meaningful Information Regarding the Investigation to Kazuo Okada**

126.   While attempting to set a date to schedule the Freeh Sporkin interview, Mr. Okada's counsel requested that Freeh Sporkin identify the specific matters under review so that Mr. Okada could prepare appropriately for his interview.  After all, Mr. Okada is the Chairman of a publicly traded corporation – and cannot be expected to know every operational detail in his organizations.  In addition, translations between Japanese and English are notoriously difficult because of subtleties in language.  Mr. Okada's counsel repeatedly requested documents that Freeh Sporkin might use in the interview and topics so Mr. Okada could prepare for the interview and be ready to provide

-34-

1   information and documents that could help Freeh Sporkin (and the Board) understand the

2   facts concerning whatever topics and issues it wanted to discuss with Mr. Okada.

3          127.   Freeh Sporkin refused to provide anything more than a statement that it was

4   investigating "all matters related to Mr. Okada's, Universal's, and Aruze's activities in the

5   Philippines and Korea."  This was the first time that Korea was even mentioned as the

6   subject of any investigation by the Company.  Again – the basis of Aruze USA's supposed

7   "unsuitability" kept changing.

8          128.   Instead of sharing the topics of the interview with Mr. Okada, Mr. Freeh

9   chose to conduct the interview as an ambush, not unlike the hostile interrogation of a

10  suspected criminal, rather than a respectful and cooperative interview seeking information

11  from a director of Wynn Resorts.  If he was afforded the opportunity to do so, Mr. Okada

12  could have helped Mr. Freeh and Freeh Sporkin avoid the public embarrassment of a

13  report that is riddled with factual and legal errors.

14         **J.     Kazuo Okada Voluntarily Sits For A Full-Day Interview With Freeh
              Sporkin**
15

16         129.   On February 15, 2012, Mr. Okada sat for a full-day interview with Mr. Freeh

17  and other lawyers for Freeh Sporkin.

18         130.   The questions focused mainly on expenses that Mr. Freeh claimed had been

19  paid by Universal for lodging and meals at Wynn Resorts properties on behalf of persons

20  Mr. Freeh identified as foreign officials.  This was a subject that had never been

21  mentioned in the months before when Ms. Sinatra asserted that an investigation had

22  already been conducted by the Company, or when Mr. Wynn or Mr. Shapiro, in a

23  subsequent letter, listed the supposed bases for the directors taking action to eliminate Mr.

24  Okada's position as Vice Chairman.  Other than allegations regarding such purported

25  expenses, Mr. Freeh also asked questions about Universal's compliance with Philippine

26  landownership requirements, which had been handled for Universal by one of the

27  Philippines' leading law firms.

28

-35-

131.   The interview went well into the evening, hours past the time originally estimated by Mr. Freeh.  At the end of the interview, Mr. Okada stated that he would look into the matters raised during the interview, and that he would be willing to report back with detailed information once it could be assembled.

**K.   Wynn Resorts Allows No Opportunity for A Reasonable Response**

132.   At a press conference following the redemption of Aruze USA's stock, Mr. Miller made a number of statements that will prove to be false.  One stood out in particular.  Mr. Miller said:

> Following the interview, [Mr. Freeh] informed Mr. Okada that he would be finalizing the report on Friday, February 17, and offered [Mr. Okada] an opportunity to present any exculpatory evidence prior to that time frame. [Mr. Freeh] determined that no additional exculpatory evidence was presented, and thus a final report was presented.

133.   Similarly, the Wynn Resorts Complaint states that "Freeh announced that he would report his findings to the Board of Directors on February 18, 2012."  (Compl. at ¶ 43.)

134.   Neither statement is true.  Mr. Freeh said nothing regarding the date of the completion of his report at the interview, and, in fact, said at the February 15, 2012 interview of Mr. Okada that his investigation was not complete and that his report was not complete.

135.   On February 16, 2012, Mr. Okada's counsel emailed Mr. Freeh stating:

> Louis:
>
> I hope you had a good trip back to the US.  Following your interview of Mr. Okada, we understand that you will be drafting a report for submission to the Wynn Resorts Compliance Committee.  I am writing to request an opportunity for Mr. Okada and Universal Entertainment to submit additional material for your consideration, prior to the submission of your report. Please let me know as soon as you are able if you will allow us to do.

136.   In response, on February 17, 2012, Mr. Freeh, acting as an agent for Wynn Resorts, offered two options to Mr. Okada's counsel:

> Joel Friedman called you about 900a today (PT) and left a

-36-

FIRST AMENDED COUNTERCLAIM

1    message for you to call a well as an email.

2    I can suggest two possibilities in response to your letter:

3    First, that you provide me as soon as possible, and no later
     than 600p PacT today, with a proffer of what Mr Okada and

4    Universal wish to submit for additional consideration. Your
     very able firm has represented Mr. Okada now for several

5    weeks and you know the principal areas of our investigation
     based on Wednesday's interview. So I would expect you can

6    make such a proffer.

7    *Secondly, Mr Okada will have the opportunity to respond to
     my report after he receives a copy, along with the other Wynn*

8    *Resorts' directors. I will certainly consider and evaluate
     whatever information may be provided.*

9

10   . . .

11   I also note that Mr. Okada's litigation against Wynn Resorts
     has now predicated an SEC inquiry and no doubt drawn the

12   proper attention of other regulatory agencies. Consequently,
     the Compliance Committee has given me instructions to
     conclude my report with all deliberate speed.

13

14   . . .

15   Anyway, I have a great deal of respect for you and believe the
     above alternatives allow for a fair resolution at this stage.

16   Best regards,

17   Louie

18   (emphasis added.)

19        137.   Given the timing, Mr. Okada elected to respond to the Freeh Sporkin report

20   once he was able to see it, responding through his counsel:

21   Louis:

22   Thanks for your response.  I am still traveling in Asia, and did
     not have a chance to review Joel's message or contact him.  I

23   appreciate your willingness to review any supplemental
     information that we provide and to consider it in your

24   findings.  *Under the circumstances, and in particular the tight
     time framework, I think it makes the most sense for Mr.*

25   *Okada, UE, Aruze USA, and our Firm to review your report
     and to use it to focus our efforts in providing you additional*

26   *information.*  So, we accept the second of the two proposals in
     your letter, and would expect that the opportunity to respond

27   will include an opportunity for our law firm to work with Mr.
     Okada, UE, and Aruze USA in order to be able to respond in a

28   complete and helpful fashion.  Thanks very much.

-37-

FIRST AMENDED COUNTERCLAIM

1   (emphasis added.)

2          138.   Mr. Freeh responded "Thanks Tom and safe travels."

3          139.   Curiously, about an hour and half later (now late in the day on Friday,

4   February 17), Mr. Freeh sent a second response, stating:

5                  Just to confirm, I will now deliver my report to the
                   Compliance Committee having completed my investigation
6                  regarding the matters under inquiry. It is my understanding
                   that the Compliance Committee will thereafter provide all of
7                  the Directors, including Mr. Okada, with a copy of the report.
                   As we both stated, Mr. Okada can then submit any responses
8                  to the report which will be considered and evaluated.
                   However, the report I am submitting is not a 'draft' subject to
9                  being finalized after Mr. Okada provides any response. Rather
                   this is akin to a final brief being submitted with the
10                 opportunity for a response to be made.

11                 Please let me know if you have any questions.

12                 Best regards

13                 Louie

14         140.   This statement would prove to be misleading.  As it turned out, Wynn

15  Resorts refused to give Mr. Okada a copy of the Freeh Sporkin report and then purported

16  to redeem Aruze USA's stock (at a nearly $1 billion discount) *on the day the other Wynn*

17  *Directors received the report*, without giving Mr. Okada any reasonable opportunity to

18  respond.

19         141.   In addition, Mr. Freeh's statement that he was preparing a "final brief" is

20  very telling about how Mr. Freeh viewed his role in the process.  Mr. Freeh was not

21  preparing an objective report of the facts by an "independent" investigator – he was

22  providing the Board with an argumentative document as an *advocate* against Mr. Okada.

23  But even so, Mr. Freeh clearly contemplated that Mr. Okada would and should have the

24  opportunity for a response.  Nevertheless, spurred on by Mr. Wynn, the Board ignored

25  Mr. Freeh's promise of an opportunity to respond to the report (and the express statements

26  in Mr. Freeh's report that further investigation would be needed on certain topics), and

27  instead acted rashly to redeem Aruze USA's stock on an incomplete factual record and a

28  faulty understanding of governing legal principles, including, for example, the application

-38-

of the FCPA to the facts, as well as Wynn Resorts' (lack of) contractual rights to attempt to redeem Aruze USA's stock.

**L.      Steve Wynn Hurriedly Schedules Board of Directors Meeting**

142.   On February 15, 2012, scant hours after the completion of Mr. Freeh's interview of Mr. Okada, Wynn Resorts noticed a special meeting of its Board.  The meeting was set for Saturday, February 18, 2012, at 9:00 a.m. in Las Vegas – which is 2:00 a.m. Sunday morning in Japan.  Although the notice for the Board meeting went out immediately following the conclusion of the interview of Mr. Okada, and was scheduled to occur a mere three days after the interview, Mr. Wynn and Ms. Sinatra included on the agenda a review of the Freeh Sporkin report.

**M.      Steve Wynn Tries to Use the Threat of Redemption to Buy Aruze USA's Stock at a Substantial Discount**

143.   Following the interview, Mr. Wynn communicated to Aruze USA through intermediaries that, instead of having the Board consider the Freeh Sporkin report, Mr. Wynn would be willing to buy Aruze USA's stock for his benefit at a significant discount. A sale to Mr. Wynn was presented as an alternative to the embarrassment and regulatory issues attendant to possible disclosure of the Freeh Sporkin report.

144.   On information and belief, this is not the first time Mr. Wynn has attempted to co-opt state gaming regulations to consolidate his ownership and control over a gaming company.  According to published reports, in 1980, Mr. Wynn forced out the second largest shareholder of the Golden Nugget, Inc., Mr. Edward Doumani.  Mr. Doumani was also a board member, and had expressed concerns about Mr. Wynn's practices as CEO of the Golden Nugget.  Mr. Wynn eventually strong-armed Mr. Doumani into selling his stake by threatening to instigate an investigation of Mr. Doumani, contending that his continued association with the company caused a risk to a potential gaming license in Atlantic City.  Three decades later, Mr. Wynn attempted the same scam, only this time Aruze USA refused to accede to Mr. Wynn's demand to sell him its stock on the cheap.

FIRST AMENDED COUNTERCLAIM

**IV.   WYNN RESORTS' UNFOUNDED AND UNPRECEDENTED REDEMPTION OF MORE THAN $2.9 BILLION OF ARUZE USA'S SHARES**

      **A.   Wynn Resorts Publicly Asserts That the Value of Aruze USA's Stock Is $2.9 Billion**

145.   In a letter to Aruze USA's counsel dated December 15, 2011, Mr. Shapiro asserted that Aruze USA's shares were worth approximately $2.7 billion.

146.   Hardly a month later (and a mere 22 days before purporting to redeem the shares), on January 27, 2012, Wynn Resorts filed its opposition papers in response to Mr. Okada's Petition for a Writ of Mandamus.  In that court filing, Wynn Resorts declared that Aruze USA's holdings were worth *more* than $2.7 billion, stating that Aruze USA's shares are "valued at approximately $2.9 billion[.]"  In the 22 days following Wynn Resorts' $2.9 billion valuation of Aruze USA's stock, Aruze USA's stock was not sold, transferred, or further encumbered by any additional restrictions.

      **B.   The Board Hurriedly Meets and Rushes to Redeem Aruze USA's Stock**

147.   On February 17, 2012, Mr. Okada's counsel contacted Wynn Resorts' representatives to express Mr. Okada's concerns with the substantive and procedural process for the Company's investigation, and stated that any discussion of unsuitability or redemption, including any discussion involving the Freeh Sporkin report at the February 18 Board meeting, would be premature.

148.   Rather than addressing the substantive and procedural issues raised by Mr. Okada and his counsel, Wynn Resorts responded briefly, informing Mr. Okada's counsel that additional accommodations would not be made to facilitate translation to enable Mr. Okada's participation by teleconference.  The Company also informed Mr. Okada's counsel that, despite the seriousness of the accusations against him, Mr. Okada was not permitted to have counsel present for the Board call.

149.   When it came time for the meeting, at 2:00 a.m. on Sunday morning, Mr. Okada sat ready to participate by telephone.  Mr. Wynn yelled at Mr. Okada's counsel when he introduced himself.  Mr. Wynn also said that Mr. Okada's counsel could not be

FIRST AMENDED COUNTERCLAIM

1    present to advise Mr. Okada even though counsel made clear that he would not address

2    the meeting.  (At the threat of having Mr. Okada's telephone connection to the meeting

3    severed, Mr. Okada's counsel had to sit outside the room while the meeting went on,

4    despite Wynn Resorts having a battery of lawyers from multiple law firms present on its

5    end of the line.)  Mr. Wynn and a company lawyer informed Mr. Okada that – despite

6    prior assurances that Mr. Okada would receive a copy of the Freeh Sporkin report along

7    with the other directors – he would not receive a copy of the report unless both he and his

8    legal counsel signed a nondisclosure agreement.  The nondisclosure agreement would

9    have arguably precluded Mr. Okada from using the report in legal proceedings.

10   Mr. Okada did not sign the nondisclosure agreement.

11          150.   As alleged in detail below, a few hours after demanding that Mr. Okada sign

12   the nondisclosure agreement claiming confidentiality, Wynn Resorts "leaked" a copy of

13   the Freeh Sporkin report to the *Wall Street Journal* and attached a copy to its Complaint in

14   this action.

15          151.   There were numerous translation problems during the Board meeting.

16   Mr. Wynn provided a translator who was woefully unable to perform an accurate

17   simultaneous translation.  Mr. Okada requested that the translation be provided

18   sequentially (with each speaker and the translator speaking in turn) rather than

19   simultaneously (with the translator speaking at the same time as the speaker at the

20   meeting), but this request was denied.  As a result, Mr. Okada could not follow or

21   participate in the proceedings.

22          152.   In this way, Mr. Okada sat and listened while Mr. Freeh made a presentation

23   in English that Mr. Okada could not understand.  After Mr. Freeh completed his

24   presentation, the Board asked if Mr. Okada had any questions.  Mr. Okada stated that he

25   could not understand the presentation, and that he would be able to address the claims of

26   the report only after receiving a copy and discussing with counsel.  Mr. Okada also asked

27   the Board to delay making any resolutions until he could respond to the Freeh Sporkin

28   report.

FIRST AMENDED COUNTERCLAIM

153.   At some point, someone at Wynn Resorts hung up the telephone, cutting Mr. Okada off from the meeting.  Mr. Okada waited to be reconnected, staying up until the sun rose in Asia, all the while not knowing whether the Board had resolved anything following the presentation by Mr. Freeh.  Ms. Sinatra later claimed that cutting off the telephone connection to Mr. Okada was a "misunderstanding."  No other contact was made with Mr. Okada.

154.   At 1:45 am PT on February 19, 2012, Aruze USA's counsel received correspondence, containing a notice of determination of unsuitability and a purported redemption notice.  In the redemption notice, the Company stated that it would redeem Aruze USA's stock for a promissory note of approximately $1.936 billion, a discount of exactly 30% off the $2.7 billion value measured by the stock market's valuation of the stock based on the prior day's closing price and 33% less than the value (*i.e.*, $2.9 billion) Wynn Resorts had publicly proclaimed three weeks before.

155.   Although Wynn Resorts had claimed the Freeh Sporkin report was confidential and tried to extract a signature from both Mr. Okada and his legal counsel in order to see the report prior to redemption, a copy of the report was leaked to the *Wall Street Journal* in the early morning Eastern Time of February 19, 2012.  Almost immediately, reports appeared on the *Wall Street Journal* website regarding the contents of the report.

156.   In addition, at 2:14 a.m. PT on February 19, 2012, Wynn Resorts electronically filed a complaint attaching the supposedly confidential Freeh Sporkin report (without exhibits).

157.   Despite repeated requests to Ms. Sinatra and Mr. Shapiro, Mr. Okada's counsel only obtained a copy of the "confidential" report when it sent a messenger to court on February 21, 2012, the first court day following the weekend Board meeting.  Wynn Resorts continues to refuse to provide the Freeh Sporkin report's exhibits to Mr. Okada or Aruze USA.

## C.     Aruze USA Disputes That Redemption Has Occurred

158.   In public statements, representatives of Wynn Resorts have claimed redemption is complete and that the securities formerly held by Aruze USA have been cancelled.  Aruze USA disputes that this has happened.  Among other reasons, as explained elsewhere in this Counterclaim, the purported redemption is void *ab initio*.

## D.     The Board Redeems on False Premises

159.   Even if Aruze USA were bound by the redemption provision (which Aruze USA disputes), the Articles of Incorporation only purport to allow redemption in three situations.

160.   First, according to the Articles of Incorporation, Wynn can redeem when it "is determined by a Gaming Authority to be unsuitable to Own or Control any Securities or unsuitable to be connected or affiliated with a Person engaged in Gaming Activities in a Gaming Jurisdiction."  This has not occurred.  In fact, Aruze USA has been found to be "suitable" by the Nevada gaming authorities.

161.   Second, according to the Articles of Incorporation, Wynn can redeem when a person "causes the Corporation or any Affiliated Company to lose or to be threatened with the loss of any Gaming License."  This has not occurred.

162.   Third, Wynn Resorts' Articles of Incorporation profess that the Company can redeem where a person "in the sole discretion of the board of directors of the Corporation, is deemed likely to jeopardize the Corporation's or any Affiliated Company's [a] application for, [b] receipt of approval for, [c] right to the use of, or [d] entitlement to, any Gaming License."  Subsections [a] and [b] do not apply because, on information and belief, Wynn Resorts has no present plan to apply for a license and is not awaiting approval of any pending application.  So, even under the standards of the Articles of Incorporation, Wynn Resorts could only seek redemption upon a showing that Aruze USA's stock ownership is "likely to jeopardize" Wynn Resorts' "right to the use of, or entitlement to" its existing gaming licenses.

FIRST AMENDED COUNTERCLAIM

163.   No such showing was made in the rushed Freeh Sporkin report.  In fact, in the gaming industry, any impact on the right to use or entitlement to a gaming license requires action by the cognizant gaming authority.  No gaming authority has found Aruze USA, Universal, or Mr. Okada to be "unsuitable."  Furthermore, association with an "unsuitable" person would only conceivably create a problem for a gaming license *after* that person has been found by a gaming authority to be unsuitable.  Even then, such concerns can be addressed via a voting trust or orderly sale of shares.  If Wynn Resorts' true aim was to disassociate itself from Aruze USA in order to protect its interests, it failed miserably.  Even if the redemption were effective, Aruze USA would now be Wynn Resorts' largest holder of debt – a circumstance which would be impermissible under Nevada law if Aruze USA were truly "unsuitable."  Under the circumstances, it is obvious that the supposed redemption of Aruze USA's shares was simply a pretext to seek to quiet a potential dissident shareholder and director, increase the relative ownership interests of the Board members by virtue of their shareholdings in Wynn Resorts, and to enhance and maintain Mr. Wynn's personal control over Wynn Resorts.

**E.    Even if Aruze USA Was Subject to the Redemption Provision (Which it is Not), the Unilateral Blanket 30% Discount that Wynn Resorts Applied to the Stock is Erroneous and the Promissory Note is Unconscionably Vague, Ambiguous, and Oppressive**

164.   According to a press release dated February 19, 2012, Wynn Resorts issued a note in the amount of $1.936 billion to Aruze USA.  This amount is exactly 30% less than the market value of Aruze USA's stock as measured by the closing price of Wynn Resorts' stock on the Friday prior to the Saturday Board meeting.  According to its press release, Wynn Resorts arrived at this value because "it engaged an independent financial advisor to assist in the fair value calculation and concluded that a discount to the current trading price was appropriate because of restrictions on most of the shares which are subject to the terms of an existing stockholder agreement."  The irony here is rich, because the Stockholders Agreement, by its terms, either precludes the redemption of Aruze USA's stock altogether or, alternately, the transfer restrictions are not binding on

1    Aruze USA to the extent that they constitute an illegal restraint on alienability, and thus

2    could not legitimately impact the value of Aruze USA's shares so as to support a discount

3    against the market price.

4        165.   The February 19, 2012 Wynn Resorts press release also falsely stated that

5    the redemption process in the Articles of Incorporation had "been [in place] since the

6    Company's inception."  This is untrue, as Mr. Wynn unilaterally *amended* the Articles of

7    Incorporation to include the purported redemption language months *after Wynn Resorts*

8    *was created*, and nearly 90 days after Aruze USA agreed to invest in Wynn Resorts and

9    committed its interests in Valvino to Wynn Resorts.  Wynn Resorts and Mr. Wynn thus

10   sought to continue their fraudulent scheme by publishing a false basis under which Wynn

11   Resorts purported to have the authority to redeem Aruze USA's shares of Wynn Resorts'

12   stock.

13       166.   Nevertheless, hoping to unilaterally decide on a "clearance" price for

14   Aruze USA's almost 20% shareholder interest in the Company, Wynn Resorts relied

15   solely on one opinion from Moelis & Company ("Moelis"), *which has done business with*

16   *Wynn Resorts in the past*.

17       167.   Mr. Wynn and Kenneth Moelis ("Mr. Moelis") – the founder of Moelis – go

18   way back.  Mr. Moelis first worked with Mr. Wynn when Mr. Moelis worked at the

19   investment banking firm of Drexel Burnham Lambert ("Drexel").  At Drexel, Mr. Moelis

20   was the banker who helped Mr. Wynn finance his Golden Nugget Casino in Atlantic City

21   and Mirage casino in Las Vegas.  On information and belief, Mr. Wynn has a close

22   personal and professional relationship with Mr. Moelis.  According to press reports,

23   Mr. Moelis has stated that he would take the first flight out of LAX to rush to the

24   assistance of Mr. Wynn.  Mr. Wynn reciprocates Mr. Moelis' loyalty and support.

25   Among other things, Mr. Wynn engaged Mr. Moelis to serve as the lead underwriter of

26   Wynn Resorts' $210 million common stock offering in March 2009.

27       168.   Mr. Wynn called on Mr. Moelis' loyalty in this case.  Despite the fact that at

28   least some of the stock was exempted from the Stockholders Agreement, Moelis

1   discounted Aruze USA's more than $2.7 billion shares of Wynn Resorts' stock by a round

2   30%.

3   169.   The terms of the note are unreasonable and one-sided in the extreme,

4   completely lacking reasonable and customary terms used to protect and preserve the

5   interests of the note holder.  Among other things, the hastily issued, ten-year $1.936

6   billion promissory note is unsecured and fully subordinated, not merely to current

7   outstanding Wynn Resorts debt, but potentially to all future debt Wynn Resorts may incur,

8   and pays a mere 2% interest per annum.  In contrast, for example, less than a month after

9   the purported redemption, Wynn Resorts issued $900 million aggregate principal amount

10   in collateralized notes paying 5.375% interest.  Moreover, though Nevada gaming

11   regulations do not permit an "unsuitable" person from holding debt of a publicly-traded

12   licensee, by its terms the note sent to Aruze USA is not even transferable.  Wynn Resorts

13   prepared the promissory note without any input from Mr. Okada, or any representative at

14   Aruze USA, forcibly imposing an unsecured, non-transferrable, non-voting, un-

15   marketable, severely discounted and oppressive debt instrument on its largest shareholder.

16   **F.   The Timing of the Redemption Demonstrates that Wynn Resorts Redeemed Aruze USA's Shares Based on Material, Non-Public Information that Was Not Incorporated Into the Redemption Price**

17

18   170.   On March 2, 2012, Wynn Resorts released a Form 8-K.

19   171.   The Form 8-K purported to disclose positive news regarding Wynn Resorts'

20   efforts in Macau to receive certain land concessions related to Cotai:

> As previously disclosed . . . Wynn Macau, Limited ("WML"),
> an indirect subsidiary of the Registrant with ordinary shares of
> its common stock listed on The Stock Exchange of Hong
> Kong Limited, announced that Palo Real Estate Company
> Limited ("Palo") and Wynn Resorts (Macau) S.A. ("Wynn
> Macau"), each an indirect subsidiary of the Registrant,
> formally accepted the terms and conditions of a land
> concession contract (the "Land Concession Contract") from
> the government (the "Macau Government") of the Macau
> Special Administrative Region of the People's Republic of
> China ("Macau") in respect of approximately 51 acres of land
> in the Cotai area of Macau (the "Cotai Land").  The Land
> Concession Contract permits Palo and Wynn Macau to
> develop a resort containing a five-star hotel, gaming areas,

-46-

retail, entertainment, food and beverage, spa and convention offerings on the Cotai Land.

The Land Concession Contract was published in the official gazette of Macau (the "Gazette") on January [•] 2012. Effective from such publication date, Palo will lease the Cotai Land from the Macau Government for an initial term of 25 years with the right to renew the Land Concession Contract for additional successive periods, subject to applicable legislation.  The Land Concession Contract also requires that Wynn Macau, as a gaming concessionaire, operate and manage gaming operations on the Cotai Land.  In addition, as previously disclosed in the Registrant's filings with the Commission, on August 1, 2008, Palo and certain affiliates of the Registrant entered into an agreement (the "Agreement") with an unrelated third party to make a one-time payment in the amount of US $50 million in consideration of the latter's relinquishment of certain rights in and to any future development on the Cotai Land.  The Agreement provides that such payment be made within 15 days after the publication of the Land Concession Contract in the Gazette.

The foregoing description of the Land Concession Contract is qualified in its entirety by reference to the full English translation of the Land Concession Contract (originally published in the Gazette in traditional Chinese and Portuguese), which is filed as Exhibit 10.1 hereto and incorporated herein by reference.  Dollar amounts in the Land Concession Contract refer to Macau Patacas.

172.   Such a land concession is significant positive development for Wynn Resorts.  In fact, Wynn Resorts' stock immediately spiked 6% on this news.

173.   After initially attempting to backtrack from the filing as a "mistake," Wynn Resorts filed another Form 8-K on May 2, 2012.  The Form 8-K reconfirmed the material information Wynn Resorts disclosed on March 2, 2012.

174.   On information and belief, these positive developments in Macau (or elsewhere in Wynn Resorts operational sphere) were imminent and known by Wynn Resorts.  To the extent that the redemption of Aruze USA's stock actually occurred, Wynn Resorts redeemed Aruze USA's stock based on this material, non-public information. Although Wynn Resorts claims to have purchased Aruze USA's stock using the current stock market value, Wynn Resorts knew, but failed to disclose, that the stock market value did not reflect the land concession contract that it had obtained in Macau.  Therefore,

-47-

1   Wynn Resorts continued its fraudulent and misleading omission of this information in

2   calculating the redemption price knowingly based on materially misleading information.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COUNTERCLAIM

# CLAIMS FOR RELIEF

## COUNT I

### Declaratory Relief

**(By Aruze USA and Universal Against Wynn Resorts and the Wynn Directors)**

175.    Aruze USA and Universal reassert and reallege Paragraphs 4 through 174 above as if set forth in full below.

176.    Aruze USA and Universal seek a judicial declaration that the purported redemption of Aruze USA's shares is void *ab initio*, and that Aruze USA is the owner of 24,549,222 shares or 19.66% of the total outstanding common stock of Wynn Resorts, with all rights and privileges appurtenant thereto (including, but not limited to, payment of dividends and voting rights).  This declaration is appropriate because, as alleged above: (1) the redemption provision in the Articles of Incorporation is inapplicable to the Wynn Resorts' stock owned by Aruze USA because Aruze USA entered into the Contribution Agreement, which prevented any further restrictions without agreement of the parties, before the enactment of the redemption provision, and Wynn Directors' acts were *ultra vires*; (2) the redemption provision in the Articles of Incorporation is inconsistent with Nevada law and public policy, and thus void; (3) the Stockholders Agreement bars redemption of the Wynn Resorts' stock owned by Aruze USA; (4) the Board lacked a sufficient basis for a finding of "unsuitability" or for redemption; and/or, (5) the redemption provision as written and as applied is unconscionable.

177.    In addition or alternatively, Aruze USA and Universal seek a judicial declaration that the redemption provision in Wynn Resorts' Articles of Incorporation is invalid as a matter of law because it is impermissibly vague, contrary to law and public policy, and/or unconscionable.  This declaration is appropriate because, among other things, Nevada gaming regulators are given the authority under the laws of Nevada to make determinations regarding "suitability."  The redemption provision in Wynn Resorts' Articles of Incorporation purportedly relied on here by the Wynn Directors improperly and illegally usurps that authority.  Furthermore, if and when Nevada gaming regulators

-49-

1   were to make such a determination, redemption that simply replaces equity with debt is

2   ineffective to effect a disassociation; it, therefore, would not comply with Nevada law.

3       178.   In addition or alternatively, Aruze USA and Universal seek a judicial

4   declaration that the Board resolution finding Aruze USA, Universal, and Mr. Okada

5   "unsuitable" was procedurally and/or substantively defective and contrary to the Articles

6   of Incorporation and/or Nevada law.  As alleged in detail above, this declaration is

7   appropriate because the Wynn Directors' finding that there was a likely jeopardy to Wynn

8   Resorts' gaming licenses lacked a sound foundation and was made without a thorough and

9   complete review of relevant law, facts, and evidence.

10      179.   In addition or alternatively, Aruze USA and Universal seek a judicial

11  declaration that the Board resolution to redeem Aruze USA's shares was procedurally

12  and/or substantively defective, and contrary to law and public policy.  As alleged in detail

13  above, this declaration is appropriate because (1) the Stockholders Agreement bars

14  redemption of the Wynn Resorts' stock owned by Aruze USA; (2) the redemption

15  provision in the Articles of Incorporation is inapplicable to the Wynn Resorts' stock

16  owned by Aruze USA because Aruze USA entered into the Contribution Agreement,

17  which prevented any further restrictions without agreement of the parties, before the

18  enactment of the redemption provision, and Wynn Directors' acts were *ultra vires*; (3) the

19  Board lacked a sufficient basis for a finding of "unsuitability" or redemption and made its

20  findings without a thorough and complete review of relevant law, facts, and evidence; (4)

21  the redemption provision in the Articles of Incorporation is inconsistent with Nevada law

22  and public policy, and thus void; and, (5) the redemption provision, as written and as

23  applied, is unconscionable.

24      180.   Alternatively, to the extent that redemption is not otherwise barred, Aruze

25  USA and Universal seek a judicial declaration that the form and amount of compensation

26  paid for Aruze USA's shares was improper and/or inadequate and that Aruze USA is

27  entitled to cash in an amount equivalent to at least the closing price of the stock on

28  February 17, 2012.  Indeed, Wynn Resorts asserted in a court filing dated January 27,

2012, that "[w]ith holdings valued at approximately $2.9 billion, Aruze is one of Wynn's largest shareholders."  As alleged in detail above, this declaration is appropriate because simply converting Wynn Resorts' largest shareholder to Wynn Resorts' largest creditor serves no valid legal purpose.  Furthermore, the valuation by Moelis was not objective, independent, or the product of sound financial analysis, and, among other things, did not consider material non-public information available to Wynn Resorts that would militate in favor of a higher valuation, did not account for the premium that would be applied to such a large block of shares, and did not consider the extent to which transfer restrictions were not valid as to Aruze USA.

181.   Aruze USA and Universal bring this claim within the relevant statute of limitations under Nevada law, having discovered facts giving rise to this claim, including injury arising from the purported redemption of Aruze USA's shares of Wynn Resorts' stock, on or about February 18, 2012.  Despite having exercised reasonable diligence, Aruze USA and Universal did not and could not reasonably have discovered earlier the facts giving rise to this claim.

182.   An actual justifiable controversy has now arisen between the parties whose interests are adverse, and the dispute is ripe for adjudication.  Wynn Resorts acted unlawfully when it purported to "redeem" Aruze USA's equity interest in Wynn Resorts.

183.   It has been necessary for Aruze USA and Universal to retain the services of attorneys to prosecute this action, and Aruze USA and Universal are entitled to an award of the reasonable value of said services performed and to be performed in a sum to be determined.

## COUNT II

### Permanent Prohibitory Injunction

### (By Aruze USA Against Wynn Resorts and the Wynn Directors)

184.   Aruze USA reasserts and realleges Paragraphs 4 through 174 above as if set forth in full below.

-51-

185.   Aruze USA seeks a permanent injunction enjoining and restraining Wynn Resorts and the Wynn Directors, their agents, servants, employees, attorneys, and all those acting in concert or in active participation with Wynn Resorts, from enforcing a redemption notice upon Aruze USA, and from engaging in any efforts to redeem Aruze USA's equity holdings in Wynn Resorts, including but not limited to making any demands that Aruze USA surrender its Wynn Resorts' stock, instructing any transfer agent for Wynn Resorts' stock to effect any transfer or cancellation of Aruze USA's Wynn Resorts' stock, and/or making any other changes to Wynn Resorts' stock ledger regarding Aruze USA's stock.

186.   For the reasons alleged above, the purported redemption is invalid as a matter of law and violated applicable contracts, and/or depends on provisions of contracts that are unenforceable as a matter of law.  Even if there were a potentially valid legal mechanism to redeem Aruze USA's stock, which there is not, redemption would be inappropriate in this case because the Board lacked sufficient basis to find Aruze USA or any of its affiliates or employees "unsuitable."

187.   Harm will result if relief is not granted because Aruze USA's interest in Wynn Resorts is not fungible and Aruze USA's status as the largest shareholder in Wynn Resorts cannot be fully remedied through damages.

188.   Injunctive relief poses no appreciable risk of undue prejudice to Wynn Resorts and the Wynn Directors.

189.   Aruze USA brings this claim within the relevant statute of limitations under Nevada law, having discovered facts giving rise to this claim, including injury arising from the purported redemption of Aruze USA's shares of Wynn Resorts' stock, on or about February 18, 2012.  Despite having exercised reasonable diligence, Aruze USA did not and could not reasonably have discovered earlier the facts giving rise to this claim.

190.   It has been necessary for Aruze USA to retain the services of attorneys to prosecute this action, and Aruze USA is entitled to an award of the reasonable value of said services performed and to be performed in a sum to be determined.

## COUNT III

### Permanent Mandatory Injunction

### (By Aruze USA Against Wynn Resorts and the Wynn Directors)

191.   Aruze USA reasserts and realleges Paragraphs 4 through 174 above as if set forth in full below.

192.   To the extent it might be determined that Wynn Resorts' purported redemption has already occurred, Aruze USA seeks a permanent mandatory injunction directing Wynn Resorts and the Wynn Directors, their agents, servants, employees, attorneys, and all those acting in concert or in active participation with Wynn Resorts, to restore Aruze USA's ownership interest in Wynn Resorts.  The injunction sought should restore both Aruze USA's ownership interest, as well as the value of Aruze USA's stock, and all dividends and other rights and privileges accruing to the shares.

193.   For the reasons alleged above, the purported redemption was contrary to law and violated applicable contracts, and/or depends on provisions of contracts that are unenforceable as a matter of law.  Even if there were a potentially valid legal mechanism to redeem Aruze USA's stock, redemption would be inappropriate in this case because the Board lacked sufficient basis to find Aruze USA or any of its affiliates or employees unsuitable.

194.   Harm will result if relief is not granted because Aruze USA's interest in Wynn Resorts is not fungible and Aruze USA's status as the largest shareholder in Wynn Resorts cannot be fully remedied through damages.

195.   Injunctive relief poses no appreciable risk of undue prejudice to Wynn Resorts and the Wynn Directors.

196.   To the extent that Aruze USA cannot be restored to its status and/or its full rights as a Wynn Resorts shareholder, and to the extent further compensation is warranted or punitive or exemplary damages are warranted, Aruze USA seeks damages from Wynn Resorts in an amount to make Aruze USA whole, as alleged in multiple damages counts below.

-53-

197.   Aruze USA brings this claim within the relevant statute of limitations under Nevada law, having discovered facts giving rise to this claim, including injury arising from the purported redemption of Aruze USA's shares of Wynn Resorts' stock, on or about February 18, 2012.  Despite having exercised reasonable diligence, Aruze USA did not and could not reasonably have discovered earlier the facts giving rise to this claim.

198.   It has been necessary for Aruze USA to retain the services of attorneys to prosecute this action, and Aruze USA is entitled to an award of the reasonable value of said services performed and to be performed in a sum to be determined.

## COUNT IV

**Breach of Contract in Connection with Wynn Resorts' Involuntary Redemption**

**(By Aruze USA Against Wynn Resorts)**

199.   Aruze USA reasserts and realleges Paragraphs 4 through 174 above as if set forth in full below.

200.   The Contribution Agreement and the Stockholders Agreement form a contractual relationship and understanding (the "Agreement") between, *inter alia*, Aruze USA, Wynn Resorts, Mr. Wynn, and Elaine Wynn.

201.   The Agreement between Aruze USA, Wynn Resorts, Mr. Wynn, and Elaine Wynn does not permit Wynn Resorts to redeem Aruze USA's shares of Wynn Resorts' stock.

202.   Aruze USA's purchase of Wynn Resorts' shares under the Contribution Agreement did not impose any condition of redemption on Aruze USA, and therefore Wynn Resorts had no right to redeem Aruze USA's shares under the Agreement.

203.   Moreover, if the Stockholders Agreement is enforceable, Wynn Resorts' involuntary redemption (*i.e.*, transfer) of Aruze USA's shares is expressly prohibited under the terms of the Stockholders Agreement.

FIRST AMENDED COUNTERCLAIM

204.    Wynn Resorts' involuntary redemption of Aruze USA's shares is therefore a breach of the Agreement between Aruze USA, Wynn Resorts, Mr. Wynn, and Elaine Wynn.

205.    Aruze USA has been damaged in an amount greater than $10,000.

206.    Aruze USA brings this claim within the relevant statute of limitations under Nevada law, having discovered facts giving rise to this claim, including injury arising from the purported redemption of Aruze USA's shares of Wynn Resorts' stock, on or about February 18, 2012.  Despite having exercised reasonable diligence, Aruze USA did not and could not reasonably have discovered earlier the facts giving rise to this claim.

207.    It has been necessary for Aruze USA to retain the services of attorneys to prosecute this action, and Aruze USA is entitled to an award of the reasonable value of said services performed and to be performed in a sum to be determined.


**<u>COUNT V</u>**

**Breach of Articles of Incorporation/Breach of Contract in Connection with Wynn Resorts' Discounting Method of Involuntary Redemption**

**(By Aruze USA Against Wynn Resorts)**

208.    Aruze USA reasserts and realleges Paragraphs 4 through 174 above as if set forth in full below.

209.    The Contribution Agreement, the Stockholders Agreement, and the Articles of Incorporation form a contractual relationship and understanding (the "Agreement") between Aruze USA, Wynn Resorts, Mr. Wynn, and Elaine Wynn.

210.    To the extent that the redemption provision in the Articles of Incorporation applies to Aruze USA's shares (despite the parties' understanding under the Agreement), Wynn Resorts' involuntary redemption breaches the terms of the Agreement.

211.    Wynn Resorts' Articles of Incorporation provides that fair value will be provided for shares redeemed under its provisions.

1   212.   On or about February 18, 2012, Wynn Resorts purportedly redeemed Aruze

2   USA's shares for far less than the value of the shares, *e.g.*, as reflected by the closing

3   market price of Wynn Resorts' stock on NASDAQ.

4   213.   Wynn Resorts improperly discounted the fair value of the Aruze USA stock

5   to the extent the Stockholders Agreement between Mr. Wynn, Elaine Wynn, and Aruze

6   USA is not enforceable for any reason, including that it imposes an unreasonable restraint

7   on alienation and is therefore unenforceable.

8   214.   In the alternative, if the Stockholders Agreement is enforceable, Wynn

9   Resorts used an excessive discount amount and failed to provide fair value for Aruze

10  USA's stock.

11  215.   Among other things, although known to Wynn Resorts, Wynn Resorts did

12  not take into account material non-public information concerning positive developments

13  for Wynn Resorts regarding the Cotai land concession in Macau, as well as other positive

14  non-public information, when redeeming Aruze USA's shares for far less than the value

15  of the shares.  Furthermore, Wynn Resorts' unilateral valuation did not account for the

16  premium that would be applied to such a large block of shares.

17  216.   Aruze USA has been damaged in an amount greater than $100,000.

18  217.   Aruze USA brings this claim within the relevant statute of limitations under

19  Nevada law, having discovered facts giving rise to this claim, including injury arising

20  from the purported redemption of Aruze USA's shares of Wynn Resorts' stock, on or

21  about February 18, 2012.  Despite having exercised reasonable diligence, Aruze USA did

22  not and could not reasonably have discovered earlier the facts giving rise to this claim.

23  218.   It has been necessary for Aruze USA to retain the services of attorneys to

24  prosecute this action, and Aruze USA is entitled to an award of the reasonable value of

25  said services performed and to be performed in a sum to be determined.

26

27

28

FIRST AMENDED COUNTERCLAIM

**COUNT VI**

**Breach of Fiduciary Duty**

**(By Aruze USA Against the Wynn Directors)**

219.   Aruze USA reasserts and realleges Paragraphs 4 through 174 above as if set forth in full below.

220.   Directors of a corporation owe a fiduciary duty to the corporation and to its shareholders, including a duty of care and a duty of loyalty toward the corporation and each shareholder.

221.   Under Nevada law, directors of a corporation are individually liable to a stockholder for any act or failure to act that constitutes a breach of fiduciary duty.

222.   The terms of the Wynn Resorts' Articles of Incorporation purported to define an "Unsuitable Person" as a person who "in the sole discretion of the board of directors of the [Wynn Resorts], is deemed likely to jeopardize [Wynn Resorts'] or any Affiliated Company's . . . right to the use of, or entitlement to, any Gaming Licenses."

223.   The Wynn Directors abused their discretion in finding Aruze USA, Universal, and Mr. Okada "unsuitable" and resolving to have the Company cause the purported redemption of Aruze USA's shares of Wynn Resorts' stock.  The outcome of the Compliance Committee's "investigation" was already determined prior to engaging a supposedly "independent" investigator, which then openly acted as an advocate against Aruze USA, Universal, and Mr. Okada rather than providing an objective, balanced, and fully informed review of the facts and law.  Despite the fact that Freeh Sporkin informed the Board that further investigation would be required with respect to matters encompassed by its report, and despite assurances that Aruze USA, Mr. Okada, and Universal would be permitted to respond substantively to the report, the Wynn Directors deprived them of an opportunity to understand and to present any information to address the allegations against them prior to the vote on redemption.

224.   On information and belief, the Wynn Directors acted at the direction of Mr. Wynn and abandoned their own independence and objectivity in evaluating the

FIRST AMENDED COUNTERCLAIM

1   allegations.  The Wynn Directors failed to conduct a fair, comprehensive, and thoughtful

2   investigation, and failed to ensure that they were properly and adequately informed before

3   acting.

4        225.   Wynn Resorts, at the direction of Mr. Wynn, conducted an "investigation"

5   that was hurried, incomplete, one-sided, and unfair to Aruze USA, with a result that was

6   preordained by Mr. Wynn and his cohorts before the "investigator" was even hired.

7   Aruze USA was not given an opportunity to review the allegations against it or rebut or

8   address any findings of improper conduct or any other supposed basis for redemption.

9   The entire process was tainted by the desire to serve Mr. Wynn's pretextual goals of

10  removing Aruze USA as the largest single shareholder of the Company, silencing Mr.

11  Okada, and consolidating and maintaining Mr. Wynn's control over Wynn Resorts.  Such

12  actions do not withstand any standard of fundamental fairness or due process.

13       226.   Further, the purported redemption was voted on by persons with

14  irreconcilable conflicts of interest, including breaches of the duty of loyalty, the duty of

15  care, and the duty of good faith.

16       227.   Through their acts, the Wynn Directors have acted in a manner that seeks to

17  deprive Aruze USA alone from its right to vote its shares, receive dividends, elect

18  directors and other benefits of stock ownership.

19       228.   Harm will result if relief is not granted because Aruze USA's more than $2.7

20  billion equity stake in Wynn Resorts will be instantaneously and irreversibly damaged by

21  the Company's purported action to convert Aruze USA's substantial ownership interest

22  into a wholly subordinated ten-year promissory note in a principal amount 30% less than

23  the fair market value of the stock, and paying a mere 2% percent interest, without

24  providing Aruze USA any voting rights, rights to dividends, or the right to transfer the

25  note.

26       229.   As a further direct and proximate result of the wrongful conduct by the

27  Wynn Directors, as alleged herein, Aruze USA was and continues to be damaged in an

28  amount in excess of $100,000 to be proven at trial.

230.   Aruze USA brings this claim within the relevant statute of limitations under Nevada law, having discovered facts giving rise to this claim, including injury arising from the purported redemption of Aruze USA's shares of Wynn Resorts' stock, on or about February 18, 2012.  Despite having exercised reasonable diligence, Aruze USA did not and could not reasonably have discovered earlier the facts giving rise to this claim.

231.   It has been necessary for Aruze USA to retain the services of attorneys to prosecute this action, and Aruze USA is entitled to an award of the reasonable value of said services performed and to be performed in a sum to be determined.

## COUNT VII

### Imposition of a Constructive Trust and Unjust Enrichment

### (By Aruze USA Against Wynn Resorts)

232.   Aruze USA reasserts and realleges Paragraphs 4 through 174 above as if set forth in full below.

233.   By engaging the in the wrongful conduct alleged herein, Wynn Resorts purportedly redeemed Aruze USA's stock in exchange for a wholly subordinated, unsecured ten-year promissory note in a principal amount at least 30% less than the fair value of Aruze USA's stock, and paying a mere 2% interest, without providing Aruze USA any voting rights, rights to dividends, or the right to transfer the note.

234.   As a result of the relationship between the parties and the facts stated above, Wynn Resorts will be unjustly enriched if it is permitted to retain Aruze USA's stock and dividends and, therefore, a constructive trust should be established over Aruze USA's stock, and all dividends that would be paid on such shares if held by Aruze USA.  These shares and dividends are traceable to Wynn Resorts.

235.   Aruze USA brings this claim within the relevant statute of limitations under Nevada law, having discovered facts giving rise to this claim, including injury arising from the purported redemption of Aruze USA's shares of Wynn Resorts' stock, on or

FIRST AMENDED COUNTERCLAIM

about February 18, 2012.  Despite having exercised reasonable diligence, Aruze USA did not and could not reasonably have discovered earlier the facts giving rise to this claim.

236.   It has been necessary for Aruze USA to retain the services of attorneys to prosecute this action, and Aruze USA is entitled to an award of the reasonable value of said services performed and to be performed in a sum to be determined.

## COUNT VIII

### Conversion

### (By Aruze USA Against Wynn Resorts)

237.   Aruze USA reasserts and realleges Paragraphs 4 through 174 above as if set forth in full below.

238.   Wynn Resorts did not have a legal right to redeem and in addition lacked a proper and sufficient basis to find that the allegations in the Freeh Sporkin report against Aruze USA, Mr. Okada, and Universal were activities that "were likely to jeopardize [the Company's] or any Affiliated Company's . . . right to the use of, or entitlement to any Gaming License."

239.   As a result, Wynn Resorts' Board lacked a fair, proper, and sufficient basis for seizing Aruze USA's stock.

240.   Wynn Resorts wrongfully exercised dominion over Aruze USA's stock.

241.   Wynn Resorts' dominion over Aruze USA's stock without a valid basis for redemption is inconsistent with the Articles of Incorporation and Aruze USA's rights in the stock under the Contribution Agreement and the Stockholders Agreement.

242.   Wynn Resorts converted Aruze USA stock, damaging Plaintiff in an amount in excess of $10,000.

243.   Aruze USA brings this claim within the relevant statute of limitations under Nevada law, having discovered facts giving rise to this claim, including injury arising from the purported redemption of Aruze USA's shares of Wynn Resorts' stock, on or

FIRST AMENDED COUNTERCLAIM

1   about February 18, 2012. Despite having exercised reasonable diligence, Aruze USA did

2   not and could not reasonably have discovered earlier the facts giving rise to this claim.

3       244. It has been necessary for Aruze USA to retain the services of attorneys to

4   prosecute this action, and Aruze USA is entitled to an award of the reasonable value of

5   said services performed and to be performed in a sum to be determined.

6

7                                       **COUNT IX**

8   **Violations Of Nevada's Racketeer Influenced And Corrupt Organizations Act**

9                       **(RICO) (N.R.S. § 207.350, *et. Seq.*)**

10                  **(By Aruze USA Against Steve Wynn And Kim Sinatra)**

11      245. Aruze USA reasserts and realleges Paragraphs 4 through 174 above as if set

12   forth in full below.

13      246. **The Enterprise.** As alleged above, Wynn Resorts is a corporation formed

14   under the laws of Nevada. In a conspiracy with Ms. Sinatra, Mr. Wynn engaged in

15   wrongful conduct to acquire or maintain, directly or indirectly, an interest in or control of

16   Wynn Resorts in violation of N.R.S. § 207.400(1)(b) and (j). Moreover, Mr. Wynn and

17   Ms. Sinatra were and are employed by Wynn Resorts and conducted or participated,

18   directly or indirectly, in racketeering activity by and through the affairs of Wynn Resorts,

19   and/or conducted or participated, directly or indirectly, in the affairs of Wynn Resorts

20   through racketeering activity, in violation of N.R.S. § 207.400(1)(c) and (j). Mr. Wynn

21   and Ms. Sinatra are separate and distinct persons from Wynn Resorts. Thus, Wynn

22   Resorts is an "enterprise" within the meaning of N.R.S. § 207.380.

23      247. **Mr. Wynn and Ms. Sinatra engaged in at least two predicate acts**

24   **related to racketeering.** Mr. Wynn and Ms. Sinatra have each engaged in at least two

25   predicate acts related to racketeering that have the same or similar pattern, intents, results,

26   accomplices, victims or methods of commission, or are otherwise interrelated by

27   distinguishing characteristics and are not isolated incidents, within the meaning of N.R.S.

28   § 207.390.

-61-

248.   Pursuant to N.R.S. § 207.360, a "crime related to racketeering" includes the commission of, attempt to commit, or conspiracy to commit securities fraud, "[o]btaining possession of money or property valued at $250 or more, or obtaining a signature by means of false pretenses."  Securities fraud occurs under N.R.S. § 90.570 when a person, in connection with the purchase or sale of a security, either directly or indirectly, employs any device, scheme or artifice to defraud, makes a material misstatement or omission with the intent to deceive, and/or engages in any act, practice or course of business which operates or would operate as a fraud or deceit.  Under N.R.S. § 205.380, a person obtains possession of money or property by false pretenses when he/she, with an intent to defraud, makes a false representation (whether by direct or indirect conduct), that induces reliance on that representation, and defrauds the victim.  A person obtains a signature by false pretenses under N.R.S. § 205.390 when he/she has an intent to defraud, obtains a signature on a written interest, and uses a false representation (whether by direct or indirect conduct) to obtain the signature.

249.   In particular, Mr. Wynn and Ms. Sinatra engaged in a scheme to defraud Aruze USA and, ultimately, forcibly take its ownership interest in Wynn Resorts.  The central purpose of their scheme to deceive and steal from Aruze USA was to allow Mr. Wynn to consolidate, acquire, and maintain control of Wynn Resorts through a series of fraudulent and deceptive acts.

250.   In violation of N.R.S. § 207.400(1)(b), Mr. Wynn, through the above crimes related to racketeering detailed herein, acquired and maintained control over Wynn Resorts in connection with various agreements entered into by fraudulent means.  Mr. Wynn's control over Wynn Resorts has allowed him to use and operate, and transfer assets obtained in connection with Wynn Resorts, to the financial detriment of Aruze USA.  Specifically, Mr. Wynn personally committed, among other acts, the following acts constituting racketeering activity:

       a.   On or about June 11, 2002, Mr. Wynn obtained Aruze USA's signature on the Contribution Agreement under false pretenses;

FIRST AMENDED COUNTERCLAIM

  b. On or about May 16, 2011, Mr. Wynn obtained under false pretenses Aruze USA's signature on a document entitled "Waiver, Consent and Limited Release," relating to the transfer of Elaine Wynn's shares;

  c. On or about February 18, 2012, Mr. Wynn purportedly caused Wynn Resorts to redeem Aruze USA's shares of Wynn Resorts' stock (*i.e.*, the forced sale) through an ongoing fraudulent and deceptive scheme in violation of N.R.S. § 90.570; and,

  d. On or about February 18, 2012, Mr. Wynn caused Wynn Resorts to purportedly redeem Aruze USA's shares under false pretenses, in particular based on false, incomplete and/or misleading factual allegations made in the Freeh Sporkin report, for the central purpose of allowing Mr. Wynn to acquire and/or maintain control of Wynn Resorts.

  251. In violation of N.R.S. § 207.400(1)(c), Ms. Sinatra, who was employed by or associated with Wynn Resorts, has participated in and conducted the racketeering activity alleged in detail above through the affairs of Wynn Resorts. Wynn Resorts, although ultimately controlled by Mr. Wynn, is separate and distinct from Mr. Wynn and Ms. Sinatra. Specifically, Ms. Sinatra committed, among other acts, the following acts constituting racketeering activity:

  a. On or about May 16, 2011, in concert with Mr. Wynn, Ms. Sinatra obtained under false pretenses Aruze USA's signature on a document entitled "Waiver, Consent and Limited Release," relating to the transfer of Elaine Wynn's shares;

  b. On or about February 18, 2012, in concert with Mr. Wynn, Ms. Sinatra purportedly caused Wynn Resorts to redeem Aruze USA's shares of Wynn Resorts' stock (*i.e.*, the forced sale) through an ongoing fraudulent and deceptive scheme in violation of N.R.S. § 90.570; and,

FIRST AMENDED COUNTERCLAIM

c. On or about February 18, 2012, in concert with Mr. Wynn, Ms. Sinatra caused Wynn Resorts to purportedly redeem Aruze USA's shares under false pretenses, in particular based on false, incomplete and/or misleading factual allegations made in the Freeh Sporkin report, for the central purpose of allowing Mr. Wynn to acquire and/or maintain control of Wynn Resorts.

252.   In addition, Mr. Wynn and Ms. Sinatra have joined together to defraud Aruze USA and forcibly take its Wynn Resorts shares, and agreed to commit the racketeering activity detailed above.  Mr. Wynn's and Ms. Sinatra's activities, as demonstrated by the facts alleged above, establish Mr. Wynn's and Ms. Sinatra's agreement to knowingly participate in a collective venture toward a common goal, and thereby establish a conspiracy to commit the racketeering activity alleged in detail above within the meaning of N.R.S. § 207.400(1)(b) and (c).  Mr. Wynn's and Ms. Sinatra's activities, therefore, violate N.R.S. § 207.400(1)(j), which prohibits a conspiracy to violate N.R.S. § 207.400(1)(b) and (c).

253.   **Aruze USA's damages.**  As alleged above, each of Mr. Wynn and Ms. Sinatra has engaged in at least two crimes related to racketeering activity in connection with Wynn Resorts' violation of N.R.S. § 207.400(1).

254.   As a direct and proximate result of Mr. Wynn's and Ms. Sinatra's violations of N.R.S. § 207.400(1)(b), (c), and (j), Aruze USA has suffered and continues to suffer injuries to its property, most notably the fraudulent purported redemption of Aruze USA's shares held in Wynn Resorts' stock.  Those shares, with a stock market value of more than $2.7 billion, were purportedly redeemed for a 10-year, $1.9 billion promissory note.

255.   Pursuant to N.R.S. § 207.400(1), Aruze USA is entitled to recover threefold its actual damages, the costs of this action, and its reasonable attorneys' fees incurred in the trial and appellate courts.

256.   Aruze USA brings this claim within the relevant statute of limitations under Nevada law, having discovered facts giving rise to this claim, including injury arising

-64-

1   from the purported redemption of Aruze USA's shares of Wynn Resorts' stock, on or

2   about February 18, 2012.  Despite having exercised reasonable diligence, Aruze USA did

3   not and could not reasonably have discovered earlier the facts giving rise to this claim.

4       257.   It has been necessary for Aruze USA to retain the services of attorneys to

5   prosecute this action, and Aruze USA is entitled to an award of the reasonable value of

6   said services performed and to be performed in a sum to be determined.

7

8                                       **COUNT X**

9   **Fraud/Fraudulent Misrepresentation in Connection with Financing for Aruze USA**

10            **(By Aruze USA Against Wynn Resorts, Steve Wynn, and Kim Sinatra)**

11      258.   Aruze USA reasserts and realleges Paragraphs 4 through 174 above as if set

12   forth in full below.

13      259.   Wynn Resorts, Mr. Wynn, and Ms. Sinatra made false and misleading

14   statements and omissions of material facts to Aruze USA.  Specifically, on or about May

15   16, 2011, and for months thereafter, Mr. Wynn and Ms. Sinatra made false and misleading

16   statements and omissions concerning the ability of Wynn Resorts to loan money to Aruze

17   USA, which Wynn Resorts, Mr. Wynn, and Ms. Sinatra agreed would be backed by

18   shares of Wynn Resorts' stock held by Aruze USA.

19      260.   Mr. Wynn and Ms. Sinatra, acting in their individual capacity and as agents

20   of Wynn Resorts, made these false and misleading statements and omissions knowingly or

21   without sufficient basis of information because they believed Wynn Resorts permitted to

22   enter into such a lending transaction pursuant to the restrictions in Section 402 of SOX.

23   As alleged above, Mr. Wynn and Ms. Sinatra engaged in this wrongful conduct for the

24   purpose of maintaining Mr. Wynn's control over Wynn Resorts after Mr. Wynn's shares

25   in the Company were split with Elaine Wynn following their divorce, and keeping alive

26   the opportunity to later have Wynn Resorts seek to redeem Aruze USA's shares at a

27   discount.

28

FIRST AMENDED COUNTERCLAIM

261.   Furthermore, Mr. Wynn and Ms. Sinatra, acting in their individual capacity and as agents of Wynn Resorts, made these false and misleading statements and omissions knowingly or without sufficient basis of information regarding the immediate need for Elaine Wynn to transfer her shares under the Stockholders Agreement.  On information and belief, Mr. Wynn and Ms. Sinatra knew or were without a sufficient basis to make those material statements.

262.   Aruze USA relied on the false and misleading statements and omissions made by Wynn Resorts, Mr. Wynn, and Ms. Sinatra.  Aruze USA's reliance on the false and misleading statements and omissions was reasonable and justifiable, especially in light of Mr. Okada's trusting relationship with Mr. Wynn.

263.   On information and belief, Wynn Resorts, Mr. Wynn, and Ms. Sinatra knew that Aruze USA intended to rely on this information as a reason for Aruze USA to consent to Elaine Wynn's transfer of shares under the Stockholders Agreement, and for Aruze USA to not take steps to invalidate the purported restrictions on alienability contained in the Stockholders Agreement.  On information and belief, Wynn Resorts, Mr. Wynn, and Ms. Sinatra further knew and intended that, in reliance on these misrepresentations, Aruze USA would relinquish its own opportunity to liquidate its own shares of Wynn Resorts' stock to fund Universal's project in the Philippines or seek other financing.  Therefore, Aruze USA relied on the fact that Wynn Resorts was a committed lender to the project at the expense of pursuing other financing options.

264.   As a further direct and proximate result of the wrongful conduct by Wynn Resorts, Mr. Wynn, and Ms. Sinatra, as alleged herein, Aruze USA was and continues to be damaged in an amount in excess of $10,000 to be proven at trial.

265.   Pursuant to N.R.S. § 42.005, by reason of the fraudulent, reckless, misleading, malicious, willful, and wanton misconduct of Wynn Resorts, Mr. Wynn, and Ms. Sinatra, Aruze USA is entitled to punitive damages not to exceed three times the amount of compensatory damages awarded.

FIRST AMENDED COUNTERCLAIM

266.   Aruze USA brings this claim within the relevant statute of limitations under Nevada law, having discovered facts giving rise to this claim, including injury arising from the purported redemption of Aruze USA's shares of Wynn Resorts' stock, on or about September 30, 2012.

267.   Aruze USA brings this claim within the relevant statute of limitations under Nevada law, having discovered facts giving rise to this claim on or about September 30, 2011.  Despite having exercised reasonable diligence, Aruze USA did not and could not reasonably have discovered earlier the facts giving rise to this claim.

268.   It has been necessary for Aruze USA to retain the services of attorneys to prosecute this action, and Aruze USA is entitled to an award of the reasonable value of said services performed and to be performed in a sum to be determined.

## **COUNT XI**

**Negligent Misrepresentation in Connection with Financing for Aruze USA**

**(By Aruze USA Against Wynn Resorts, Steve Wynn, and Kim Sinatra)**

269.   Aruze USA reasserts and realleges Paragraphs 4 through 174 above as if set forth in full below.

270.   Wynn Resorts, Mr. Wynn, and Ms. Sinatra made false and misleading statements and omissions of material facts to Aruze USA.  Specifically, on or about May 16, 2011, and for months thereafter, Mr. Wynn and Ms. Sinatra made false and misleading statements and omissions concerning the ability of Aruze USA to obtain a loan from Wynn Resorts, which Wynn Resorts, Mr. Wynn, and Ms. Sinatra agreed would be backed by shares of Wynn Resorts' stock held by Aruze USA.

271.   The false statements of facts alleged herein were material because had Wynn Resorts, Mr. Wynn, and Ms. Sinatra provided Aruze USA with truthful and correct information, Aruze USA would not have consented to Elaine Wynn's transfer of shares under the Stockholders Agreement, and would have taken steps to invalidate the purported restrictions in the Shareholder Agreement.

-67-

FIRST AMENDED COUNTERCLAIM

272.   Wynn Resorts, Mr. Wynn, and Ms. Sinatra failed to exercise reasonable care or competence in obtaining or communicating the false statements of fact alleged herein.

273.   Wynn Resorts, Mr. Wynn, and Ms. Sinatra made the false statements or omissions of fact alleged herein with the intent to induce Aruze USA to consent to Elaine Wynn's transfer of shares under the Stockholders Agreement without pledging its own shares in a manner that would reduce Mr. Wynn's control over those shares.  Furthermore, Wynn Resorts, Mr. Wynn, and Ms. Sinatra made the false statements of fact alleged herein with the intent of gaining their own financial advantage to the disadvantage of Aruze USA, including, but not limited to, the opportunity to seek to have Wynn Resorts redeem Aruze USA's shares at a discount.

274.   Furthermore, Mr. Wynn and Ms. Sinatra, acting in their individual capacity and as agents of Wynn Resorts, made these false and misleading statements and omissions knowingly or without sufficient basis of information regarding the immediate need for Elaine Wynn to transfer her shares under the Stockholders Agreement.  On information and belief, Mr. Wynn and Ms. Sinatra knew or were without a sufficient basis to make those material statements.

275.   Aruze USA relied upon the false statements of fact alleged herein by providing consent for Elaine Wynn to transfer her shares under the Stockholders Agreement.  Aruze USA's reliance on these representations and concealment of facts was reasonable and justifiable, especially in light of Mr. Okada's trusting relationship with Mr. Wynn.

276.   Wynn Resorts, Mr. Wynn, and Ms. Sinatra aided and abetted each of the others in making the false statements of fact set herein by each failing to exercise reasonable care or competence in obtaining or communicating those statements.

277.   Aruze USA has suffered and continues to suffer economic and non-economic losses because of Wynn Resorts', Mr. Wynn's, and Ms. Sinatra's false statements of fact.  The amount of losses will be determined according to proof at trial, but damages are in an amount in excess of $10,000.

278.   Pursuant to N.R.S. § 42.005, by reason of the fraudulent, reckless, misleading, malicious, willful, and wanton misconduct of Wynn Resorts, Mr. Wynn, and Ms. Sinatra, Aruze USA is entitled to punitive damages not to exceed three times the amount of compensatory damages awarded.

279.   Aruze USA brings this claim within the relevant statute of limitations under Nevada law, having discovered facts giving rise to this claim on or about September 30, 2011.  Despite having exercised reasonable diligence, Aruze USA did not and could not reasonably have discovered earlier the facts giving rise to this claim.

280.   It has been necessary for Aruze USA to retain the services of attorneys to prosecute this action, and Aruze USA is entitled to an award of the reasonable value of said services performed and to be performed in a sum to be determined.

## COUNT XII

### Civil Conspiracy in Connection with Financing for Aruze USA

### (By Aruze USA Against Steve Wynn and Kim Sinatra)

281.   Aruze USA reasserts and realleges Paragraphs 4 through 174 above as if set forth in full below.

282.   Aruze USA, Mr. Wynn and Elaine Wynn entered into an agreement regarding the disposition of shares pursuant to the January 6, 2010 Amended and Restated Stockholders Agreement.

283.   Ms. Sinatra, as General Counsel for Wynn Resorts, had knowledge of the Stockholders Agreement and its restriction on transfer of shares.

284.   On information and belief, Ms. Sinatra had knowledge that Mr. Wynn needed Aruze USA to waive the restriction, permitting Elaine Wynn to transfer her shares.

285.   On information and belief, Ms. Sinatra and Mr. Wynn agreed to persuade Aruze USA to permit Elaine Wynn to transfer her shares without permitting Aruze USA to transfer or pledge any shares to anyone outside the control of Mr. Wynn.  In fact, upon receiving an email from Aruze USA's representative on July 13, 2011 permitting the

-69-

immediate transfer of Elaine Wynn's shares, Ms. Sinatra expressed happiness for Mr. Wynn, stating, "Thank you very much for this. I'm sure Mr. Wynn will be happy about the clarification."

286. Wynn Resorts, Mr. Wynn, and Ms. Sinatra made false and misleading statements and omissions of material facts to Aruze USA. Specifically, on or about May 16, 2011, and for months thereafter, Mr. Wynn and Ms. Sinatra made false and misleading statements and omissions concerning Wynn Resorts' ability and/or willingness to loan money to Aruze USA, which Wynn Resorts, Mr. Wynn, and Ms. Sinatra agreed would be backed by shares of Wynn Resorts' stock held by Aruze USA.

287. Mr. Wynn and Ms. Sinatra, acting in concert with Wynn Resorts, made these false and misleading statements and omissions knowingly or without sufficient basis of information because they believed Wynn Resorts was not legally permitted to enter into such a lending transaction pursuant to the restrictions in Section 402 of SOX. As alleged above, Mr. Wynn and Ms. Sinatra engaged in this wrongful conduct for the purpose of maintaining Mr. Wynn's control over Wynn Resorts after Mr. Wynn's shares in the Company were split with Elaine Wynn following their divorce, and keeping alive the opportunity to later have Wynn Resorts seek to redeem Aruze USA's shares at a discount.

288. Furthermore, Mr. Wynn and Ms. Sinatra, acting in their individual capacity and as agents of Wynn Resorts, made these false and misleading statements and omissions knowingly or without sufficient basis of information regarding the immediate need for Elaine Wynn to transfer her shares under the Stockholders Agreement. On information and belief, Mr. Wynn and Ms. Sinatra knew or were without a sufficient basis to make those material statements.

289. Aruze USA relied on the false and misleading statements and omissions made by Wynn Resorts, Mr. Wynn, and Ms. Sinatra. Aruze USA's reliance on the false and misleading statements and omissions was reasonable and justifiable, especially in light of Mr. Okada's trusting relationship with Mr. Wynn.

290.   On information and belief, Wynn Resorts, Mr. Wynn, and Ms. Sinatra knew that Aruze USA intended to rely on this information as a reason for Aruze USA to consent to Elaine Wynn's transfer of shares under the Stockholders Agreement.  On information and belief, Wynn Resorts, Mr. Wynn, and Ms. Sinatra further knew and intended that, in reliance on these misrepresentations, Aruze USA would relinquish its own opportunity to liquidate its own shares of Wynn Resorts' stock to fund Universal's project in the Philippines or seek other financing.  Therefore, Aruze USA relied on the fact that Wynn Resorts was a committed lender to the project at the expense of pursuing other financing options.

291.   As a further direct and proximate result of the wrongful conduct by Wynn Resorts, Mr. Wynn, and Ms. Sinatra, as alleged herein, Aruze USA was and continues to be damaged in an amount in excess of $10,000 to be proven at trial.

292.   Aruze USA brings this claim within the relevant statute of limitations under Nevada law, having discovered facts giving rise to this claim on or about September 30, 2011.  Despite having exercised reasonable diligence, Aruze USA did not and could not reasonably have discovered earlier the facts giving rise to this claim.

293.   Pursuant to N.R.S. § 42.005, by reason of the fraudulent, reckless, misleading, malicious, willful, and wanton misconduct of Wynn Resorts, Mr. Wynn, and Ms. Sinatra, Aruze USA is entitled to punitive damages not to exceed three times the amount of compensatory damages awarded.

294.   It has been necessary for Aruze USA to retain the services of attorneys to prosecute this action, and Aruze USA is entitled to an award of the reasonable value of said services performed and to be performed in a sum to be determined.

## COUNT XIII

**Promissory Estoppel in Connection with Financing for Aruze USA**

**(By Aruze USA Against Wynn Resorts, Steve Wynn, and Kim Sinatra)**

295.   Aruze USA reasserts and realleges Paragraphs 4 through 174 above as if set forth in full below.

296.   On or about May 16, 2011, Mr. Wynn, in the presence of Ms. Sinatra, gave Mr. Okada an explicit personal assurance that Wynn Resorts would provide a loan or facilitate the lending of money to Aruze USA, which would be backed by shares of Wynn Resorts' stock held by Aruze USA.  As alleged above, Mr. Okada agreed to the financing from Wynn Resorts – rather than causing Aruze USA to attempt to liquidate or pledge its shares of Wynn Resorts or seek alternative financing – based on assurances made by Mr. Wynn.  Ms. Sinatra agreed to provide draft loan agreements to Aruze USA within 10 days to support the agreement reached between Mr. Wynn and Mr. Okada.

297.   Based on the foregoing agreement, on July 13, 2011, Ms. Sinatra stated in an email to Aruze USA's counsel that Wynn Resorts was negotiating with Deutsche Bank on a margin loan transaction on Aruze USA's behalf, with Wynn Resorts acting as a "backstop."

298.   Mr. Wynn and Ms. Sinatra, acting in their individual capacities and as agents of Wynn Resorts, made these statements knowingly or without sufficient basis of information because they believed Wynn Resorts was not legally permitted to enter into such a lending transaction pursuant to the restrictions in Section 402 of SOX.  As alleged above, Mr. Wynn and Ms. Sinatra engaged in this wrongful conduct with the intent to induce Aruze USA to consent to Elaine Wynn's transfer of shares under the Stockholders Agreement.  Mr. Wynn and Ms. Sinatra acted with the purpose of maintaining Mr. Wynn's control over Wynn Resorts after Mr. Wynn's shares in the Company were split with Elaine Wynn following their divorce, and keeping alive the opportunity to later have Wynn Resorts seek to redeem Aruze USA's shares at a discount.

299.   At the time, Aruze USA was not aware that Wynn Resorts would take the position that it was not legally permitted to enter into such a lending transaction pursuant to the restrictions in Section 402 of SOX.  Aruze USA relied on the false and misleading statements and omissions made by Wynn Resorts, Mr. Wynn, and Ms. Sinatra.  Aruze USA's reliance on the false and misleading statements and omissions was reasonable and justifiable, especially in light of Mr. Okada's trusting relationship with Mr. Wynn.

300.   On information and belief, Wynn Resorts, Mr. Wynn, and Ms. Sinatra knew that Aruze USA intended to rely on this information as a reason for Aruze USA to forego seeking to liquidate its shares or seeking another source of financing backed by its Wynn Resorts shares.  On information and belief, Wynn Resorts, Mr. Wynn, and Ms. Sinatra further knew and intended that, in reliance on these misrepresentations, Aruze USA would relinquish its own opportunity to liquidate its own shares of Wynn Resorts' stock to fund Universal's project in the Philippines or seek other financing.  Therefore, Aruze USA relied on the fact that Wynn Resorts was a committed lender to the project at the expense of pursuing other financing options.

301.   On September 30, 2011, Wynn Resorts' Compliance Committee refused to permit the loan to Aruze USA or to otherwise serve as a "backstop" for a margin loan transaction on Aruze USA's behalf.

302.   As a further direct and proximate result of the wrongful conduct by Wynn Resorts, Mr. Wynn, and Ms. Sinatra, as alleged herein, Aruze USA was and continues to be damaged in an amount in excess of $10,000 to be proven at trial.

303.   Aruze USA brings this claim within the relevant statute of limitations under Nevada law, having discovered facts giving rise to this claim on or about September 30, 2011.  Despite having exercised reasonable diligence, Aruze USA did not and could not reasonably have discovered earlier the facts giving rise to this claim.

304.   It has been necessary for Aruze USA to retain the services of attorneys to prosecute this action, and Aruze USA is entitled to an award of the reasonable value of said services performed and to be performed in a sum to be determined.

FIRST AMENDED COUNTERCLAIM

1

2
**COUNT XIV**

3
**Fraud/Fraud in the Inducement of the Contribution Agreement**

4
**(By Aruze USA Against Wynn Resorts and Steve Wynn)**

5
305.   Aruze USA reasserts and realleges Paragraphs 4 through 174 above as if set

6
forth in full below.

7
306.   In the alternative, to the extent the Court finds that the redemption provision

8
in the later amended Articles of Incorporation applies to Aruze USA's shares, Aruze USA

9
asserts the claim of fraudulent inducement into entering the Contribution Agreement

10
against Wynn Resorts and Steve Wynn.  Aruze USA thus brings this claim in the

11
alternative to Aruze USA's claims that assert the purported redemption by Wynn Resorts

12
is void *ab initio*.

13
307.   On or about April 11, 2002, Aruze USA, Baron Asset Fund, and Mr. Wynn

14
entered into the Stockholders Agreement in recognition of their desire to form Wynn

15
Resorts.  On June 3, 2002, Mr. Wynn caused Wynn Resorts to file its Articles of

16
Incorporation with Nevada's Secretary of State without including a redemption provision.

17
308.   On behalf of Aruze USA, on or about June 11, 2002, Mr. Wynn caused

18
Aruze USA to enter into a Contribution Agreement between Aruze USA, Mr. Wynn, and

19
Wynn Resorts.  The Contribution Agreement committed Aruze USA's LLC interests in

20
Valvino in exchange for Wynn Resorts common stock.

21
309.   Prior to causing the contribution to occur, on or about September 10, 2002,

22
Mr. Wynn filed amended Articles of Incorporation that included the redemption

23
provision.  On information and belief, Mr. Wynn deliberately delayed in causing the

24
contribution in order to allow Mr. Wynn to amend the Articles of Incorporation without

25
affording Aruze USA a shareholder vote as would have been required pursuant to N.R.S.

26
§ 78.390.  At the time of the amendment, Mr. Wynn was the sole stockholder of Wynn

27
Resorts.

28

-74-

310.   On or about September 28, 2002, about three months after Aruze USA entered into the Contribution Agreement, and eighteen days after Mr. Wynn amended the Articles of Incorporation, Mr. Wynn caused the contribution of Aruze USA's LLC interests in Valvino to Wynn Resorts in exchange for Wynn Resorts common stock.

311.   In entering into the Contribution Agreement, Wynn Resorts and Mr. Wynn made materially false and/or misleading representations to Aruze USA regarding Wynn Resorts' stockholder obligations under the Articles of Incorporation.  Mr. Wynn and Wynn Resorts misrepresented and/or failed to disclose that Wynn Resorts' Articles of Incorporation would seek to impose substantial financial risk on Aruze USA's shares of Wynn Resorts stock by providing Wynn Resorts' Board – which was controlled by Mr. Wynn – purported discretion to redeem Aruze USA's stock on potentially onerous terms.

312.   The misrepresentations and concealment of facts alleged herein were material because, had Wynn Resorts and Mr. Wynn provided Aruze USA with truthful and correct information, Aruze USA would not have entered into the Contribution Agreement.

313.   Wynn Resorts and Mr. Wynn knew the misrepresentations and concealment of facts alleged herein were false, or alternatively, made misrepresentations of facts with reckless disregard for whether those representations were true.

314.   Wynn Resorts and Mr. Wynn made the misrepresentations and concealed facts as set forth herein with the intent to induce Aruze USA to enter into the Contribution Agreement.  Furthermore, Wynn Resorts and Mr. Wynn made the misrepresentations and concealment of facts alleged herein with the intent of gaining their own financial advantage to the disadvantage of Aruze USA.

315.   Aruze USA relied upon the misrepresentations and concealment of facts made by Wynn Resorts and Mr. Wynn regarding Wynn Resorts' common stock at the time Aruze USA entered into the Contribution Agreement.  Aruze USA's reliance on these representations and concealment of facts was reasonable and justifiable, especially in light of Mr. Okada's trusting relationship with Mr. Wynn.

316.   Aruze USA was not aware of and could not have known about the misrepresentations until September 30, 2011, when Wynn Resorts, for the first time, indicated that it might attempt to apply the redemption restriction to Aruze USA's shares.

317.   Wynn Resorts and Mr. Wynn aided and abetted each other in making the false statements of facts alleged herein by each failing to exercise reasonable care or competence in obtaining or communicating those statements.

318.   Aruze USA has suffered and continues to suffer injury because of Wynn Resorts' and Mr. Wynn's misrepresentations and concealment of facts set forth herein. As a direct and proximate result of Wynn Resorts' and Mr. Wynn's wrongful conduct, Aruze USA suffered injury when the redemption provision was purportedly invoked by Wynn Resorts' Board on or about February 18, 2012.

319.   As a remedy for Wynn Resorts' and Mr. Wynn's fraudulent inducement, Aruze USA seeks imposition of a constructive trust over Aruze USA's Wynn Resorts shares purportedly redeemed by the Board, or, in the alternative, recovery of unjust enrichment/restitution.

320.   Aruze USA brings this claim within the relevant statute of limitations under Nevada law, having discovered facts giving rise to this claim, including injury arising from the purported redemption of Aruze USA's shares of Wynn Resorts' stock, on or about February 18, 2012.  Despite having exercised reasonable diligence, Aruze USA did not and could not reasonably have discovered earlier the facts giving rise to this claim.

321.   It has been necessary for Aruze USA to retain the services of attorneys to prosecute this action, and Aruze USA is entitled to an award of the reasonable value of said services performed and to be performed in a sum to be determined.

FIRST AMENDED COUNTERCLAIM

## COUNT XV

**Negligent Misrepresentation in Connection with the Contribution Agreement**

**(By Aruze USA Against Wynn Resorts and Steve Wynn)**

322.   Aruze USA reasserts and realleges Paragraphs 4 through 174 above as if set forth in full below.

323.   In the alternative, to the extent that the redemption provision in the later amended Articles of Incorporation is found to apply to Aruze USA's shares, Aruze USA asserts the claim of negligent misrepresentation in connection with the Contribution Agreement against Wynn Resorts and Steve Wynn.  Aruze USA thus brings this claim in the alternative to Aruze USA's claims that assert the purported redemption by Wynn Resorts is void *ab initio*.

324.   On or about April 11, 2002, Aruze USA, Baron Asset Fund, and Mr. Wynn entered into the Stockholders Agreement in recognition of their desire to form Wynn Resorts.  On June 3, 2002, Mr. Wynn caused Wynn Resorts to file its Articles of Incorporation with Nevada's Secretary of State without including a redemption provision.

325.   On behalf of Aruze USA, on or about June 11, 2002, Mr. Wynn caused Aruze USA to enter into a Contribution Agreement between Aruze USA, Mr. Wynn, and Wynn Resorts.  The Contribution Agreement committed Aruze USA's LLC interests in Valvino in exchange for Wynn Resorts common stock.

326.   Prior to causing the contribution to occur, on or about September 10, 2002, Mr. Wynn filed amended Articles of Incorporation that included the redemption provision.  On information and belief, Mr. Wynn deliberately delayed in causing the contribution in order to allow Mr. Wynn to amend the Articles of Incorporation without affording Aruze USA a shareholder vote as would have been required pursuant to N.R.S. § 78.390.  At the time of the amendment, Mr. Wynn was the sole stockholder of Wynn Resorts.

327.   On or about September 28, 2002, about three months after Aruze USA entered into the Contribution Agreement, and eighteen days after Mr. Wynn amended the

1    Articles of Incorporation, Mr. Wynn caused the contribution of Aruze USA's LLC

2    interests in Valvino to Wynn Resorts in exchange for Wynn Resorts common stock.

3         328.   In entering into the Contribution Agreement, Wynn Resorts and Mr. Wynn

4    made materially false representations and/or omissions to Aruze USA regarding Wynn

5    Resorts' stockholder obligations under Articles of Incorporation.  Mr. Wynn and Wynn

6    Resorts misrepresented and/or failed to disclose that Wynn Resorts' Articles of

7    Incorporation would seek to impose substantial financial risk to Aruze USA by providing

8    Wynn Resorts' Board (which was controlled by Mr. Wynn) purported discretion to

9    redeem Aruze USA's stock on potentially onerous terms.

10        329.   Aruze USA was not aware of and could not have known about the

11   misrepresentations until September 30, 2011, when Wynn Resorts, for the first time,

12   indicated that it might attempt to apply the redemption restriction to Aruze USA's shares.

13        330.   The false statements and/or omissions of facts alleged herein were material

14   because, had Wynn Resorts and Mr. Wynn provided Aruze USA with truthful and correct

15   information, Aruze USA would not have entered into the Contribution Agreement.

16        331.   Wynn Resorts and Mr. Wynn failed to exercise reasonable care or

17   competence in obtaining or communicating the false statements of fact alleged herein.

18        332.   Aruze USA relied on the false and misleading statements and omissions

19   made by Wynn Resorts and Mr. Wynn regarding Wynn Resorts' common stock at the

20   time Aruze USA entered into the Contribution Agreement.  Aruze USA's reliance on the

21   false and misleading statements and omissions was reasonable and justifiable, especially

22   in light of Mr. Okada's trusting relationship with Mr. Wynn.

23        333.    On information and belief, Wynn Resorts and Mr. Wynn knew that Aruze

24   USA intended to rely on this information as a reason for Aruze USA to enter into the

25   Contribution Agreement.

26        334.   Aruze USA has suffered and continues to suffer injury because of Wynn

27   Resorts' and Mr. Wynn's false and misleading statements and omissions alleged herein.

28   As a direct and proximate result of Wynn Resorts' and Mr. Wynn's wrongful conduct,

Aruze USA suffered injury when the redemption provision was purportedly invoked by Wynn Resorts' Board on or about February 18, 2012.

335.   As a remedy for Wynn Resorts' and Mr. Wynn's negligent misrepresentations, Aruze USA seeks imposition of a constructive trust over Aruze USA's Wynn Resorts shares purportedly redeemed by the Board, or, in the alternative, unjust enrichment/restitution.

336.   Aruze USA brings this claim within the relevant statute of limitations under Nevada law, having discovered facts giving rise to this claim, including injury arising from the purported redemption of Aruze USA's shares of Wynn Resorts' stock, on or about February 18, 2012.  Despite having exercised reasonable diligence, Aruze USA did not and could not reasonably have discovered earlier the facts giving rise to this claim.

337.   It has been necessary for Aruze USA to retain the services of attorneys to prosecute this action, and Aruze USA is entitled to an award of the reasonable value of said services performed and to be performed in a sum to be determined.

## **COUNT XVI**

### **Breach of Contract in Connection with the Stockholders Agreement**

### **(By Aruze USA Against Steve Wynn)**

338.   Aruze USA reasserts and realleges Paragraphs 4 through 174 above as if set forth in full below.

339.   Mr. Wynn, Elaine Wynn, and Aruze USA are parties to the Stockholders Agreement.

340.   Section 2(a) of the Stockholders Agreement provides that Mr. Wynn must endorse and vote for Aruze USA's proposed slate of directors so long as the resulting Board is composed of a majority of directors selected by Mr. Wynn.

341.   Aruze USA has designated three nominees for election to the Board.  If the stockholders of the Company elect the Aruze USA director candidates, the resulting

-79-

1    Board shall be comprised of at least nine of the directors nominated by Mr. Wynn, a clear

2    majority.

3          342.   Mr. Wynn has failed and refused to endorse Aruze USA's slate of directors

4    in violation of his obligations under the Stockholders Agreement and failed and refused to

5    provide assurances of his intent to vote his and Elaine Wynn's stock in favor of those

6    nominees.

7          343.   Mr. Wynn has materially breached the Stockholders Agreement without

8    justification and has frustrated the essential purpose of the Stockholders Agreement.

9          344.   The Stockholders Agreement provides that each of the parties to it

10   recognizes and acknowledges that a breach by any party of any covenants or agreements

11   contained in the Agreement will cause the other parties to sustain damages for which they

12   would not have an adequate remedy at law for money damages, and therefore each of the

13   parties agrees that in the event of any such breach the parties shall be entitled to

14   appropriate equitable relief.

15         345.   On account of Mr. Wynn's material breach of the Stockholders Agreement,

16   Aruze USA is entitled to be excused and completely discharged from any further

17   performance of its obligations contained therein.

18         346.   Further, the breaches by Mr. Wynn have frustrated the entire purpose of the

19   Stockholders Agreement, and have instead served to further entrench Mr. Wynn's control

20   over the Company to the detriment of the other parties to the Agreement.  Thus, the

21   appropriate equitable relief for Mr. Wynn's breach is rescission of the Stockholders

22   Agreement.

23         347.   Aruze USA brings this claim within the relevant statute of limitations under

24   Nevada law, having discovered facts giving rise to this claim, including injury arising

25   from the purported redemption of Aruze USA's shares of Wynn Resorts' stock, on or

26   about February 18, 2012.  Despite having exercised reasonable diligence, Aruze USA did

27   not and could not reasonably have discovered earlier the facts giving rise to this claim.

28

FIRST AMENDED COUNTERCLAIM

348.   It has been necessary for Aruze USA to retain the services of attorneys to prosecute this action, and Aruze USA is entitled to an award of the reasonable value of said services performed and to be performed in a sum to be determined.

## COUNT XVII

**Breach of Covenant of Good Faith and Fair Dealing in Stockholders Agreement**

**(By Aruze USA Against Steve Wynn)**

349.   Aruze USA reasserts and realleges Paragraphs 4 through 174 above as if set forth in full below.

350.   In every contract, there exists an implied covenant of good faith and fair dealing.

351.   Aruze USA and Mr. Wynn are parties to the Stockholders Agreement, between Mr. Wynn, Elaine Wynn, and Aruze USA.

352.   Aruze USA has properly sought to exercise its rights under the Stockholders Agreement in seeking to designate directors for endorsement by Mr. Wynn while complying with the contractual condition that the Board will consist of a majority of directors nominated by Mr. Wynn.

353.   Mr. Wynn has materially breached the Stockholders Agreement by failing to endorse Aruze USA's slate of nominees for directors to the Wynn Resorts Board and by failing to confirm his intent to vote his and Elaine Wynn's stock in favor of those nominees, thereby frustrating the essential purpose of the Stockholders Agreement.

354.   Mr. Wynn has breached the reasonable and justifiable expectations of Aruze USA with respect to Aruze USA's ability to successfully designate director candidates, an essential purpose of the Stockholders Agreement.

355.   Mr. Wynn also has breached the reasonable and justifiable expectations of Aruze USA by unreasonably withholding his consent for Aruze USA to liquidate stock, and by falsely promising financing in order to persuade Aruze USA to delay its demands for liquidity.

356.   Accordingly, Mr. Wynn's conduct has breached the covenant of good faith and fair dealing. On account of Mr. Wynn's material breach, Aruze USA is entitled to contract damages, or in the alternative, Aruze USA is entitled to being excused and discharged from its obligations under the Stockholders Agreement.  Aruze USA is also entitled to rescission of the Stockholders Agreement.

357.   By virtue of his purported position as power of attorney under the Stockholders Agreement, Mr. Wynn owed fiduciary duties to Aruze USA.  Given the existence of this "special relationship" between Mr. Wynn and Aruze USA, Mr. Wynn is also liable for a tortuous breach of the implied duty of good faith and fair dealing and the accompanying tort damages.

358.   Aruze USA brings this claim within the relevant statute of limitations under Nevada law, having discovered facts giving rise to this claim, including injury arising from the purported redemption of Aruze USA's shares of Wynn Resorts' stock, on or about February 18, 2012.  Despite having exercised reasonable diligence, Aruze USA did not and could not reasonably have discovered earlier the facts giving rise to this claim.

359.   It has been necessary for Aruze USA to retain the services of attorneys to prosecute this action, and Aruze USA is entitled to an award of the reasonable value of said services performed and to be performed in a sum to be determined.

## **COUNT XVIII**

**Claim for Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5(a) Promulgated Thereunder**

**(By Aruze USA Against Wynn Resorts and Steve Wynn)**

360.   Aruze USA reasserts and realleges Paragraphs 4 through 174 above as if set forth in full below.

361.   Wynn Resorts has claimed publicly and Wynn Resorts has alleged in its Complaint in this action that it has redeemed Aruze USA's shares of Wynn Resorts'

1   stock.  Aruze USA brings this claim in the alternative to Aruze USA's claims that assert

2   the purported redemption by Wynn Resorts is void *ab initio*.

3        362.   Since at least the beginning of 2011, Wynn Resorts and Mr. Wynn have

4   committed a series of manipulative or deceptive acts in furtherance of a device, scheme,

5   and/or artifice to defraud Aruze USA, which they knew or deliberately disregarded would

6   perpetrate a fraud.

7        363.   In particular, as alleged in detail above, Wynn Resorts and Mr. Wynn caused

8   an illegal redemption (*i.e.*, a forced "sale" under the securities laws) of Aruze USA's more

9   than $2.7 billion interest in Wynn Resorts by:

10   •      Undertaking a series of acts in 2011 to prevent Aruze USA from pledging

11          its securities, including acts by Mr. Wynn and Ms. Sinatra dissuading Aruze

12          USA from pledging its shares of Wynn Resorts and holding out a false

13          promise of financing by Wynn Resorts, while knowing that Wynn Resorts

14          was secretly investigating Mr. Okada to create a pretext for redemption;

15   •   Causing a redemption based on the Freeh Sporkin report, which among

16       other things:

17       •      was incomplete;

18       •      contained false and misleading statements;

19       •      failed to address or include exculpatory facts and evidence;

20       •      relied upon an inaccurate and incomplete understanding the FCPA;

21              and,

22       •      relied upon an inaccurate and incomplete understanding of Philippine

23              law and related facts.

24   •   Causing a redemption without evidence of any bona fide jeopardy to any

25       Wynn Resorts gaming license;

26   •   Causing a redemption in the absence of a finding by the Nevada Gaming

27       Commission, or any other gaming regulator, that Aruze USA or its affiliates

28       is unsuitable;

FIRST AMENDED COUNTERCLAIM

- Causing Aruze USA not to apply for injunctive relief prior to the Board's consideration of redemption, by falsely representing through Mr. Freeh that Aruze USA and Mr. Okada would have an opportunity to review the Freeh Sporkin report and present responsive facts and evidence;
- Excluding Mr. Okada and his counsel from Wynn Resorts' Board meetings discussing redemption;
- Denying Aruze USA access to investigative materials, by falsely invoking attorney-client privilege;
- Falsely invoking "confidentiality" in an attempt to get Aruze USA to sign away legal rights in exchange for reviewing the Freeh Sporkin report;
- Setting a redemption price for Aruze USA's shares of Wynn Resorts' stock that was not the product of independent assessment;
- Setting a redemption price that does not reflect, among other things, fair value and that failed to consider:
  - the lack of applicability of the Stockholders Agreement to a redemption;
  - developments in Cotai and other positive inside information; and,
  - a premium for the volume of stock transacted.

364.    The deliberate, intentional, and/or reckless aim of the above scheme by Wynn Resorts and Mr. Wynn was to force the illegal sale of Aruze USA's shares of Wynn Resorts' stock to Wynn Resorts at a price well below the fair value of the shares, consolidating Mr. Wynn's dominance over Wynn Resorts, and eliminating Aruze USA as a troublesome shareholder.  As alleged in detail above, Wynn Resorts and Mr. Wynn's acts were carefully orchestrated to secure Aruze USA's continued acceptance of the Stockholders Agreement and to dissuade legal action to enjoin enforcement of the Stockholders Agreement or otherwise challenge the restraint on alienation purportedly contained therein.  At the same time as Wynn Resorts and Mr. Wynn were promising Aruze USA financing secured by Aruze USA's stock in Wynn Resorts, Wynn Resorts and

FIRST AMENDED COUNTERCLAIM

Mr. Wynn were secretly conspiring to force a sale of Aruze USA's interest in Wynn

Resorts based on false, misleading, and incomplete allegations. This scheme was

deliberately calculated to perpetuate and consolidate Mr. Wynn's control over Wynn

Resorts and to enable the forced sale of Aruze USA's shares of Wynn Resorts' stock at

this steep discount. Wynn Resorts and Mr. Wynn took steps to conceal all aspects of the

investigation from Aruze USA and its representatives in order to prevent scrutiny or

rebuttal and to prevent legal action that would interrupt the scheme to take Aruze USA's

stock at a vast discount. In order to bring the scheme to fruition, Wynn Resorts and Mr.

Wynn fashioned a rushed and wholly inadequate determination that Aruze USA, Mr.

Okada, and Universal are "unsuitable." This determination necessarily depended on false

information, unreliable innuendo, an incorrect understanding of the FCPA and the laws of

the Philippines, and a flawed process that failed to (1) investigate or consider obvious

exculpatory evidence; (2) provide any reasonable opportunity for Aruze USA, Mr. Okada,

and Universal to respond to the allegations; or (3) consider the unprecedented nature of

the determination and the utter lack of any bona fide jeopardy to Wynn Resorts' gaming

licenses.

365.   The determinations of unsuitability and subsequent redemption were aided

by actions deliberately calculated to prevent an application for injunctive relief or other

steps by Aruze USA to intervene and prevent a redemption, including but not limited to:

(1) false promises that Aruze USA, Mr. Okada, and Universal would have an opportunity

to respond, (2) false assertions of privilege, (3) exclusion of English speaking persons and

counsel from Board proceedings (so that Aruze USA could understand the proceedings

and/or respond appropriately or effectively), and (4) false assertions of confidentiality and

imposing onerous waivers of legal rights in order to see documents that were not

confidential because they were leaked to the *Wall Street Journal* and filed in Court at or

about the time Mr. Wynn and Wynn Resorts asserted they were confidential. Finally,

Wynn Resorts and Mr. Wynn conspired to ensure that the redemption price was set well

below fair value, by relying on one biased appraisal that relied centrally on an incorrect

1  premise of the enforceability of the restraint of sale in the Stockholders Agreement and

2  failed to account for inside information available to Mr. Wynn and Wynn Resorts.

3      366.   In the absence of the wrongful conduct of Wynn Resorts and Mr. Wynn, no

4  redemption would have occurred, let alone a redemption of Aruze USA's shares in Wynn

5  Resorts at a price well below fair value or market value.

6      367.   Under the "forced seller" or "fundamental change" doctrine, reliance is not

7  an element of a scheme liability claim alleging an involuntary sale, such as the purported

8  redemption in this case.  The forced seller doctrine provides a cause of action under the

9  federal securities laws, because Aruze USA was forced by Wynn Resorts and Mr. Wynn

10  to convert its stock for money or other consideration, and/or because Aruze USA was

11  forced by Wynn Resorts and Mr. Wynn to fundamentally change the nature of its

12  investments as part of the fraudulent scheme.  No volitional act was necessary by

13  Aruze USA to complete the transaction – and, in fact, Aruze USA did not want the sale to

14  occur.

15      368.   As a direct consequence of the wrongful conduct of Wynn Resorts and

16  Mr. Wynn, Aruze USA suffered injury that resulted in the sale of its stock for more than

17  $1 billion below fair value.

18      369.   Aruze USA brings this claim within the relevant statute of limitations under

19  federal law, having discovered facts giving rise to this claim, including injury arising from

20  the purported redemption of Aruze USA's shares of Wynn Resorts' stock, on or about

21  February 18, 2012.  Despite having exercised reasonable diligence, Aruze USA did not

22  and could not reasonably have discovered earlier the facts giving rise to this claim.

23

24

25

26

27

28

-86-

FIRST AMENDED COUNTERCLAIM

**COUNT XIX**

**Claim for Violations of Section 10(b) of the Securities Exchange Act of 1934**

**and SEC Rule 10b-5(c) Promulgated Thereunder**

**(By Aruze USA Against Wynn Resorts and Steve Wynn)**

370.   Aruze USA reasserts and realleges Paragraphs 4 through 174 above as if set forth in full below.

371.   Wynn Resorts has claimed publicly and Wynn Resorts has alleged in its Complaint in this action that it has redeemed Aruze USA's shares of Wynn Resorts' stock.  Aruze USA brings this claim in the alternative to Aruze USA's claims that assert the purported redemption by Wynn Resorts is improper, illegal, and void *ab initio*.

372.   Since the beginning of 2011, Wynn Resorts and Mr. Wynn have engaged in a series of acts, practices, and/or courses of business, which Wynn Resorts and Mr. Wynn knew or deliberately disregarded would operate as a fraud and/or deceit upon Aruze USA, in connection with the redemption of Aruze's shares in Wynn Resorts.

373.   In particular, as alleged in detail above, Wynn Resorts and Mr. Wynn caused an illegal redemption (*i.e.*, a forced "sale" under the securities laws) of Aruze USA's more than $2.7 billion interest in Wynn Resorts by:

- Undertaking a series of acts in 2011 to prevent Aruze USA from pledging its securities, including acts by Mr. Wynn and Ms. Sinatra dissuading Aruze USA from pledging its shares of Wynn Resorts and holding out a false promise of financing by Wynn Resorts, while knowing that Wynn Resorts was secretly investigating Mr. Okada to create a pretext for redemption;
- Causing a redemption based on the Freeh Sporkin report, which, among other things:
  - was incomplete;
  - contained false and misleading statements;
  - failed to address or include exculpatory facts and evidence;

-87-

FIRST AMENDED COUNTERCLAIM

- relied upon an inaccurate and incomplete understanding of the FCPA; and,
- relied upon an inaccurate and incomplete understanding of Philippine law and related facts.

- Causing a redemption without evidence of any bona fide jeopardy to any Wynn Resorts gaming license;

- Causing a redemption in the absence of a finding by the Nevada Gaming Commission, or any other gaming regulator, that Aruze USA or its affiliates is unsuitable;

- Causing Aruze USA not to apply for injunctive relief prior to the Board's consideration of redemption, by falsely representing through Mr. Freeh that Aruze USA and Mr. Okada would have an opportunity to review the Freeh Sporkin report and present responsive facts and evidence;

- Excluding Mr. Okada and his counsel from Wynn Resorts' Board meetings discussing redemption;

- Denying Aruze USA access to investigative materials, by falsely invoking attorney-client privilege;

- Falsely invoking "confidentiality" in an attempt to get Aruze USA to sign away legal rights in exchange for reviewing the Freeh Sporkin report;

- Setting a redemption price for Aruze USA's shares of Wynn Resorts' stock that was not the product of independent assessment;

- Setting a redemption price that does not reflect, among other things, fair value and that failed to consider:
  - the lack of applicability of the Stockholders Agreement to a redemption;
  - developments in Cotai and other positive inside information; and,
  - a premium for the volume of stock transacted.

-88-

374.   The deliberate, intentional, and/or reckless aim of the above scheme by Wynn Resorts and Mr. Wynn was to force the illegal sale of Aruze USA's shares of Wynn Resorts' stock to Wynn Resorts at a price well below the fair value of the shares.  As alleged in detail above, Wynn Resorts and Mr. Wynn's acts were carefully orchestrated to secure Aruze USA's continued acceptance of the Stockholders Agreement and to dissuade legal action to enjoin enforcement of the Stockholders Agreement or otherwise challenge the restraint on alienation purportedly contained therein.  At the same time as Wynn Resorts and Mr. Wynn were promising Aruze USA financing secured by Aruze USA's stock in Wynn Resorts, Wynn Resorts and Mr. Wynn were secretly conspiring to force a sale of Aruze USA's interest in Wynn Resorts based on false, misleading, and incomplete allegations.  This scheme was deliberately calculated to perpetuate and consolidate Mr. Wynn's control over Wynn Resorts and to enable the forced sale of Aruze USA's shares of Wynn Resorts' stock at this steep discount.  Wynn Resorts and Mr. Wynn took steps to conceal all aspects of the investigation from Aruze USA and its representatives in order to prevent scrutiny or rebuttal and to prevent legal action that would interrupt the scheme to take Aruze USA's stock at a vast discount.  In order to bring the scheme to fruition, Wynn Resorts and Mr. Wynn fashioned a rushed and wholly inadequate determination that Aruze USA, Mr. Okada, and Universal are "unsuitable."  This determination necessarily depended on false information, unreliable innuendo, an incorrect understanding of the FCPA and the laws of the Philippines, and a flawed process that failed to (1) investigate or consider obvious exculpatory evidence; (2) provide any reasonable opportunity for Aruze USA, Mr. Okada, and Universal to respond to the allegations; or (3) consider the unprecedented nature of the determination and the utter lack of any bona fide jeopardy to Wynn Resorts' gaming licenses.

375.   The determinations of unsuitability and subsequent redemption were aided by actions deliberately calculated to prevent an application for injunctive relief or other steps by Aruze USA to intervene and prevent a redemption, including but not limited to: (1) false promises that Aruze USA, Mr. Okada, and Universal would have an opportunity

-89-

1    to respond, (2) false assertions of privilege, (3) exclusion of English speaking persons and

2    counsel from Board proceedings (so that Aruze USA could understand the proceedings

3    and/or respond appropriately or effectively), and (4) false assertions of confidentiality and

4    imposing onerous waivers of legal rights in order to see documents that were not

5    confidential because they were leaked to the *Wall Street Journal* and filed in Court at or

6    about the time Mr. Wynn and Wynn Resorts asserted they were confidential.  Finally,

7    Wynn Resorts and Mr. Wynn conspired to ensure that the redemption price was set well

8    below fair value, by relying on one biased appraisal that relied centrally on an incorrect

9    premise of the enforceability of the restraint of sale in the Stockholders Agreement and

10   failed to account for inside information available to Mr. Wynn and Wynn Resorts.

11          376.   In the absence of the wrongful conduct of Wynn Resorts and Mr. Wynn, no

12   redemption would have occurred, let alone a redemption of Aruze USA's shares in Wynn

13   Resorts at a price well below fair value or market value.

14          377.   Under the "forced seller" or "fundamental change" doctrine, reliance is not

15   an element of a scheme liability claim alleging an involuntary sale, such as the purported

16   redemption in this case.  The forced seller doctrine provides a cause of action under the

17   federal securities laws, because Aruze USA was forced by Wynn Resorts and Mr. Wynn

18   to convert its stock for money or other consideration, and/or because Aruze USA was

19   forced by Wynn Resorts and Mr. Wynn to fundamentally change the nature of its

20   investments as part of the fraudulent scheme.  No volitional act was necessary by

21   Aruze USA to complete the transaction – and, in fact, Aruze USA did not want the sale to

22   occur.

23          378.   As a direct consequence of the wrongful conduct of Wynn Resorts and

24   Mr. Wynn, Aruze USA suffered injury that resulted in the sale of its stock for more than

25   $1 billion below fair value.

26          379.   Aruze USA brings this claim within the relevant statute of limitations under

27   federal law, having discovered facts giving rise to this claim, including injury arising from

28   the purported redemption of Aruze USA's shares of Wynn Resorts' stock, on or about

February 18, 2012.  Despite having exercised reasonable diligence, Aruze USA did not and could not reasonably have discovered earlier the facts giving rise to this claim.

**COUNT XX**

**Claim for Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5(b) Promulgated Thereunder**

**(By Aruze USA Against Wynn Resorts and Steve Wynn)**

380.   Aruze USA reasserts and realleges Paragraphs 4 through 174 above as if set forth in full below.

381.   Wynn Resorts has claimed publicly and Wynn Resorts has alleged in its Complaint in this action that it has redeemed Aruze USA's shares of Wynn Resorts' stock.  Aruze USA brings this claim in the alternative to Aruze USA's claims that assert the purported redemption by Wynn Resorts is improper, illegal, and void *ab initio*.

382.   Furthermore, this claim under SEC Rule 10b-5(b) is made in the alternative to the prior claims under Rule 10b-5(a) and Rule 10b-5(c).  While Aruze USA believes the allegations are more properly brought under Rule 10b-5(a) and Rule 10b-5(c) because the claims encompass conduct beyond mere misrepresentations and/or omissions, Aruze USA makes this alternate claim under Rule 10b-5(b) to the extent a Court might find certain allegations of wrongdoing are misstatements or omissions, and not:  (i) devices, schemes, or artifices under Rule 10b-5(a); (ii) acts, practices, of courses of business under Rule 10b-5(c); or (iii) fraudulent statements that sound under Rule 10b-5(a) or (c) because they were intended to deceive third parties in furtherance of a scheme to defraud Aruze USA.

383.   Since the beginning of 2011, Wynn Resorts and Mr. Wynn have made a series of untrue statements of material fact and/or have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

384.   In particular, as alleged in detail above, Wynn Resorts and Mr. Wynn caused an illegal redemption (*i.e.*, a forced "sale" under the securities laws) of Aruze USA's more than $2.7 billion interest in Wynn Resorts by:

- Making false statements by Mr. Wynn and Ms. Sinatra to dissuade Aruze USA from pledging its shares of Wynn Resorts and holding out a false promise of financing by Wynn Resorts, while knowing that Wynn Resorts was secretly investigating Mr. Okada to create a pretext for redemption;

- Adopting the Freeh Sporkin report, which, as alleged in detail above, contained numerous false and misleading statements, and omitted numerous material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading and using the Freeh Sporkin report to cause a sale of securities on false premises;

- Making untrue statements that Mr. Okada and Aruze USA would have an opportunity to review the Freeh Sporkin report and present responsive facts and evidence, with the intent of inducing Aruze USA not to apply for injunctive relief prior to the Board's consideration of redemption;

- Making false statements invoking attorney-client privilege to deny Aruze USA access to investigative materials and impede Aruze USA's ability to present arguments against and/or enjoin the redemption;

- Making false statements claiming that the Freeh Sporkin report was "confidential" in an attempt to (i) delay Aruze USA's access to the report and thereby impede Aruze USA's ability to argue against the Board's action and/or seek injunctive relief prior to redemption, and (ii) deceive Aruze USA into signing away legal rights in exchange for reviewing the report;

- Making false statements regarding the "fair value" or market value of Aruze USA's shares in Wynn Resorts that failed to account for:

  - the lack of applicability of the Stockholders Agreement to a redemption;

-92-

1          •       developments in Cotai and other positive inside information; and,

2          •       a premium for the volume of stock transacted;

3     •     Making false statements that Aruze USA, Universal Entertainment, and Mr.

4          Okada are unsuitable; and

5     •     Making false statements that there was any bona fide jeopardy to Wynn

6          Resorts gaming license.

7          385.   The deliberate, intentional, and/or reckless aim of the above

8    misrepresentations and omissions by Mr. Wynn and Wynn Resorts was to force the illegal

9    sale of Aruze USA's shares of Wynn Resorts' stock to Wynn Resorts at a price well

10   below the fair value of the shares.  As alleged in detail above, Wynn Resorts and Mr.

11   Wynn's misrepresentations and omissions were carefully orchestrated to secure Aruze

12   USA's continued acceptance of the Stockholders Agreement and to dissuade legal action

13   to enjoin enforcement of the Stockholders Agreement or otherwise challenge the restraint

14   on alienation purportedly contained therein.  At the same time as Wynn Resorts and Mr.

15   Wynn were holding out a false promise of financing to Aruze USA secured by Aruze

16   USA's stock in Wynn Resorts, Wynn Resorts and Mr. Wynn were secretly conspiring to

17   force a sale of Aruze USA's interest in Wynn Resorts based on false, misleading, and

18   incomplete allegations.  Mr. Wynn and Wynn Resorts' misrepresentations and omissions

19   were deliberately calculated to perpetuate and consolidate Mr. Wynn's control over Wynn

20   Resorts and to enable the forced sale of Aruze USA's shares of Wynn Resorts' stock at a

21   vast discount.

22        386.   In order to bring this to fruition, Wynn Resorts and Mr. Wynn fashioned a

23   rushed and wholly inadequate determination that Aruze USA, Mr. Okada, and Universal

24   were "unsuitable."  This determination necessarily depended on misrepresentations and

25   omissions regarding the facts and law.  The misrepresentations concern facts resulting

26   from an incomplete investigation that omitted to include obvious exculpatory evidence

27   and false statements regarding purported jeopardy to Wynn Resorts' gaming licenses.

28   The determinations of unsuitability and subsequent redemption were enabled by

misrepresentations and omissions, including but not limited to false promises that Aruze USA, Mr. Okada, and Universal would have an opportunity to respond, false assertions of privilege, and false assertions of confidentiality.  Finally, Wynn Resorts and Mr. Wynn misrepresented the fair value of the securities by relying on one biased appraisal that failed to account for inside information available to Mr. Wynn and Wynn Resorts and other relevant factors, including the lack of enforceability of the Stockholders Agreement.

387.   In the absence of the wrongful conduct of Wynn Resorts and Mr. Wynn, no redemption would have occurred, let alone a redemption of Aruze USA's shares in Wynn Resorts at a price well below fair value or market value.

388.   Under the "forced seller" or "fundamental change" doctrine, reliance is not an element of a securities fraud claim alleging an involuntary sale, such as the purported redemption in this case.  The forced seller doctrine provides a cause of action under the federal securities laws, because Aruze USA was forced by Wynn Resorts and Mr. Wynn to convert its stock for money or other consideration, and/or because Aruze USA was forced by Wynn Resorts and Mr. Wynn to fundamentally change the nature of its investments as part of the fraudulent scheme.  No volitional act was necessary by Aruze USA to complete the transaction – and, in fact, Aruze USA did not want the sale to occur.

389.   As a direct consequence of the wrongful conduct of Wynn Resorts and Mr. Wynn, Aruze USA suffered losses that resulted in the sale of its stock for more than $1 billion below fair value.

390.   Aruze USA brings this claim within the relevant statute of limitations under federal law, having discovered facts giving rise to this claim, including injury arising from the purported redemption of Aruze USA's shares of Wynn Resorts' stock, on or about February 18, 2012.  Despite having exercised reasonable diligence, Aruze USA did not and could not reasonably have discovered earlier the facts giving rise to this claim.

**COUNT XXI**

**Claim for Violations of Section 20(a) of the Securities Exchange Act of 1934**

**and SEC Rule 10b-5 Promulgated Thereunder**

**(By Aruze USA Against Steve Wynn)**

391.   Aruze USA reasserts and realleges Paragraphs 4 through 174 above as if set forth in full below.

392.   Mr. Wynn acted as a controlling person of Wynn Resorts within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By reason of his positions as an officer and director of Wynn Resorts, and his ownership of Wynn Resorts' stock, Mr. Wynn had the power and authority to cause Wynn Resorts to engage in the wrongful conduct complained of herein.  Mr. Wynn controlled Wynn Resorts and all of its other employees.

393.   By reason of such conduct, Mr. Wynn is liable pursuant to Section 20(a) of the Exchange Act.

394.   Aruze USA brings this claim within the relevant statute of limitations under federal law, having discovered facts giving rise to this claim, including injury arising from the purported redemption of Aruze USA's shares of Wynn Resorts' stock, on or about February 18, 2012.  Despite having exercised reasonable diligence, Aruze USA did not and could not reasonably have discovered earlier the facts giving rise to this claim.

**COUNT XXII**

**Unconscionability/Reformation of Promissory Note**

**(By Aruze USA Against Wynn Resorts)**

395.   Aruze USA reasserts and realleges Paragraphs 4 through 184 above as if set forth in full below.

396.   In the alternative, to the extent that the redemption provision in the later amended Articles of Incorporation is found to apply to Aruze USA's shares and the

-95-

FIRST AMENDED COUNTERCLAIM

redemption was lawful, Aruze USA asserts that the promissory note is unconscionable and therefore subject to reformation.

397.   On January 27, 2012, Wynn Resorts declared in a publicly filed Opposition to Mr. Okada's Petition for Writ of Mandamus that Aruze USA's nearly 20% stake in Wynn Resorts was "valued at approximately $2.9 billion."

398.   Just 22 days later, on February 18, 2012, Wynn Resorts acted to forcibly acquire Aruze USA's stake in Wynn Resorts in exchange for a $1.936 billion promissory note, paying a mere 2% interest per annum over a ten-year term.

399.   The promissory note is unconscionably vague, ambiguous, and oppressive.

400.   Aruze USA was never permitted the opportunity to negotiate the amount of the promissory note given the market value of its shares, nor was Aruze USA permitted the opportunity to negotiate the terms of the promissory note, including, but not limited to, the interest rate, the restrictions on transfer, and the subordination provisions.

401.   Wynn Resorts received a grossly one-sided windfall by forcibly redeeming $2.9 billion of securities at a deep discount, transforming equity into a 2 percent per annum debt instrument that Aruze USA may not transfer, retaining the ability to issue additional debt at any time and provide any new lender priority rights above Aruze USA's note, and removing voting and other rights from Aruze USA.

402.   Aruze USA, therefore, seeks reformation of the promissory note, including but not limited to its principal, duration, interest rate, restrictions on transfer, restrictions on subordination, and inclusion of other customary and reasonable terms, conditions, and covenants.

**PRAYER FOR RELIEF**

WHEREFORE, Aruze USA and Universal each expressly reserves its and their right to amend these Counterclaims before or at the time of the trial of this action to include all items of injury and damages not yet ascertained.  Aruze USA and Universal pray that the Honorable Court enter judgment in favor of each of them, and against Wynn Resorts, Mr. Wynn, Ms. Sinatra, and the other Wynn Directors, and each of them, as follows:

    a.  For general damages in an amount in excess of $100,000;

    b.  For consequential damages;

    c.  For treble and statutory damages;

    d.  For punitive damages three times the amount of compensatory damages awarded;

    e.  For disgorgement of profits;

    f.  For constructive trust and unjust enrichment;

    g.  For preliminary and/or permanent injunctive relief;

    h.  For declaratory relief;

    i.  For reformation of the promissory note;

    j.  For costs and expenses of this action, prejudgment and post-judgment interest, and reasonable attorneys' fees incurred herein; and,

    k.  Any and all such other and further equitable and legal relief as this Court deems just and proper.

**JURY DEMAND**

Defendants and Counterclaimants hereby demand a trial by jury on all claims and issues so triable.

-97-

DATED:  June 14, 2012

Respectfully Submitted,

PAUL HASTINGS LLP

By: _____ /s/ Howard M. Privette
                    HOWARD M. PRIVETTE

William F. Sullivan*
Thomas A. Zaccaro*
Howard M. Privette*
Thomas P. O'Brien*
John S. Durrant*
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Telephone:    (213) 683-6000
Facsimile:     (213) 683-0705

LIONEL SAWYER & COLLINS
Samuel S. Lionel
Paul R. Hejmanowski
Charles H. McCrea, Jr.
1700 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101
Telephone:    (702) 383-8888
Facsimile:     (702) 383-8845

DAVIS POLK & WARDWELL LLP
Linda Chatman Thomsen**
Paul Spagnoletti**
Greg D. Andres**
450 Lexington Avenue
New York, NY 10017
Telephone:    (212) 450-4000
Facsimile:     (212) 701-5800

Attorneys for Defendants and Counterclaimants
ARUZE USA, INC. and UNIVERSAL
ENTERTAINMENT CORPORATION

*admitted pro hac vice
** will comply with Local Rule 10-2 governing pro
hac vice petitions within the require timeframe

-98-

FIRST AMENDED COUNTERCLAIM

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

Pursuant to Federal Rule of Civil Procedure 5(b), I hereby certify that I am an employee of Paul Hastings LLP and that on this 14th day of June, 2012, I caused the document entitled:

**FIRST AMENDED COUNTERCLAIM OF ARUZE USA, INC.
AND UNIVERSAL ENTERTAINMENT CORP.**

to be served to parties in this action via the Court's CM/ECF System.

/s/ Howard M. Privette

Howard M. Privette

FIRST AMENDED COUNTERCLAIM