1   LIONEL SAWYER & COLLINS
    Samuel S. Lionel (SBN #1766)
2   Paul R. Hejmanowski (SBN #94)
    Charles H. McCrea, Jr. (SBN #104)
3   1700 Bank of America Plaza
    300 South Fourth Street
4   Las Vegas, Nevada 89101
    Telephone:   (702) 383-8888
5   Facsimile:   (702) 383-8845

6   PAUL HASTINGS LLP
    William F. Sullivan*
7   Thomas A. Zaccaro*
    Howard M. Privette*
8   Thomas P. O'Brien*
    John S. Durrant*
9   515 South Flower Street, 25th Floor
    Los Angeles, CA 90071
10  Telephone:   (213) 683-6000
    Facsimile:   (213) 683-0705

11

12  DAVIS POLK & WARDWELL LLP
    Linda Chatman Thomsen**
    Paul Spagnoletti**
13  Greg D. Andres**
    450 Lexington Avenue
14  New York, NY 10017
    Telephone:   (212) 450-4000
15  Facsimile:   (212) 701-5800

16  Attorneys for Defendants and Counterclaimants
    ARUZE USA, INC. and UNIVERSAL
17  ENTERTAINMENT CORPORATION
    * admitted pro hac vice
18  ** will comply with Local Rule 10-2 governing pro hac
    vice petitions within the required timeframe
19

20              **UNITED STATES DISTRICT COURT**

                  **DISTRICT OF NEVADA**
21

22  WYNN RESORTS, LIMITED, a Nevada          CASE NO:  2:12-cv-00400-LRH-PAL
    Corporation,

23                        Plaintiff,         **MOTION FOR PRELIMINARY
                                             INJUNCTION BY ARUZE USA, INC.
24  vs.                                      AND UNIVERSAL ENTERTAINMENT
                                             CORPORATION**
25  KAZUO OKADA, an individual, ARUZE
    USA, INC., a Nevada corporation,
26  UNIVERSAL ENTERTAINMENT              **MEMORANDUM OF POINTS AND
    CORP., a Japanese corporation,       AUTHORITIES**
26

27                        Defendants.

28

ARUZE USA, INC., a Nevada corporation
and UNIVERSAL ENTERTAINMENT
CORP., a Japanese corporation

                              Counterclaimants,

vs.

WYNN RESORTS, LIMITED, a Nevada
corporation, STEPHEN A. WYNN, an
individual, KIMMARIE SINATRA, an
individual, LINDA CHEN, an individual,
RAY R. IRANI, an individual, RUSSELL
GOLDSMITH, an individual,  ROBERT J.
MILLER, an individual, JOHN A.
MORAN, an individual, MARC D.
SCHORR, an individual, ALVIN V.
SHOEMAKER, an individual, D. BOONE
WAYSON, an individual, ELAINE P.
WYNN, an individual, and ALLAN
ZEMAN, an individual,

                              Counterdefendants.

        COMES NOW Defendants and Counterclaimants, ARUZE USA, INC.

("Aruze USA") and UNIVERSAL ENTERTAINMENT CORPORATION ("Universal"),

by and through their attorneys of record, LIONEL SAWYER & COLLINS, PAUL

HASTINGS LLP, and DAVIS POLK & WARDWELL LLP, to respectfully move this

Court to issue a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65,

that:

- Prohibits[1] Plaintiff and Counterdefendant WYNN RESORTS, LIMITED ("Wynn Resorts") and its officers, directors, agents, employees, attorneys, or anyone else acting on its behalf from barring or preventing Aruze USA from exercising its right to vote its 24,549,222 shares of common stock of Wynn Resorts, absent a final determination on the merits in this case; and,

- Prohibits Wynn Resorts and its officers, directors, agents, employees, attorneys, or anyone else acting on its behalf from acting in any other manner to deprive Aruze USA of any of its rights as a stockholder of Wynn Resorts, absent a final determination on the merits in this case.

---

[1] In the alternative, Aruze USA seeks a mandatory injunction of the same effect as the prohibitory relief set forth herein.

This Motion is based on this Notice and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Howard M. Privette filed concurrently herewith, all pleadings and papers on file in this action, and such evidence or oral argument as may be presented at the hearing on this Motion.

DATED:  June 14, 2012                    Respectfully Submitted,

PAUL HASTINGS LLP


By:_____/s/ HOWARD M. PRIVETTE
                           HOWARD M. PRIVETTE

William F. Sullivan*
Thomas A. Zaccaro*
Howard M. Privette*
Thomas P. O'Brien*
John S. Durrant*
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Telephone:   (213) 683-6000
Facsimile:    (213) 683-0705

DAVIS POLK & WARDWELL LLP
Linda Chatman Thomsen**
Paul Spagnoletti**
Greg D. Andres**
450 Lexington Avenue
New York, NY 10017
Telephone:   (212) 450-4000
Facsimile:    (212) 701-5800

LIONEL SAWYER & COLLINS
Samuel S. Lionel
Paul R. Hejmanowski
Charles H. McCrea, Jr.
1700 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101
Telephone:   (702) 383-8888
Facsimile:    (702) 383-8845

Attorneys for Defendants and Counterclaimants
ARUZE USA, INC. and UNIVERSAL
ENTERTAINMENT CORPORATION
* admitted pro hac vice
** will comply with Local Rule 10-2 governing pro
hac vice petitions within the require timeframe

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................ 1

II.  BACKGROUND ................................................................................................. 4

    A.   The Formation and Ownership Structure of Wynn Resorts ......................... 4

    B.   After Mr. Okada Questions Wynn Resorts' Massive Donation to Macau University, Mr. Wynn and the Board Seek to Disenfranchise Aruze USA and Silence Mr. Okada by Redeeming Aruze USA's Shares ........................................................................................................... 5

III. ARGUMENT ...................................................................................................... 9

    A.   Legal Standard for Granting a Preliminary Injunction ............................... 9

    B.   Aruze USA Will Suffer Irreparable Harm Absent Preliminary Relief ....... 10

    C.   Aruze USA is Likely to Succeed on the Merits Regarding the Invalidity of the Purported Redemption of Its Shares ................................. 12

        1.   The Redemption Was Improper Because the Redemption Restriction Does Not Apply to Aruze USA's Shares ..................... 12

            a.   Aruze USA's Investment in Wynn Resorts Is Controlled By the Terms of the Contribution Agreement ................................................................... 13

            b.   The Contribution Agreement Precludes Any Restrictions on Aruze USA's Shares of Wynn Resorts' Stock Unless Aruze USA Authorizes the Restriction in Writing ........................................... 14

        2.   The Purported Redemption of Aruze USA's Shares Constituted a Breach of the Board's Fiduciary Duties Because The Primary Purpose of the Redemption of Aruze USA's Shares Was to Interfere with the Effectiveness of a Stockholder Vote ...................................................................... 17

    D.   The Balance of Hardships Favors Aruze USA ........................................... 20

        1.   Extensive Authority Favors Granting Preliminary Relief When a Company Attempts to Deprive Stockholders of the Right to Vote ................................................................................. 20

        2.   Wynn Resorts Would Suffer No Comparable Hardship From the Grant of a Preliminary Injunction ................................. 21

        3.   Wynn Resorts' Wrongdoing Also Tips the Balance of Hardships in Aruze USA's Favor .............................................. 22

    E.   A Preliminary Injunction Would Serve the Public Interest ........................ 22

    F.   A Preliminary Injunction Will Preserve the Status Quo ............................. 23

IV.  CONCLUSION ................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Alliance for the Wild Rockies v. Cottrell,
  632 F.3d 1127 (9th Cir. 2011) ....................................................................... 9

Am. Trucking Ass'ns v. City of Los Angeles,
  559 F.3d 1046 (9th Cir. 2009) ....................................................................... 9

Bagdon v. Bridgestone/Firestone, Inc.,
  916 F.2d 379 (7th Cir. 1990) ........................................................................ 13

Benihana of Tokyo, Inc. v. Benihana, Inc.,
  906 A.2d 114 (Del. 2006) ............................................................................. 13

Beztak Co. v. Bank One Columbus, N.A.,
  811 F. Supp. 274 (E.D. Mich. 1992) ...................................................... 11, 22

Blasius Indus. v. Atlas Corp.,
  564 A.2d 651 (Del. Ch. 1998) ................................................................ 17, 23

Brunzell v. Woodbury,
  85 Nev. 29, 449 P.2d 158 (1969) ................................................................. 15

Danaher Corp. v. Chicago Pneumatic Tool Co.,
  Nos. 86 Civ. 3499 & 3638 (PNL), 1986 WL 7001 (S.D.N.Y. June 19, 1986)...... 11, 22

Darnet Realty Assocs., LLC v. 136 East 56th Street Owners, Inc.,
  153 F.3d 21 (2d Cir. 1998) ........................................................................... 13

David P. Simonetti Rollover IRA v. Margolis,
  No. 3694-VCN, 2008 WL 5048692 (Del. Ch. June 27, 2008) .................... 21

Durkin v. Nat'l Bank of Olyphant,
  772 F.2d 55 (3rd Cir. 1985) .......................................................................... 21

Ellison v. California State Auto. Ass'n,
  106 Nev. 601 (1990) ..................................................................................... 16

ER Holdings, Inc. v. Norton Co.,
  735 F. Supp. 1094 (D. Mass. 1990) ........................................................ 11, 22

Flynt Distrib. Co. v. Harvey,
  734 F.2d 1389 (9th Cir. 1984) ........................................................................ 9

MOTION FOR PRELIMINARY INJUNCTION

Hilton Hotels Corp. v. ITT Corp.,
   962 F. Supp. 1309 (D. Nev. 1997).................................................................. 10

Hilton Hotels Corp. v. ITT Corp.,
   978 F. Supp 1342 (D. Nev. 1997)............................................................. 17, 21

Hubbard v. Hollywood Park Realty Enters., No. 11779, 1991 WL 3151 (Del. Ch.
   Jan. 14, 1991).......................................................................................... 12, 20

Int'l Banknote Co. v. Muller,
   713 F. Supp. 612 (S.D.N.Y. 1989)...................................................... 11, 12, 20

Johnson v. Couturier,
   572 F.3d 1067 (9th Cir. 2009) ...................................................................... 9

La. Mun. Police Emps. Ret. Sys. v. Crawford,
   Nos. 2635-N & 2663-N, 2007 WL 625006 (Del. Ch. Feb. 13, 2007) ........................ 22

M.R. v. Dreyfus,
   663 F.3d 1100 (9th Cir. 2011) ...................................................................... 9

O'Connor v. North Truckee Ditch Co.,
   17 Nev. 245 (1883) ...................................................................................... 13

ODS Techs., L.P. v. Marshall,
   832 A.2d 1254 (Del. Ch. 2003)..................................................................... 21

Okada v. Wynn Resorts, Ltd.,
   No. A-12-65422-B ......................................................................................... 5

Ringle v. Bruton,
   120 Nev. 82 (2004) ...................................................................................... 16

Schnell v. Chris-Craft Indus., Inc.,
   285 A.2d 437 (Del. 1971) ............................................................................ 11

Schram v. Smith,
   97 F.2d 662 (9th Cir. 1938) ........................................................................ 13

Sherwood v. Ngon,
   No. 7106-VCP, 2011 WL 6355209 (Del. Ch. Dec. 20, 2011).................................... 11

Shoen v. AMERCO,
   885 F. Supp. 1332 (D. Nev. 1994)......................................................... passim

State v. Rosenthal,
   93 Nev. 36 (1977) ......................................................................................... 7

-iii-

Textile Unlimited, Inc. v. A. BMH & Co.,
   240 F.3d 781 (9th Cir. 2001) ............................................................................. 23

Treco, Inc. v. Land of Lincoln Sav. & Loan,
   572 F. Supp. 1447 (N.D. Ill. 1983) .......................................................... 11, 22

United Capital Fin. Advisers, Inc. v. Capital Insight Partners, LLC,
   No. 2:12–CV–0300, 2012 WL 1079329 (D. Nev. Mar. 30, 2012) ............................... 9

Wisconsin Inv. Bd. v. Peerless Sys. Corp.,
   No. 17637, 2000 WL 1805376 (Del. Ch. Dec. 4, 2000) .............................................. 19

**STATUTES**

Nev. Rev. Stat. § 78.242(2) ...................................................................................... 13

Nev. Rev. Stat. § 463.310(1)-(2) ......................................................................... 8, 19

Nev. Rev. Stat. § 463.310(2)(b) .............................................................................. 19

Nev. Rev. Stat. § 463.643(7) .................................................................................... 18

Nev. Rev. Stat. § 463.643(9) ............................................................................. 17, 18

Nev. Rev. Stat. § 463.3125-3145 ............................................................................. 19

**OTHER AUTHORITIES**

18A Am. Jur. 2d Corporations, § 456 (2004) ......................................................... 20

Nev. Gaming Comm'n Reg. 7.070, et seq. ............................................................... 19

Nev. Gaming Comm'n Reg. 16.440(2) ...................................................................... 19

MOTION FOR PRELIMINARY INJUNCTION

1 | **I.      INTRODUCTION**

2         This Motion seeks an order enjoining Wynn Resorts, Limited ("Wynn

3 Resorts" or the "Company") from infringing on the fundamental rights of Aruze USA,

4 Inc. ("Aruze USA") as a stockholder of Wynn Resorts – including its right to vote

5 regarding corporate matters and its right to nominate directors – until this Court makes a

6 final determination on the merits of this case.  This relief is necessary because the Wynn

7 Resorts Board of Directors (the "Board") purports to have forcibly redeemed Aruze

8 USA's almost 20% ownership interest in Wynn Resorts, seeking to disenfranchise Aruze

9 USA with respect to critical upcoming stockholder votes and to silence Kazuo Okada as

10 the lone voice of dissent against Steve Wynn on the Board.  These actions by Wynn

11 Resorts are in direct contravention of both the Company's contractual obligations to

12 Aruze USA and the Board's fiduciary duties.

13         Wynn Resorts seeks to justify its action by claiming that Aruze USA's

14 continued ownership of the Company's stock would put Wynn Resorts in imminent

15 danger of losing its gaming licenses.  This argument is without merit.  The Board

16 purported to act solely on the basis of allegations – contained in an incomplete and

17 fundamentally flawed "report" commissioned by Wynn Resorts – that Aruze USA's

18 parent, Universal Entertainment Corp. ("Universal"), had paid for travel and

19 entertainment expenses on behalf of foreign gaming officials.  Aruze USA and Universal

20 categorically deny any wrongdoing, but more to the point, nothing that they have been

21 accused of doing could pose a legitimate and imminent danger to Wynn Resorts' gaming

22 licenses.  These allegations are mere pretext for actions taken to entrench and enrich Steve

23 Wynn, the Board, and the management of Wynn Resorts.

24         A special Board meeting was hurriedly put together on February 18, 2012,

25 called on only three days' notice and held in the middle of the night in Asia.  There,

26 Mr. Wynn caused the Board to declare Mr. Okada, Aruze USA and Universal to be

27 "unsuitable."  At Mr. Wynn's urging, the Board then voted to forcibly take Aruze USA's

28 stock in exchange for a ten-year note **at an arbitrary 30% discount to the then-current**

1    **stock market price**, an amount nearly $1 billion less than the value Wynn Resorts itself

2    had given Aruze USA's shares in a recent court filing.  In one fell swoop, Mr. Wynn and

3    his Board thus acted to quell dissent and consolidate power at Wynn Resorts by

4    disenfranchising the Company's largest shareholder.

5           First, the Board did not have authority to redeem Aruze USA's shares

6    because the provision of the Company's Articles of Incorporation covering redemption

7    does not apply to Aruze USA.  Aruze USA acquired its shares in Wynn Resorts before

8    Wynn Resorts became a publicly-traded company.  This was accomplished through a

9    Contribution Agreement that set forth the terms governing Aruze USA's investment in the

10   Company.  Wynn Resorts expressly acknowledged in the Contribution Agreement that no

11   restrictions – other than those reflected in then-existing agreements among the parties –

12   would apply to the stock issued to Aruze USA.  Wynn Resorts further agreed that the

13   existing restrictions could be altered only with Aruze USA's express written consent.  The

14   redemption restriction upon which the Board relied to redeem Aruze USA's stock,

15   however, was added to the Articles of Incorporation through the unilateral action of

16   Mr. Wynn.  Aruze USA never agreed that such restrictions would govern its shares.

17          Second, the Board breached its fiduciary duties when it abruptly redeemed

18   Aruze USA's shares on a pretext.  The Board directed Aruze USA's shares to be

19   redeemed in exchange for a 10-year promissory note, an action that could not serve the

20   Board's stated purpose of safeguarding Wynn Resorts' gaming license.  Under Nevada

21   law, if the Nevada Gaming Commission ("Nevada Commission") orders the

22   disassociation of an "unsuitable" person or entity from a licensed gaming enterprise, the

23   unsuitable person or entity is precluded not only from holding stock, but also from

24   holding the gaming company's *debt*.  Accordingly, the Board's resolution to exchange

25   Aruze USA's stock for a 10-year note utterly fails to solve the supposed "suitability"

26   problem purportedly underlying its decision to act.  Instead, if permitted to stand, the

27   Board's action would serve only to disenfranchise Aruze USA over the coming months by

28   preventing it from voting its almost 20% ownership interest in the Company, and from

1   presenting proposals for consideration at Wynn Resorts' annual meeting of stockholders –

2   including proposals for the nomination of independent directors to help break Mr. Wynn's

3   stranglehold on the Company.

4           Following the purported redemption of Aruze USA's stock, Wynn Resorts

5   filed a preliminary proxy statement announcing that a special stockholder meeting would

6   be held for the sole purpose of obtaining shareholders' approval to remove Mr. Okada

7   from the Board.  Though that special stockholder meeting and the Company's annual

8   stockholder meeting have been delayed without explanation, Wynn Resorts must hold its

9   annual meeting no later than November 17, 2012, and the Company may schedule the

10  meeting with as little as 10 days notice.  A preliminary injunction that blocks Wynn

11  Resorts from preventing Aruze USA from exercising its rights as a stockholder until the

12  conclusion of this litigation is the only way to avoid irreparable harm to Aruze USA.

13          Aruze USA satisfies all of the criteria required for a preliminary injunction

14  to issue.  First, the interference with Aruze USA's right to vote, and with its rights to

15  submit stockholder proposals and to nominate directors, cannot be remedied with

16  monetary damages.  Second, after a hearing on the merits, this Court is likely to find the

17  Board's purported redemption of Aruze USA's shares to be void *ab initio*.  Third, the

18  balance of the hardships and the public interest strongly favors Aruze USA, which is

19  faced with the complete loss of its stockholder rights, while Wynn Resorts faces no

20  comparable harm from the requested relief.

21          For all these reasons, and as set forth in greater detail below, Aruze USA

22  respectfully requests that the Court grant this Motion and enjoin Wynn Resorts from

23  depriving Aruze USA of its rights as a stockholder until there is a final determination on

24  the merits of this case.[1]

25

26  ─────────────────────
    [1]  Aruze USA's Counterclaim and Answer raises additional claims and defenses in connection
27  with the purported redemption of Aruze USA's shares of Wynn Resorts stock.  Aruze USA
    reserves its right to pursue those additional claims and defenses in this litigation.
28

-3-

MOTION FOR PRELIMINARY INJUNCTION

1

2

## II.   BACKGROUND

### A.   The Formation and Ownership Structure of Wynn Resorts

3

4

5

6

7

8

9

10

11

        In April 2000, a Nevada limited liability company named Valvino Lamore, LLC ("Valvino") was created for the purpose of pursuing a possible new resort and casino in Las Vegas.  (Declaration of Howard M. Privette ("Privette Decl.") at ¶ 1, Ex. A (Amended and Restated Operating Agreement).)  Valvino first acquired the old Desert Inn property on the Las Vegas Strip.  Then, after discussions between Mr. Wynn and Mr. Okada, the indirect principal shareholder of Aruze USA, Aruze USA made a contribution of $260 million in cash to Valvino in exchange for 50% of the membership interests in Valvino, effective October 3, 2000.  (Id.)  This contribution was the seed capital that allowed for the development of what is now Wynn Resorts.[2]  (Id.)

12

13

14

15

16

17

18

19

        In mid-2002, after some progress on the development of the new resort, the owners of Valvino entered into a written Contribution Agreement by which they agreed to contribute their Valvino ownership interests in exchange for stock issued by a new corporate entity, to be called "Wynn Resorts, Limited."  (Id. at ¶ 3, Ex. C.)  In light of Aruze USA's large ownership interest in the new entity, Mr. Okada became a member of Wynn Resorts' Board and, ultimately, was named Vice Chairman in October 2002. Mr. Okada maintained these positions after Wynn Resorts became a publicly-traded company.  (See Wynn Resorts' Compl. at ¶ 5.)

20

21

22

23

24

25

        On October 25, 2002, Wynn Resorts conducted an initial public offering ("IPO") of its common shares at $13 per share, and its shares started trading on NASDAQ.  (See Privette Decl. at ¶ 5, Ex. E at 8; see also id. at ¶ 17, Ex. Q at 3.) Following Wynn Resorts' IPO, Mr. Wynn and Aruze USA each held approximately equal ownership interests in the Company.  (Id. at ¶ 4, Ex. D (April 21, 2003 Wynn Resorts' Preliminary Proxy Statement).)  Ultimately, these interests each amounted to about 20%

26

27

28

_____

[2]  In April 2002, Aruze USA made two additional contributions totaling $120 million to Valvino. (Id. at ¶ 2, Ex. B at 2 (Third Amendment to the Amended and Restated Operating Agreement).)

of the then-outstanding common stock in Wynn Resorts.  (Wynn Resorts' Compl. at ¶¶ 5-6; Privette Decl. at ¶ 5, Ex. E at 8-9.)

The relative ownership of Wynn Resorts changed in 2010 when Mr. Wynn and his wife, Elaine, divorced.  The divorce effectively split Mr. Wynn's stockholding, with about half of his shares in Wynn Resorts going to his ex-wife.  (Id. at ¶ 5, Ex. E.) This meant that Aruze USA, led by Mr. Okada, now owned the largest single stake in Wynn Resorts.  In fact, Aruze USA held more than twice as much stock as Mr. Wynn following his divorce.  (See id.)

**B.     After Mr. Okada Questions Wynn Resorts' Massive Donation to Macau University, Mr. Wynn and the Board Seek to Disenfranchise Aruze USA and Silence Mr. Okada by Redeeming Aruze USA's Shares**

In early 2011, Mr. Okada questioned Mr. Wynn's proposal that Wynn Resorts' affiliate in Macau make a $135 million "donation" to the University of Macau Development Foundation.  Not satisfied with the explanations given by Mr. Wynn for this unprecedented gift, Mr. Okada voted against the donation.  He was the sole director on the Board to do so.  Subsequently, Mr. Okada continued to request more information about the donation, culminating in a formal demand made in late 2011 to inspect Wynn Resorts' books and records regarding the donation.  Wynn Resorts ultimately forced Mr. Okada to go to court to vindicate his rights as a director to have access to such information.  (See Okada v. Wynn Resorts, Ltd., No. A-12-65422-B, Department XI (the "Inspection Action").)[3]

As Mr. Okada continued to press his questions regarding the Macau donation, Mr. Wynn began an increasingly punitive series of steps intended to restore and maintain his own unopposed control over Wynn Resorts.  After secretly initiating a supposed internal "investigation" into Universal's long-standing, established plans to

---

[3]  At a hearing on February 9, 2012, the District Court of Clark County ordered Wynn Resorts to comply with Mr. Okada's requests.

MOTION FOR PRELIMINARY INJUNCTION

1    develop a resort and casino in the Philippines, and without providing Mr. Okada any

2    factual basis for any allegations of wrongdoing, Mr. Wynn demanded that Mr. Okada

3    resign as Vice Chairman of Wynn Resorts and as a director of Wynn Resorts and Wynn

4    Macau.  (See Privette Decl. at ¶ 9, Ex. I at 3 (Wynn Resorts Proxy Statement (Schedule

5    14A) (Mar. 7, 2012).)  When Mr. Okada refused, in October 2011, Mr. Wynn persuaded

6    the Board to eliminate the position of Vice Chairman.  (See Privette Decl. at ¶ 17, Ex. Q at

7    3 (Freeh Report).)

8            Historically, Wynn Resorts has conducted its annual stockholders meeting

9    each year in the spring.  At the annual meeting, stockholders vote on directors to fill the

10   number of seats that come up for election in a given year, as well as any other proposals

11   that the Board or other stockholders bring forward for consideration.  Anticipating that the

12   2012 annual meeting of stockholders would be held, as usual, in the spring of 2012, Aruze

13   USA submitted a letter to the Nominating and Corporate Governance Committee of Wynn

14   Resorts on January 18, 2012, designating three individuals as candidates to be considered

15   for nomination as directors of the Company.  (Id. at ¶ 14, Ex. N.)  Each of these

16   individuals is highly qualified and, significantly, has no prior connection to Mr. Wynn.

17   Pursuant to the terms of a Stockholders Agreement with Mr. Wynn, Aruze USA also

18   requested that Mr. Wynn fulfill his obligation to endorse the slate of directors nominated

19   by Aruze USA.  (Id. at ¶ 15, Ex. O.)  Mr. Wynn refused to do so.  (Id. at ¶ 16, Ex. P.)[4]

20           With the Inspection Action pending in Nevada state court, and with Aruze

21   USA seeking to bring its concerns about the corporate governance of Wynn Resorts

22   before all of the Company's stockholders at its annual meeting, Mr. Wynn and the Board

23   accelerated their efforts to rid themselves of Mr. Okada and Aruze USA.  On January 19,

24   2012, counterdefendant Robert Miller, Chair of Wynn Resorts' Compliance Committee,

25   _____

26   [4]  Pursuant to the Stockholders Agreement, Mr. Wynn agreed to endorse a slate of directors that
     includes nominees approved by Aruze USA and to vote his shares and the shares of Ms. Wynn in

27   favor of such nominees.  (See Privette Decl. at ¶ 7, Ex. G at 5 (Stockholders Agreement at

28   § 2(a)).)

MOTION FOR PRELIMINARY INJUNCTION

1   demanded that Mr. Okada make himself available for an interview, threatening that if he

2   did not do so, the Compliance Committee could "only conclude that [Mr. Okada] refused

3   participation."  Mr. Okada's counsel repeatedly requested information about the subject

4   matter of the interview so Mr. Okada could prepare and be ready to provide information

5   and documents that could help the interviewers (and the Board) understand the facts

6   concerning whatever topics and issues they wanted to discuss with Mr. Okada.  In

7   response, counsel was told simply that the inquiry might cover "all matters related to Mr.

8   Okada's, Universal's, and Aruze's activities in the Philippines and Korea."  After the

9   interview concluded, Mr. Okada and Universal offered to gather and provide further

10  information and documents about the specific matters discussed at the interview.  The

11  interviewer, Mr. Freeh, stated that they would be given an opportunity to do so, but

12  instead concluded his pretextual investigation and finalized his purportedly objective

13  report without so much as a further communication with Mr. Okada or his counsel.  Not

14  surprisingly, having ignored the possibility of evidence to the contrary, the Freeh Report

15  reached several unsubstantiated and inaccurate conclusions regarding the conduct of

16  Universal, Aruze USA, and Mr. Okada.

17         Mr. Wynn then rushed the Board into action.  On February 15, 2012, just a

18  few hours after the interview of Mr. Okada had concluded in Tokyo, Wynn Resorts

19  delivered a notice of a special meeting of the Board to take place in Las Vegas on the

20  morning of Saturday, February 18, 2012.  Despite the fact that it was after midnight in

21  Asia, Mr. Okada tried to participate in the meeting via teleconference, but the feed was

22  controlled and repeatedly cut off by Wynn Resorts.  Relying on the hastily prepared and

23  pre-ordained conclusions of the Freeh Report, Wynn Resorts claims that at that meeting,

24  the Board made a determination of "unsuitability" under the Company's Articles of

25  Incorporation, and then voted to redeem Aruze USA's shares.[5]  (Id. at ¶ 8, Ex. H (Wynn

26  _____

27  [5]  Nevada has created an independent agency, the Nevada Gaming Commission (the "Nevada
     Commission"), to regulate the gaming industry.  Under Nevada law, "[t]he sole responsibility for
     [gaming] licensing is vested exclusively in the [Gaming C]ommission."  State v. Rosenthal, 93

28

MOTION FOR PRELIMINARY INJUNCTION

1   Resorts Press Release (Feb. 19, 2012).)  Taking only a few hours to make this momentous

2   decision, and without permitting Mr. Okada the opportunity to read or address the

3   allegations against him, the Board purportedly decided to redeem Aruze USA's shares in

4   exchange for a 10-year note paying 2% annual interest on a face amount of approximately

5   $1.936 billion, a discount of exactly 30% off the stock market valuation of the stock based

6   on the prior day's closing price.  This deeply discounted valuation was imposed despite

7   the fact that Wynn Resorts had asserted in a court filing weeks earlier that Aruze USA's

8   stock was worth approximately $2.9 billion.  (See id. at ¶ 18, Ex. R at 5 (Respondent's

9   Opposition to Petition for Writ of Mandamus).)  Wynn Resorts then initiated this lawsuit,

10  accusing Mr. Okada of breaching his fiduciary duties to the Company and seeking a

11  declaration that the purported redemption of Aruze USA's shares was proper.

12          On March 7, 2012, Wynn Resorts filed a preliminary proxy statement with

13  the U.S. Securities and Exchange Commission proposing a special meeting of the

14  Company's stockholders to vote to remove Mr. Okada as a director.  (Id. at ¶ 9, Ex. I at 1,

15  3-4.)[6]  Since that time, however, Wynn Resorts has taken no further action to set a date for

16  such a meeting.  Furthermore, Wynn Resorts has inexplicably delayed its annual meeting

17  of stockholders; at the time of this filing, no date has been set for the annual meeting.

18  Wynn Resorts must, however, hold its annual meeting no later than November 17, 2012,

19  18 months after the date of the 2011 annual meeting.

20

21

22

23

_____

24  Nev. 36, 42 (1977).  To this end, the Nevada Commission makes determinations regarding the
    suitability and unsuitability of persons affiliated with gaming companies.  Nevada regulations
25  governing the gaming industry also provide for a rigorous enforcement mechanism.  See Nev.
    Rev. Stat. § 463.310(1)-(2).  Under this carefully constructed regime, a licensee or affiliated
26  person is ensured basic due process rights.  The process employed by the Board in this case,
    however, had none of these basic protections.
27
    [6]  A shareholder vote would be required to remove Mr. Okada as a director of Wynn Resorts.
28

-8-

1    **III.**    **ARGUMENT**

2           **A.**    **Legal Standard for Granting a Preliminary Injunction**

3           A party "seeking a preliminary injunction must establish that he is likely to

4    succeed on the merits, that he is likely to suffer irreparable harm in the absence of

5    preliminary relief, that the balance of equities tips in his favor, and that an injunction is in

6    the public interest." Am. Trucking Ass'ns v. City of Los Angeles, 559 F.3d 1046, 1052

7    (9th Cir. 2009) (citing Winter v. Natural Res. Def. Council, 555 U.S. 7, 20 (2008)), aff'd

8    in part & rev'd in part on other grounds, 660 F.3d 384 (9th Cir. 2011).

9           In the Ninth Circuit, "the elements of the preliminary injunction test are

10    balanced, so that a stronger showing of one element may offset a weaker showing of

11    another." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).

12    Thus, if the balance of hardships "tips sharply toward the plaintiff" and "serious

13    questions" exist regarding the merits, the court may issue a preliminary injunction as long

14    as the other two elements of the test are met. Id. at 1132; United Capital Fin. Advisers,

15    Inc. v. Capital Insight Partners, LLC, No. 2:12–CV–0300, 2012 WL 1079329, at *2

16    (D. Nev. Mar. 30, 2012). Further, the Ninth Circuit looks favorably on grants of

17    injunctive relief that have the effect of preserving the status quo while the parties litigate

18    the merits of the relevant claims. See M.R. v. Dreyfus, 663 F.3d 1100, 1120 (9th Cir.

19    2011) (quoting Rodde v. Bonta, 357 F.3d 988, 999 n.14 (9th Cir. 2004)).

20           When evaluating a preliminary injunction motion, this Court has wide

21    latitude to consider all types of evidence, including evidence that may not be admissible at

22    the permanent injunction stage. See Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir.

23    2009) ("A district court may . . . consider hearsay in deciding whether to issue a

24    preliminary injunction."); Flynt Distrib. Co. v. Harvey, 734 F.2d 1389, 1394 (9th Cir.

25    1984) ("The trial court may give even inadmissible evidence some weight, when to do so

26    serves the purpose of preventing irreparable harm before trial").

27           A preliminary injunction should issue here because Aruze USA will suffer

28    irreparable harm if Wynn Resorts is permitted to conduct stockholder votes, at a special

-9-

1   meeting and/or the Company's annual meeting, without permitting Aruze USA the

2   opportunity to vote its shares.  Furthermore, Aruze USA is likely to succeed on the merits

3   of its claim that Wynn Resorts' purported redemption of Aruze USA's shares was

4   improper, and both the balance of the equities and public policy considerations strongly

5   militate in favor of ensuring the protection of stockholder rights against the encroachment

6   of an overreaching board of directors.  In addition, the limited nature of the relief –

7   maintaining the status quo by preventing the elimination of Aruze USA's stockholder

8   rights – weighs in favor of granting this Motion.

9          **B.      Aruze USA Will Suffer Irreparable Harm Absent Preliminary Relief**

10                  No legal remedy will be able to compensate for the harm that would flow

11   from allowing Wynn Resorts to deny Aruze USA's rights as a stockholder, including its

12   right to cast votes critical to the future of the Company, notice stockholder proposals,

13   wage a proxy contest, or nominate its own directors.

14                  Wynn Resorts must set a date for its annual stockholder meeting on or

15   before November 17, 2012, and could schedule the annual meeting on as little as 10 days'

16   notice.  (See Privette Decl. at ¶ 10, Ex. J at 2-3 (Wynn Resorts Ltd., Fourth Amended and

17   Restated Bylaws (Nov. 13, 2006)).)[7]  If the stockholder meeting is allowed to proceed

18   without recognizing Aruze USA's rights as a stockholder, no post-decision relief will be

19   adequate to compensate Aruze USA for its inability to vote (including votes for election

20   of directors), notice stockholder proposals, wage a proxy contest, or nominate its own

21   directors in connection with the meeting.

22                  There can be no dispute that the "denial or frustration" of a stockholder's

23   ability to vote its shares constitutes irreparable injury.  Shoen v. AMERCO, 885 F. Supp.

24   _____

25   [7]  Pursuant to Nevada law, a Nevada corporation's annual shareholder meetings must occur at
     intervals not to exceed 18 months.  See Hilton Hotels Corp. v. ITT Corp., 962 F. Supp. 1309,

26   1310 (D. Nev. 1997) ("annual meetings for Nevada corporations are contemplated to occur no
     later than eighteen months after the last such meeting").  Wynn Resorts' last annual meeting was

27   held on May 17, 2011.  (See Privette Decl. at ¶ 11, Ex. K at 21 (Wynn Resorts Amended Annual
     Report (Form 10-K/A) (Apr. 30, 2012)).)

28

1   1332, 1352 (D. Nev. 1994), vacated pursuant to settlement, No. CV-N-94-475-ECR, 1995

2   WL 936692 (D. Nev. Feb. 10, 1995); see also Beztak Co. v. Bank One Columbus, N.A.,

3   811 F. Supp. 274, 283-84 (E.D. Mich. 1992); ER Holdings, Inc. v. Norton Co., 735 F.

4   Supp. 1094, 1101-02 (D. Mass. 1990); Danaher Corp. v. Chicago Pneumatic Tool Co.,

5   Nos. 86 Civ. 3499 & 3638 (PNL), 1986 WL 7001, at *14 (S.D.N.Y. June 19, 1986);

6   Treco, Inc. v. Land of Lincoln Sav. & Loan, 572 F. Supp. 1447, 1450 (N.D. Ill. 1983),

7   aff'd, 749 F.2d 374 (7th Cir. 1984).  "Courts have consistently found that corporate

8   management subjects shareholders to irreparable harm by denying them the right to vote

9   their shares[.]"  Int'l Banknote Co. v. Muller, 713 F. Supp. 612, 623 (S.D.N.Y. 1989).

10  Standing alone, the disenfranchisement of Aruze USA constitutes more than sufficient

11  irreparable harm to merit a preliminary injunction in this case.

12          Absent preliminary relief, Aruze USA will be irreparably harmed before the

13  actual date of the annual stockholder meeting, if Wynn Resorts is able to deny Aruze

14  USA's right to offer stockholder proposals or wage a proxy contest.  See Sherwood v.

15  Ngon, No. 7106-VCP, 2011 WL 6355209, at *9, 15 (Del. Ch. Dec. 20, 2011) (granting a

16  temporary restraining order and finding irreparable harm because, in part, the plaintiffs

17  could not "conduct an effective proxy contest" absent injunctive relief); Schnell v. Chris-

18  Craft Indus., Inc., 285 A.2d 437, 439 (Del. 1971). [8]  Under the Wynn Resorts Bylaws, the

19  window for a stockholder to make proposals to be considered at an annual meeting is

20  either 10 days following the announcement of the meeting date or 60 to 90 days prior to

21  the announced date, whichever is later.  (See Privette Decl. at ¶ 10, Ex. J at 7 (Wynn

22  Resorts Ltd., Fourth Amended and Restated Bylaws (Nov. 13, 2006).)  Thus, the

23  irreparable harm Aruze USA will suffer in the absence of preliminary relief will almost

24

---

25  [8]  "Because the powers of corporate directors are determined by state law[,] it is the law of the
    state of incorporation that is controlling."  Shoen, 885 F. Supp. at 1341 n.20 (alteration in
26  original) (internal quotation marks omitted).  Wynn Resorts is a Nevada corporation.  Where
    there is no Nevada precedent on point, courts in this District have looked to the Delaware
27  Supreme Court and the Delaware Courts of Chancery as persuasive authorities on questions of
    corporation law.  Id.

28

MOTION FOR PRELIMINARY INJUNCTION

1    certainly occur well in advance of even the latest possible date for the annual meeting and

2    could conceivably begin at any moment.

3            Moreover, unless this Motion is granted, Aruze USA will suffer irreparable

4    harm because it will be deprived of its right to nominate directors.  A stockholder's right

5    to nominate and elect directors is the primary method by which it may exert influence

6    upon the conduct and affairs of the entity in which it has invested.  For this reason, courts

7    have consistently held that the denial of a right to nominate directors constitutes

8    irreparable harm.  See, e.g., Hubbard v. Hollywood Park Realty Enters., No. 11779, 1991

9    WL 3151, at *5 (Del. Ch. Jan. 14, 1991) ("The shareholders' right to vote includes the

10   right to nominate a contesting slate."); Int'l Banknote Co., 713 F. Supp. at 623 ("Courts

11   have consistently found that corporate management subjects shareholders to irreparable

12   harm by denying them the right to vote their shares or unnecessarily frustrating them in

13   their attempt to obtain representation on the board of directors").

14           The harms that would be suffered by Aruze USA if it is unable to exercise

15   its rights as a stockholder at the upcoming stockholder meeting(s) are quintessential

16   examples of the kinds of harm that a preliminary injunction is designed to prevent.

17       **C.      Aruze USA is Likely to Succeed on the Merits Regarding the Invalidity
18               of the Purported Redemption of Its Shares**

19           In addition to the irreparable harm that would be imposed on Aruze USA if

20   Wynn Resorts were permitted to conduct its stockholder meetings without recognizing

21   Aruze USA's ownership rights, Aruze USA is likely to succeed on the merits of its

22   argument regarding the invalidity of the purported redemption.  This is because the

23   express contractual provisions make the redemption restriction inapplicable to Aruze USA

24   and because the primary purpose of the redemption was to disenfranchise Aruze USA.

25       **1.      The Redemption Was Improper Because the Redemption
26               Restriction Does Not Apply to Aruze USA's Shares**

27           The Board's attempt to use the redemption provision of the Articles of

28   Incorporation against Aruze USA was improper because that provision cannot be applied

-12-

MOTION FOR PRELIMINARY INJUNCTION

1   to Aruze USA's shares.  A corporation's articles of incorporation form the equivalent of a

2   contract between a stockholder and the corporation.  See Schram v. Smith, 97 F.2d 662,

3   664 (9th Cir. 1938) (finding Arizona contract law principles applied to articles of

4   incorporation); O'Connor v. North Truckee Ditch Co., 17 Nev. 245 (1883) (holding that

5   the certificate of incorporation forms an agreement between the stockholders and the

6   corporation); see also Benihana of Tokyo, Inc. v. Benihana, Inc., 906 A.2d 114, 120 (Del.

7   2006) ("It is settled law that certificates of incorporation are contracts, subject to the

8   general rules of contract and statutory construction").

9           However, this does not mean that all aspects of a corporation's articles of

10  incorporation must apply uniformly to all stockholders.  Because the articles form an

11  agreement between the corporation and its stockholders, the corporation is free to

12  negotiate different terms with particular stockholders.  See Darnet Realty Assocs., LLC v.

13  136 East 56th Street Owners, Inc., 153 F.3d 21, 28 (2d Cir. 1998) (recognizing that a

14  corporation's agreement with a stockholder may supersede the company's articles of

15  incorporation if reflected by the intent of the agreement); cf. Nev. Rev. Stat. § 78.242(2)

16  (stockholders and corporations may enter into private agreements regarding restrictions on

17  shares).[9]  That is precisely what happened in this case.  The redemption restriction in

18  Wynn Resorts' Articles of Incorporation does not govern the shares held by Aruze USA.

19              a.      **Aruze USA's Investment in Wynn Resorts Is Controlled**
20                      **By the Terms of the Contribution Agreement**

21          In 2002, Aruze USA and the other owners of Valvino decided to form a

22  corporation that could pursue a public offering of securities to help develop the new Wynn

23  resort and casino properties, to be known as "Wynn Resorts, Limited."  (See Privette

24  Decl. at ¶¶ 1-3.)  On April 11, 2002, prior to the filing of the Articles of Incorporation for

---

25  [9]  See also Bagdon v. Bridgestone/Firestone, Inc., 916 F.2d 379, 383 (7th Cir. 1990) ("Investors
26  may strike agreements between themselves on many subjects, under many bodies of law . . .").
    Indeed, Wynn Resorts' Articles of Incorporation themselves expressly permit the waiver of the
27  redemption provisions "in any instance" where the Board determines such a waiver would be in
    the best interest of the Company.  (See Privette Decl. at ¶ 19, Ex. S at 19.)

28

1   Wynn Resorts, Mr. Wynn and Aruze USA entered into the Stockholders Agreement,

2   which imposed certain restrictions on the sale of the stock they were to receive in

3   "NewCo," the entity that would become Wynn Resorts.  (Id. at ¶ 6, Ex. F (April 11, 2002

4   Stockholders Agreement).)  On June 3, 2002, Mr. Wynn, on behalf of Wynn Resorts,

5   caused the filing of the Company's initial Articles of Incorporation.  Notably, **the Articles**

6   **of Incorporation did not include any restriction establishing Wynn Resorts'**

7   **purported right to redeem shares held by "Unsuitable Person[s]."**  (Privette Decl. at

8   ¶ 12, Ex. L (June 3, 2002 Articles of Incorporation of Wynn Resorts).)

9           At this point, however, Wynn Resorts was still effectively a legal shell.  In

10  particular, the owners of Valvino still had to decide on what terms they would transfer

11  their LLC membership interests to the new entity.  Accordingly, on June 11, 2002, Wynn

12  Resorts, Mr. Wynn, Aruze USA and another Valvino member entered into the

13  Contribution Agreement, the critical controlling document that establishes the terms by

14  which the Valvino members agreed to contribute their membership interests to Wynn

15  Resorts in exchange for the shares of common stock of Wynn Resorts.  (Id. at ¶ 3, Ex. C at

16  2 (June 11, 2002 Contribution Agreement).)  In short, the Contribution Agreement

17  establishes the terms by which Aruze USA agreed to invest in Wynn Resorts, including

18  any restrictions that would apply to the Wynn Resorts' stock that Aruze USA would be

19  acquiring.

20              **b.    The Contribution Agreement Precludes Any Restrictions**
21                     **on Aruze USA's Shares of Wynn Resorts' Stock Unless**
22                     **Aruze USA Authorizes the Restriction in Writing**

23          The Contribution Agreement makes clear that any restrictions on the shares

24  to be provided to Aruze USA are limited to those that were set forth in the parties' various

25  written agreements as they existed at the time they entered into the Contribution

26  Agreement.  The Contribution Agreement's integration clause states:

27              This Agreement, the Stockholders Agreement, and the
                Operating Agreement contain the entire understanding of the
28              parties with respect to the subject matter hereof or thereof.

1
2
3
4

> **There are no restrictions, agreements, promises, representations, warranties, covenants, or undertakings with respect to the subject matter hereof other than those expressly set forth or referred to herein or therein**. This Agreement, the Stockholders Agreement, and the Operating Agreement supersede all prior agreements and understandings between the parties with respect to their subject matter.

5    (Id., Ex. C at 4 (emphasis added).)  At the time that the Contribution Agreement was

6    entered into between Aruze USA and Wynn Resorts, there was no redemption restriction

7    applicable to Wynn Resorts' common stock under the Articles of Incorporation.  See

8    Brunzell v. Woodbury, 85 Nev. 29, 33, 449 P.2d 158, 160 (1969) ("When the parties have

9    deliberately put their agreement in writing, in such language as imports a legal

10   consideration, it is conclusively presumed that the whole engagement and the extent and

11   manner of their undertaking is there expressed").

12          Furthermore, the Contribution Agreement establishes that Wynn Resorts

13   could not later change or add to the restrictions on Aruze USA's rights with respect to the

14   stock without obtaining Aruze USA's written consent:

15
16
17
18
19

> Amendment and Waiver.  **This Agreement may not be modified or amended except by an instrument in writing signed by the Corporation and all the Holders.  No waiver of any provision of this Agreement or of any rights or obligations of any party under this Agreement shall be effective unless in writing and signed by the party or parties waiving compliance**, and shall be effective only in the specific instance and for the specific purpose stated in that writing.

20   (Privette Decl. at ¶ 3, Ex. C at 3 (emphasis added).)  Yet, shortly after the parties entered

21   into the Contribution Agreement, but before Aruze USA received its common stock of

22   Wynn Resorts, Mr. Wynn unilaterally amended Wynn Resorts' Articles of Incorporation

23   to include the provision that purports to give the Board authority to redeem the shares of

24   "unsuitable" stockholders.  At the time, Mr. Wynn was the sole stockholder and director

25   of Wynn Resorts and therefore was the only stockholder who voted on the amendment to

26   the Articles of Incorporation.  (Id. at ¶ 13, Ex. M (September 10, 2002 Amended and

27   Restated Articles of Incorporation).)  In light of the Contribution Agreement, however,

28

-15-

Mr. Wynn's unilateral change to Wynn Resorts' Articles of Incorporation never has applied to the shares issued to Aruze USA.

Wynn Resorts' invocation of the redemption restriction undermines the purpose and contradicts the terms of the Contribution Agreement.  In exchange for Aruze USA's membership interests in Valvino, Aruze USA was to receive the common stock of Wynn Resorts with certain rights and restrictions attached to that common stock as specified in the Contribution Agreement.  Wynn Resorts now claims that it could ignore the terms of the Contribution Agreement.  It apparently believes it could provide Aruze USA with more restrictive common stock than Aruze USA bargained for when exchanging Aruze USA's LLC interests in Valvino.

Under the plain terms of the Contribution Agreement, such a unilateral act by Wynn Resorts is not permitted.  Wynn Resorts never asked for or received written authorization from Aruze USA to add the redemption restriction on its Wynn Resorts' stock.  As a result, pursuant to the Contribution Agreement, the redemption restriction that Mr. Wynn added to Wynn Resorts' Articles of Incorporation – while it may apply to other Wynn Resorts stockholders – does not and cannot apply to Aruze USA's shares of Wynn Resorts stock by virtue of the binding agreement with Wynn Resorts.  See Ringle v. Bruton, 120 Nev. 82, 93 (2004) ("[W]hen a contract is clear, unambiguous, and complete, its terms must be given their plain meaning and the contract must be enforced as written; the court may not admit any other evidence of the parties' intent because the contract expresses their intent."); Ellison v. California State Auto. Ass'n, 106 Nev. 601, 603 (1990) ("It has long been the policy in Nevada that absent some countervailing reason, contracts will be construed from the written language and enforced as written").  Consequently, the Board never had the right to redeem Aruze USA's shares, and that purported redemption is void *ab initio*.

MOTION FOR PRELIMINARY INJUNCTION

1

2       **2.     The Purported Redemption of Aruze USA's Shares Constituted a Breach of the Board's Fiduciary Duties Because The Primary Purpose of the Redemption of Aruze USA's Shares Was to Interfere with the Effectiveness of a Stockholder Vote**

3

4       Because the Board's attempt to exchange Aruze USA's shares for debt

5 entirely failed to achieve its supposed objective – elimination of the potential for scrutiny

6 of Wynn Resorts by the Nevada Commission – the only effect of the redemption was to

7 deprive Aruze USA of its rights as a stockholder of Wynn Resorts.  These ineffective and

8 precipitous actions are not entitled to the protection of the business judgment rule, a

9 presumption which does not apply when directors act "for the *primary purpose* of

10 interfering with the effectiveness of a stockholder vote[.]"  Shoen, 885 F. Supp. at 1341.

11 Under these circumstances, "the board bears 'the heavy burden of demonstrating a

12 compelling justification . . . '" for its action.  Id. (quoting Blasius Indus. v. Atlas Corp.,

13 564 A.2d 651, 661 (Del. Ch. 1998).)  The Board simply cannot do so here.  When

14 analyzing whether a board's actions were taken primarily to disenfranchise a stockholder,

15 courts in this District look to circumstantial evidence and consider factors including the

16 timing of the board action and the stated purpose of the action.  See Hilton Hotels Corp. v.

17 ITT Corp., 978 F. Supp 1342, 1349 (D. Nev. 1997) (granting permanent injunctive relief

18 where board action threatened the stockholder franchise).  In this case, the only plausible

19 inference to be drawn from these factors is that the Board acted for the purpose of

20 interfering with Aruze USA's voting rights.

21       While the Board suggested that it acted to redeem the shares of Aruze USA

22 so as to insulate the Company from an entity it deemed "unsuitable," the redemption in

23 reality did no such thing.  To complete the redemption, Wynn Resorts issued a promissory

24 note for more than $1.9 billion to Aruze USA, transforming Aruze USA from the

25 Company's largest stockholder to its largest holder of debt securities.  See Nev. Rev. Stat.

26

27

28

MOTION FOR PRELIMINARY INJUNCTION

§ 463.643(9).[10]  Yet Nevada law is clear that the Nevada Commission may investigate a gaming licensee because of an affiliation with an unsuitable stockholder *or debtholder*. Nev. Rev. Stat. § 463.643(7) (any "unsuitable" person "shall not hold directly or indirectly" a "voting security" or a "debt security").  Thus, the redemption was legally incapable of achieving its stated purpose because it merely converted Wynn Resorts' largest stockholder into its largest debtholder.

The tremendous haste with which the Board acted to redeem Aruze USA's shares only confirms that the Board's true motive was to strip its largest stockholder of its voting franchise.  There was no emergency.  Only days after receiving a report alleging improper conduct by Aruze USA, Universal, and Mr. Okada,[11] and without allowing any of the subjects to respond to the allegations, the Board voted to exercise the redemption restriction against Aruze USA.  To explain its highly unusual action, the Board made reference to the Company's obligations as a Nevada gaming licensee.  (See Privette Decl. at ¶ 8, Ex. H (Wynn Resorts Press Release (Feb. 19, 2012).)  No law or regulation in Nevada, however, requires or even encourages gaming companies to redeem stock prior to a determination of unsuitability by the Nevada Commission.  Regardless, the Company's gaming licenses never faced an imminent risk.

By advancing its own premature "judgment" as to a question of suitability, the Board disregarded the well-established procedures and authority of the Nevada Commission for no apparent reason.  The Nevada Commission, which has the sole power to grant and withdraw gaming licenses, has in place a well-established process for

---

[10]  The Nevada statute defines "debt security" to mean "any instrument generally recognized as a corporate security representing money owed and reflected as debt on the financial statement of a publicly traded corporation, including, but not limited to, bonds, notes and debentures."  Nev. Rev. Stat. § 463.643(9).

[11]  That report, flawed and incomplete as it is, comprised the sole basis for the Board's precipitous actions.  The Board is therefore limited to defending its actions solely by reference to the report. Aruze USA and Universal dispute the allegations contained in the report, and look forward to addressing those allegations at trial.  Because it is not necessary for the Court to resolve those allegations as part of this Motion, however, Aruze USA and Universal have not addressed those allegations here.

1   investigating and removing so-called "unsuitable persons" from positions of potential

2   influence within the gaming industry – **before** any affiliates of these "unsuitable persons"

3   are threatened with loss of their gaming licenses.  Nev. Rev. Stat. § 463.310 (1)-(2).

4   Under this regime, a licensee or affiliated person possesses basic due process rights.  The

5   State Gaming Control Board (the "Nevada Board") files a complaint that the Nevada

6   Commission serves on the licensee and to which the licensee can respond.  Id. at

7   § 463.310(2)(b).  A licensee has the right to be heard and to receive and produce

8   discovery prior to a determination by the Commission.  Id. at § 463.3125-3145; Nev.

9   Gaming Comm'n Reg. § 7.070, et seq.

10         Even if the Nevada Commission were to issue a determination of

11   unsuitability, it would then "serve[] notice" to the licensee "that a person is unsuitable to

12   be a stockholder or to have any other relationship or involvement . . ." with the

13   corporation.  Nev. Gaming Comm'n Reg. 16.440(2).  Only if the licensee then "fail[ed] to

14   pursue all lawful efforts to require [the] unsuitable person to relinquish his voting

15   securities . . ." could its gaming license potentially be in any jeopardy whatsoever.  Id. at

16   16.440(2)(d).  Plainly, there was no need for the Board to act so precipitously to address a

17   perceived risk of Aruze USA's unsuitability in this case – especially where the Board's

18   actions so obviously failed to achieve that objective as a matter of law.

19         In view of the above, the only plausible explanation for the Board's

20   redemption decision is that it was meant to deny Aruze USA's stockholder franchise in

21   plain violation of the Board's fiduciary duties.  See Wisconsin Inv. Bd. v. Peerless Sys.

22   Corp., No. 17637, 2000 WL 1805376, at *13 (Del. Ch. Dec. 4, 2000) ("The fiduciary duty

23   of loyalty between a board of directors and the shareholders of a corporation is always

24   implicated where the board seeks to thwart the action of the company's shareholders").

25   There is an obvious motive for the Board's conduct:  the disenfranchisement of Aruze

26   USA would facilitate the Board's efforts to remove Mr. Okada as a director of the

27   corporation.  (See Privette Decl. at ¶ 9, Ex. I at 1, 3-4 (Wynn Resorts Ltd., Preliminary

28   Proxy (Form PRE 14A) (March 7, 2012)).)  With Aruze USA's 20% percent stake in the

1   Company sidelined, Wynn Resorts will be better positioned to achieve the supermajority

2   vote required to remove Mr. Okada from the Board and further empower Wynn.  If Aruze

3   USA were eliminated as a stockholder, Mr. Wynn could further concentrate his control of

4   the Company.

5            To date the Board has offered no justification, let alone the required

6   "compelling justification," to defend its decision to interfere with the stockholder

7   franchise.  See Shoen, 885 F. Supp. at 1341.  Accordingly, Aruze USA is likely to prevail

8   on the merits of its breach of fiduciary duty claim as to the propriety of the redemption,

9   and the preliminary injunction should issue.

10           **D.      The Balance of Hardships Favors Aruze USA**

11           Wynn Resorts' refusal to allow Aruze USA to exercise its rights as a

12   stockholder constitutes a significant hardship for Aruze USA that cannot be remedied

13   through a post-resolution award of damages.  Meanwhile, Wynn Resorts faces no hardship

14   if an injunction were to be issued.  Accordingly, the balance of the equities is squarely in

15   favor of the grant of a preliminary injunction.[12]

16           **1.      Extensive Authority Favors Granting Preliminary Relief When a
17                     Company Attempts to Deprive Stockholders of the Right to Vote**

18           Where a company attempts to deprive a stockholder of its fundamental right

19   to participate meaningfully in corporate elections, the balance of the equities weighs

20   heavily in the stockholder's favor.  See Hubbard, 1991 WL 3151, at *13 (holding that the

21   "policy underlying the shareholders' fundamental right to exercise their franchise

22   significantly outweighs the policies favoring the continued enforcement of [a disputed

23   directorial action]" and noting that "[t]he harm caused to shareholders from enforcing [a

24   disputed provision] will greatly outweigh its benefits"); see also Int'l Banknote Co., 713

25

26   [12]  In addition, basic principles of corporate law dictate that "[t]he power granted by a provision
     in articles of incorporation permitting the board of directors to call outstanding common stock for
27   retirement must not be exercised oppressively for the purpose of discriminating against a single
     stockholder or group of stockholders."  18A Am. Jur. 2d Corporations, § 456 (2004).
28

-20-

1    F. Supp. at 628 (granting stockholders' preliminary injunction to stop the enforcement of

2    a bylaw impairing stockholders' right to vote and unnecessarily frustrating them in

3    attempt to obtain representation on the board of directors).[13]

4           A grant of injunctive relief is the appropriate equitable remedy in cases

5    where a stockholder is facing deprivation of its voting rights.  See Shoen, 885 F. Supp. at

6    1352 (finding that the balance of the hardships weighs in the plaintiff's favor in the grant

7    of a preliminary injunction barring the defendant from holding its annual meeting)

8    (internal citation omitted); see also David P. Simonetti Rollover IRA v. Margolis, No.

9    3694-VCN, 2008 WL 5048692, at *13 (Del. Ch. June 27, 2008).  Courts in this District

10   have not hesitated to grant injunctive relief in cases where corporate control contests

11   implicate stockholder franchise issues.  See Hilton Hotels Corp., 978 F. Supp. at 1351.

12           **2.      Wynn Resorts Would Suffer No Comparable Hardship From the
13                     Grant of a Preliminary Injunction**

14           In contrast to the severe and irreparable harm Aruze USA faces, Wynn

15   Resorts would suffer no comparable injury if it were precluded from stifling Aruze USA's

16   rights as a stockholder.  Any claim that Wynn Resorts faces a hardship because the

17   suspension of the redemption would imperil the Company's gaming licenses is simply not

18   credible.  As detailed above, by making Aruze USA a debtholder, the redemption failed to

19   insulate Wynn Resorts from Aruze USA; as such, an injunction that forestalls the effects

20   of the redemption will have no impact whatsoever on the Company's stated purpose for its

21   redemption decision.  Further, there is no imminent threat of harm to the Company from

22   its ongoing affiliation with Aruze USA – no order has issued finding Aruze USA to be an

23   unsuitable affiliate for a company with a gaming license.  Other potential claims for

24   hardship would be similarly unavailing.  See, e.g., ODS Techs., L.P. v. Marshall, 832

25   A.2d 1254, 1263 (Del. Ch. 2003) ("[I]t is axiomatic that enjoining a shareholder meeting

26   _____

27   [13]  Courts have long recognized that the right to vote in a corporate election is as crucial to the
     legitimacy of corporate governance as is the right to vote in civil elections is to democratic civil
28   governance.  See, e.g., Durkin v. Nat'l Bank of Olyphant, 772 F.2d 55, 59 (3rd Cir. 1985).

1   may affect the price of a company's stock.  But this concern . . . is insufficient to allow a

2   tainted shareholder vote to proceed").

3       **3.      Wynn Resorts' Wrongdoing Also Tips the Balance of Hardships
                   in Aruze USA's Favor**

4

5           Lastly, any alleged injury attendant to the grant of a preliminary injunction

6   here is a consequence of Wynn Resorts' own wrongdoing.  The Board wrongfully

7   attempted to disenfranchise Aruze USA and by its actions has violated the Stockholders

8   Agreement, Contribution Agreement, and Nevada law by purporting to redeem Aruze

9   USA's shares via the redemption restriction.  Courts find that the balance of the equities

10  undoubtedly tips in the favor of the moving party where the preliminary injunction is the

11  result of the defending party's own wrongdoing.  See La. Mun. Police Emps. Ret. Sys. v.

12  Crawford, Nos. 2635-N & 2663-N, 2007 WL 625006, at *1 (Del. Ch. Feb. 13, 2007)

13  ("[I]n considering the balance of equities between plaintiffs and defendants, it is relevant

14  to note that any wounds to defendants are entirely self-inflicted").  Had Wynn Resorts not

15  employed pretextual and hyperbolic justifications to embark upon an extraordinary course

16  of action, it would not be facing whatever "harm" it now alleges it will suffer if its

17  stockholder meeting is delayed.  In sum, there is no question that the balance of the

18  hardships here counsels in favor of the grant of preliminary injunctive relief.

19      **E.      A Preliminary Injunction Would Serve the Public Interest**

20          The public interest weighs heavily in favor of the relief sought here.  Courts

21  across the country have recognized universally that "interference with shareholder voting

22  is an especially serious matter . . . because it undercuts a primary justification for allowing

23  directors to rely own their judgment . . . ."  Shoen, 885 F. Supp. at 1340; see also Treco,

24  Inc., 572 F. Supp. at 1450 ("[P]laintiffs' attempt to obtain representation on Lincoln's

25  Board furthers the legitimate public interests of corporate democracy and participation by

26  shareholders in the management of corporations which they have an interest"); Beztak

27  Co., 811 F. Supp. at 283-84; ER Holdings, Inc., 735 F. Supp. at 1101-02; Danaher Corp.,

28  1986 WL 7001, at *14.  In other words, "[t]he shareholder franchise is the ideological

-22-

1  underpinning upon which the legitimacy of directorial power rests." <u>Blasius</u>, 564 A.2d at
2  659.  The directors of Wynn Resorts abused their power by interfering with the
3  stockholder franchise, and the public has an interest in preventing the harm that Aruze
4  USA would suffer as a result.

5         Further, the public interest weighs in favor of granting preliminary relief
6  because the Board's stated purpose for the purported redemption clearly was nothing more
7  than pretext.  Deception and manipulation of stockholders by the officers and directors of
8  public companies is condemned by both Nevada and federal law.  In this case, where the
9  Board's stated justification was not its actual motivation for the decision to redeem Aruze
10 USA's shares, the public interest favors holding the Board accountable before irreparable
11 harm results.

12         **F.     A Preliminary Injunction Will Preserve the Status Quo**

13         A preliminary injunction is not an adjudication on the merits.  This
14 preliminary injunction seeks to preserve the status quo and prevent irreparable loss of
15 rights before judgment.  <u>Textile Unlimited, Inc. v. A. BMH & Co.</u>, 240 F.3d 781, 786 (9th
16 Cir. 2001).  Maintaining the status quo allows Aruze USA to continue as a stockholder of
17 Wynn Resorts as it has been since the formation of Wynn Resorts.  If Aruze USA is not
18 allowed to vote or otherwise is precluded from exercising its rights as a stockholder, the
19 status quo will be fundamentally altered.  Therefore, a preliminary injunction should be
20 issued that maintains Aruze USA's rights as a stockholder until a final determination on
21 the merits.

22 //
23 //
24 //
25 //
26 //
27 //
28

-23-

IV.     CONCLUSION

For the foregoing reasons, Aruze USA respectfully requests that the Court grant its Motion for Preliminary Injunction and enjoin Wynn Resorts from infringing upon Aruze USA's stockholder rights until the Court enters a final judgment in this action.

DATED:  June 14, 2012          Respectfully Submitted,

PAUL HASTINGS LLP


By:_____/s/ HOWARD M. PRIVETTE


William F. Sullivan*
Thomas A. Zaccaro*
Howard M. Privette*
Thomas P. O'Brien*
John S. Durrant*
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Telephone:   (213) 683-6000
Facsimile:    (213) 683-0705

DAVIS POLK & WARDWELL LLP
Linda Chatman Thomsen**
Paul Spagnoletti**
Greg D. Andres **
450 Lexington Avenue
New York, NY 10017
Telephone:   (212) 450-4000
Facsimile:    (212) 701-5800

LIONEL SAWYER & COLLINS
Samuel S. Lionel
Paul R. Hejmanowski
Charles H. McCrea, Jr.
1700 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101
Telephone:   (702) 383-8888
Facsimile:    (702) 383-8845

Attorneys for Defendants and Counterclaimants
ARUZE USA, INC. and UNIVERSAL
ENTERTAINMENT CORPORATION
* admitted pro hac vice
** will comply with Local Rule 10-2 governing pro
hac vice petitions within the required timeframe

-24-

MOTION FOR PRELIMINARY INJUNCTION

1

## <u>CERTIFICATE OF SERVICE</u>

2

Pursuant to Federal Rule of Civil Procedure 5(b), I hereby certify that I am

3

an employee of Paul Hastings LLP and that on this 14th day of June, 2012, I caused the

4

document entitled:

5

**MOTION FOR PRELIMINARY INJUNCTION BY ARUZE USA,**
**INC. AND UNIVERSAL ENTERTAINMENT CORPORATION**

6

7

to be served to parties in this action via the Court's CM/ECF System.

8

9

/s/ Howard M. Privette

10

Howard M. Privette

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR PRELIMINARY INJUNCTION